J. TONY SERRA, SBN 32639
SARA ZALKIN, SBN 223044
506 Broadway
San Francisco CA 94133
Telephone: 415/986-5591

Attorneys for Defendant
MICHAEL MARTIN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHAEL MARTIN,

Defendant.
_______________________________/

CR 08-0099 CW

DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DEPARTURE

**I.**

**INTRODUCTION**

Pursuant to a written plea agreement, on March 26, 2008 defendant MICHAEL MARTIN entered a plea of guilty to count one of the information, alleging a conspiracy to manufacture and distribute a mixture and substance containing a detectable amount of marijuana in violation of 21 U.S.C. § 846.

The parties agree that level 20 is the appropriate base offense level for the purpose of calculating the Federal Sentencing Guidelines. The parties further agree to a two-level upward adjustment, pursuant to U.S.S.G. §§ 3B1.1(a) and (b) for

PIER 5 LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
FAX: (415) 421-1331

his role as an "organizer, leader, manager, or supervisor" and a three level downward adjustment pursuant to U.S.S.G. § 3E1.1(a) and (b), (acceptance of responsibility), for an **adjusted offense level of 19.**

The plea agreement specifies that Mr. Martin may seek a downward departure from the calculated offense level, which the government may oppose.

The plea agreement further specifies that Mr. Martin retains the right to request a substitute confinement sentence outside the Guideline range pursuant to 18 U.S.C. §3553.

A sentence in the Guideline range of 30-37 months would be greater than necessary to fulfill the purposes of sentencing as set forth in 18 U.S.C. § 3553(a)(2). United States Probation agrees, in recommending a sentence of 24 months, predicated upon Mr. Martin's self-reported motivation for his involvement and recognizing that California's Compassionate Use Act "muddles up what would otherwise be clear."

As discussed herein, Mr. Martin urges this Court to consider substitute confinement, given the mitigating nature and circumstances of the offense and his personal history and characteristics, to wit:

A. The conflict between state and federal law, in conjunction with Mr. Martin's good-faith belief in the medical efficacy of marijuana, and especially marijuana in edible form;

B. Super acceptance of responsibility, including his immediate surrender to authorities upon learning of the charges; his plea of guilty early in the

PIER 5 LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
FAX: (415) 421-1331

proceedings; and his written statement to Probation;

C. His post-offense rehabilitation, including his excellent performance on pretrial release and voluntary participation in counseling to address his depression, anxiety and alcohol problems;

D. Physical/mental conditions that would not be adequately addressed in prison;

E. Harsh impact of incarceration on innocent family members, including his wife; their two young children, and his disabled mother;

F. Mr. Martin's relatively young age, excellent employment history, academic achievements, and ability to provide legitimate support for his family;

G. Mr. Martin’s exceptional good works, charitable and community activities predating this prosecution;

H. Mr. Martin’s support in the community, reflected in the numerous letters of support received on his behalf;

I. Mr. Martin was not motivated by profit; in fact, he has a negative net worth of $147,000 according to the presentence investigation;

J. Disparity in sentencing given co-defendants’ Anderson and McLinn misdemeanor probationary sentences;

K. Departure would substitute community confinement for incarceration;

L. Taxpayer costs of incarceration;

M. The "convergence of factors" analysis.

PIER 5 LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
FAX: (415) 421-1331

The Court must consider the factors set forth in 18 U.S.C. 3553(a)(2) in crafting a sentence "sufficient, but not greater than necessary":

(A) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) To afford adequate deterrence to criminal conduct;

(C) To protect the public from further crimes of the defendant; and

(D) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Considering all the circumstances, this Court clearly has the discretion to sentence Mr. Martin to substitute confinement.

**II.**

**BACKGROUND**

Michael Martin stands before this Court with a heavy heart. He fully accepts responsibility for his actions, and he accepts the rule of law. At the same time, he is greatly disturbed by the cognitive dissonance of marijuana's continued classification as a "Schedule I" controlled substance, notwithstanding numerous peer-reviewed studies establishing its medical efficacy, (including the 1999 study by the Institute of Medicine, commissioned by the Office of National Drug Control Policy).

Attached as appendices are materials that Mr. Martin hopes the Court will consider with respect to factors "A" and "B" that he proposes in mitigation. Appendix A is a copy of the "Opinion and Recommended Ruling, Findings of Fact, Conclusions of Law and Decision of Administrative Law Judge" Francis L. Young of the

PIER 5 LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
FAX: (415) 421-1331

United States Department of Justice, Drug Enforcement Administration (September 6, 1988; Docket No. 86-22), which recommended marijuana's transfer to Schedule II after extensive hearings.[1] The DEA has not acted on this recommendation to date.

Appendix B is a copy of a "Request for Correction of Information Disseminated by [the United States Department of Health and Human Services] Regarding the Medical Use of Marijuana," submitted by Americans for Safe Access on October 4, 2004, rebutting the Department's continued pronouncement that marijuana "has no currently accepted medical use in treatment in the United States."

Attached as Appendix C is a compilation of medical marijuana endorsements and statements of support by government panels; medical organizations; etc.[2]

Attached as Appendix D is a position paper of the American College of Physicians entitled "Supporting Research into the Therapeutic Role of Marijuana," approved by the Board of Regents in January, 2008.  In addition to urging reclassification from Schedule I, the paper also "encourages the use of nonsmoked forms of THC that have proven therapeutic value."[3]

Mr. Martin's conduct unquestionably facilitated the use of nonsmoked forms of THC, intended for thereapeutic value to patients who are qualified to seek relief from cannabis pursuant

---

[1]  The transcript of the prehearing conference on the petition for rescheduling and the subsequent hearings comprises 15 volumes. See Appendix B, page 4, footnote 4.

[2]  Courtesy of Americans for Safe Access.

[3]  Executive Summary, page 3.

PIER 5 LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
FAX: (415) 421-1331

to California Health and Safety Code § 11362.5 (the "Compassionate Use Act" of 1996). He refers the Court to his written statement that he submitted to Probation and which is set forth at pages 6 through 11 of the Presentence Report.

The Presentence Report provides a thorough personal and family history that will only be summarized here to avoid repetition. Mr. Martin was raised by a single mother, Kimberly Miller. From a young age it was apparent that he was highly intelligent; inquisitive; independent; and hyperactive. In early adolescence he was prescribed Ritalin for Attention Deficit Hyperactivity Disorder but could not tolerate the side effects. He found that marijuana helped him focus better, without adverse effects. He has a familial history of alcohol abuse and reports drinking at an early age (12 or 13). Mr. Martin is well aware that his drinking has caused him problems. To his credit, approximately one month before his arrest in this matter he stopped drinking, which Probation confirmed with his wife, Elinor Clark Martin.

Mr. Martin describes his deceased father as an alcoholic who was not a consistent presence in his life. His use of marijuana as a teen caused problems in his relationship with his father. His father suffered from cancer but refused to try marijuana because he considered it an "illicit drug." After September 11, 2001 Mr. Martin traveled to New York in an effort make peace, but his father was too ill to open the door or answer the telephone. He passed away shortly thereafter.

Mr. Martin attributes all that is positive in his life to Elinor and their children, as well as his mother's unconditional

PIER 5 LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
FAX: (415) 421-1331

love and support. He and Elinor have known each other for twelve years and married in May, 2007. She states he has always been a good provider, which allows her to stay at home with their children, Tyler, who is now four years old, and Lucas, age one.

Counsel submitted a wealth of character letters received on Mr. Martin's behalf to Probation and assumes their receipt by the Court. Mr. Martin submits letters subsequently received on his behalf as **Exhibit A**.

III.

**THIS COURT MAY CONSIDER *ALL* RELEVANT FACTORS IN FASHIONING AN APPROPRIATE SENTENCING.**

In United States v. Booker, 543 U.S. 220 (2005) the Court severed 18 U.S.C.A. §§ 3553(b)(1) and 3742(e), rendering the Guidelines advisory. While the sentencing court must *consider* the Guidelines, the court may tailor the sentence in light of other statutory concerns. See id.

Section 3553(a)(1) expressly provides for consideration of the characteristics of the defendant at sentencing. In rendering the Guidelines advisory, the Supreme Court restored the obligation upon the district courts to consider § 5H *et seq.*, effectively prohibited from consideration prior to Booker. Furthermore, § 3553(a)(5) and post-Booker case law calls for consideration of policy statements issued by the Sentencing Commission. The following "Specific Offender Characteristics" may provide a basis for downward departure: Age in Combination with Other Factors, U.S.S.G. §5H1.1; Vocational Skills, U.S.S.G. § 5H1.2; Employment Record, U.S.S.G. § 5H1.5; Family Responsibility and Community ties, U.S.S.G. § 5H1.6; Role in the

PIER 5 LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
FAX: (415) 421-1331

Offense, U.S.S.G. § 5H1.7; and Criminal History, U.S.S.G. § 5H1.8.

For a wealth of reasons, in the present case the advisory guidelines are "greater than necessary," and the purposes of sentencing would be satisfied by a sentence below the Guideline range of 30-37 months. United States Probation concurs, in recommending a lesser sentence of 24 months.

Even prior to Booker, courts long recognized that where the sentence called for by the Guidelines would result in punishment greater than necessary, the court can depart downward. United States v. Redemann, 295 F.Supp.2d 887 (E.D. Wisc. 2003); United States v. Harrington, 947 F.2d 956, 964 (D.C. Cir. 1991)(Edwards, J., concurring)[Guidelines "often produce harsh results that are patently unfair because they fail to take account of individual circumstances]"; U.S. v. Molina, 963 F.Supp. 213, 215 (1997 E.D.N.Y.) [Commenting on "[t]he all-too-familiar harshness required by rigid federal Guideline ... and the depredations they wreak upon individual defendants and their families."]

More recently, the United States Supreme Court has held that district court sentences are reviewed for abuse of discretion, and district courts are not required to find extraordinary circumstances in sentencing outside of the Sentencing Guidelines. See Gall v. United States, 128 S.Ct. 586 (2007). Gall was involved with distribution of ecstacy (MDMA) and the presentence report recommended a Guideline range of 30-37

PIER 5 LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
FAX: (415) 421-1331

months.[4] See id. at 592-593. After considering a number of factors, the district court sentencing him to a probationary term of 36 months, finding that any term of imprisonment would be "counter effective." See id. at 593.

Thus, the Sentencing Guidelines are but *one* factor to be considered at sentencing. *See* Kimbrough v. United States, 128 S. Ct. 558, 564 (2007). In Kimbrough, the Court held that district courts may exercise their discretion in sentencing to account for and alleviate the substantial disparity in sentencing for crack versus powder cocaine. See id.

In this case, a sentence based strictly on the Guidelines would not adequately take into account Mr. Martin's offense conduct, nor his particular characteristics and attributes, discussed below as factors in mitigation.

A. The Conflict Between State and Federal law, in Conjunction with Mr. Martin's Good-Faith Belief in Marijuana's Medical Efficacy, Especially in Edible Form.

Thirteen states presently have programs recognizing the medical use of marijuana.[5] Just recently, a California Court of Appeal upheld medical marijuana legislation over claims of federal pre-emption.[6] Medical marijuana is a topic of

---

[4] Coincidentally, the same range contemplated in the plea agreement herein.

[5] To wit: Alaska, California, Colorado, Hawaii, Maine, Maryland, Montana, Nevada, New Mexico, Oregon, Rhode Island, Vermont, and Washington.

[6] See, e.g., County of San Diego v. San Diego NORML, 2008 Cal. App. LEXIS 1176 (Docket No. D050333, Court of Appeal of California Fourth Appellate District, Div. 1) (Filed July 31, 2008); see also City of Garden Grove v. Superior Court, 157 Cal. App. 4 355 (4th Dist. 2007) [state officers may not refuse to

PIER 5 LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
FAX: (415) 421-1331

increasing national prominence and mainstream attention. Recently, on August 18, 2008), the topic was featured in the Los Angeles Times; excerpts are attached hereto as Exhibit B.

As to the changing legal landscape, even Joseph Russoniello, the United States Attorney for the Northern District, who does not support the use marijuana as medicine, questioned the wisdom of ongoing raids of medical marijuana dispensaries, stating at a January 31, 2007 press briefing:

> We could spend a lifetime closing dispensaries and doing other kinds of things and enforcement actions ... shoveling sand against the tide, it would be terribly unproductive and probably not an efficient use of precious federal resources.

Further documenting the changing legal landscape and attached hereto as Exhibit C is Congressman Conyers' letter to the Drug Enforcement Agency seeking answers to the increased frequency of "paramilitary-style enforcement raids" and mentions the instant prosecution. The letter also includes resolutions by state and local officials condemning this trend, as well as the text of Senator Migden's Proposed "Senate Joint Resolution Number 20."

Mr. Martin submits that the foregoing demonstrates unique and extraordinary circumstances that should be considered for purposes of sentencing. See, e.g., United States v. Rosenthal, 266 F. Supp. 2d 1091 (N.D. Cal. 2003) [defendant convicted of cultivating more than 100 marijuana plants for medical use under California law granted safety valve and sentenced to one-day

---

return marijuana pursuant to court order on claim of liability under federal Controlled Substances Act].

PIER 5 LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
FAX: (415) 421-1331

imprisonment, with credit for time served, due, in part, to disparity between state and federal law].

B. Super-Acceptance of Responsibility, Including Immediate Surrender Upon Learning of the Charges and Admission of Guilt at a Very Early Stage.

Mr. Martin's extraordinary acceptance of responsibility can be considered in fashioning his sentence even though he gets credit for that in the Guidelines calculations.

18 U.S.C.S. section 3E1.1(a) states that if the "defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense by two levels." In United States v. Smith, 311 F.Supp.2d 801 (E.D. Wis. 2004), the Court granted a two level downward departure from the heartland of the sentencing guidelines even though defendant also received an offense level reduction for acceptance of responsibility].

In United States v. Brown,985 F.2d 478, 482-83 (9th Cir. 1993), under U.S.S.G. 5K2.0, in light of defendant's confession, the court was permitted to depart downward from the range if it determined that the two point reduction did not adequately reflect the defendant's acceptance or responsibility]. See also United States v. Fagan,162 F.3d 1280, 1284-85 (10th Cir. 1998)[in light of Koon, a court may depart downward where a defendant showed great remorse "to an exceptional degree" even though the defendant already received adjustment for acceptance of responsibility]; United States v. Jaroszenko, 92 F.3d 486 (7th Cir. 1996).

Mr. Martin agrees with paragraph 91 of the Presentence Report, which states: "The probation officer has determined that the defendant's self-disclosed motivation for participating in

PIER 5 LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
FAX: (415) 421-1331

this offense be considered in fashioning an appropriate disposition for this matter." The "self-disclosed motivation" refers to Mr. Martin's written statement, set forth at pages 6 through 11 of the PSR.

Mr. Martin believed in what he was doing and in that regard lacked "criminal intent" in the traditional sense. He openly and notoriously expanded from a small kitchen to providing edibles to a growing number of California residents for whom physicians had recommended the use of medicinal cannabis. There is no evidence of diversion from medical patients (or for that matter to children, despite public comments by the Drug Enforcement Administration).

C. Mr. Martin's Post-Offense Rehabilitation, Including his Exemplary Performance on Pretrial Release and his Voluntary Participation in Counseling to Address his Depression, Anxiety and Alcohol Problems.

While on Pretrial Supervision, Mr. Martin has availed himself of counseling. He has gained a great deal of insight into his life and his motivations. Under Pretrial Supervision he has tested clean from illicit substances.

As his wife Elinor can attest, Mr. Martin has refrained from the use of alcohol, which has caused family problems in the past, while this case has been pending (and in fact had stopped drinking prior to the charges herein).

See United States v. Green, 152 F. 3d 1202 (9th Cir. 1998) [post-sentence rehabilitative efforts, such as exemplary conduct in prison, may be basis for downward departure in case involving manufacture of 4,000 marijuana plants; no abuse to depart downward 11 levels and re-sentence defendant to 30 days; Court

PIER 5 LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
FAX: (415) 421-1331

need not analogize to comparable guideline provisions to explain extent of departure so long as reasonable]; and United States v. DeShon, 183 F.3d 888 (8th Cir. 1999) [where defendant pled to tax evasion, district court did not abuse discretion in departing downward from 30-37 months to 5 months community confinement without work release based on defendant's post-offense rehabilitation].

D. Physical/Mental Conditions That Would Not be Adequately Addressed in Prison.

Mr. Martin is presently scheduled for surgery on September 25th for a knee arthroscopy and anterior cruciate ligament re-construction, which was recommended on July 10 but held up by the doctor's surgery schedule. See Exhibit D, Correspondence from Sabine Von Glinski, M.D, dated July 22, 2008 and July 10, 2008. This surgery requires "very intensive rehabilitation" according to Dr. Von Glinski's letter of July 10, 2008. In that same letter, Dr. Von Glinski requests consideration of house arrest so she could initiate "home health physical therapy" as part of his rehabilitation.

In addition to his knee, Mr. Martin shattered his left heel in 2002, resulting in surgery wherein a steel plate and screws were inserted (documented by Probation). He has chronic pain from this injury.

Also, as noted above, Mr. Martin has a medical history of prescribed medications. He was prescribed Ritalin as a child for hyperactivity and spent time in a residential program as a juvenile. He was seen in 2003 for psychotherapy and the treatment anxiety and depression by Dr. Arlene Noble, and also

PIER 5 LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
FAX: (415) 421-1331

has been treated by Dr. Eugene Schoenfeld.[7] He has sought counseling throughout his life, and is participating in counseling at present.

18 U.S.C. § 3553(a)(2)(D) requires sentencing courts to consider the need for medical care "in the most effective manner." Due to Mr. Martin's chronic pain from his pre-existing heel injury, compounded by what will be a lengthy and undoubtedly painful recovery from his pending knee surgery, he will require special medical attention in the Bureau of Prisons that may not be available.

Mr. Martin's surgeon is willing to initiate "home health physical therapy" in the event the Court considers house arrest as one option for sentencing purposes.

With respect to his ongoing counseling and alcohol abstinence, Mr. Martin submits that consideration of his need for medical care "in the most effective manner" weighs in favor of allowing him to continue his holistic recovery in which he appears to be doing well.

E. Incarceration Would Have Harsh Effect on Innocent Family Members, Including Mr. Martin's Wife; Their Two Young Children, and his Disabled Mother.

As documented in the Presentence Report, Mr. Martin is the sole provider to his wife and young children, who will need to relocate to live with family out of state in the event of his incarceration. The PSR also notes that Mr. Martin had previously assisted his disabled mother. Since his arrest in

[7] At the Court's request counsel will provide corroborating documentation, but hesitates to attach medical records to a publicly-filed document.

PIER 5 LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
FAX: (415) 421-1331

this matter he has not been able to do so. As a consequence of not being able to afford her private caretaker she had to move to assisted living and cannot afford all of her necessary medications.

Family circumstances may provide grounds for departure. See, e.g., United States v. Menyweather, 431 U.S. 692, 700 (9th Cir. 2005) ["In the 'broader appraisal' available to district courts after Booker, courts can justify consideration of family responsibilities, an aspect of defendant's attributes and characteristics, 18 U.S.C. § 3553(a)(1), for reasons extending beyond the Guidelines."]; United States v. Antonakopoulos, 399 F.3d 68, 81 (1st Cir. 2005); United States v. Leon, 341 F.3d 929 (9th Cir. 2000); United States v. Dominguez, 296 F.3d 192 (3rd Cir. 2002); United States v. Galante, 111 F.3d 1029 (2nd Cir. 1997) [affirms 13-level downward departure in drug case from 46-57 months to 8 days where defendant was a conscientious and caring father of two young sons who would have faced severe financial hardship]; United States v. Milikowsky, 65 F.3d 4, 8 (2nd Cir. 1995) ["Among the permissible justifications for downward departure...is the need, given appropriate circumstances, to reduce the destructive effects that incarceration of a defendant may have on innocent third parties."]

F. Mr. Martin's Excellent Employment History, Academic Achievements, and Ability to Support his Family.

As his wife Elinor Clark Martin states, Mr. Martin has always been a good provider to his family. He obtained his Bachelor's in Business Management from St. Mary's College, with

PIER 5 LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
FAX: (415) 421-1331

honors, in 2006. Even before this prosecution, he started "Boing!" a business providing children's play equipment (e.g. "bouncy houses" to schools, community groups, and for use at private parties.

Even pre-Booker, Courts recognized employment and academic accomplishments as factors in fashioning an appropriate sentence. See, e.g., United States v. Thompson, 74 F.Supp.2d 69 (D.Mass. 1999) [Court departed from 87 to 60 months in a drug case because the defendant exhibited a sustained commitment to his family and consistently worked to provide for them]; see also United States v. Big Crow, 898 F.2d 1326, 1331 (8th Cir. 1990) [excellent employment record]; United States v. Jogmohan, 909 F.2d 61 (2nd Cir. 1990) [exceptional employment history; nature of crime].

G. Mr. Martin's Exceptional Good Works, Charitable and Community Activities.

In addition to generating income with his "Boing!" entertainment business, Mr. Martin has provided discounts and donations to schools and non-profit events (such as Habitat for Humanity). See Exhibit E, comprised of "Boing!" Invoices reflecting school discounts and acknowledgment of donation by Habitat for Humanity, East Bay.

Additionally, Mr. Martin has been coaching the "Junior Optimist Baseball League," described more fully by Tiffany Schultz in her letter on Mr. Martin's behalf (submitted to the Court through Probation). Other letters submitted on his behalf by those who know him share a common thread in describing his big heart, generous nature, and willingness to jump in and help

PIER 5 LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
FAX: (415) 421-1331

where help is needed.

Philanthropy can be considered for the purpose of sentencing. See, e.g., United States v. Cooper, 394 F.3d 172 (3rd. Cir. 2005) [with sentencing range 14-21 months, four-level departure for "good works" and sentence of probation was warranted, where defendant donated money to charity and also organized and ran a youth football team in a depressed area, mentored the members and helped several members attend better high schools]; United States v. Serafini, 233 F.3d 758 (3rd Cir. 2000)[community service and charitable works performed by defendant were sufficiently "extraordinary and exceptional" to justify a three-level downward departure, e.g. providing a $300,000 guarantee for medical treatment for terminally ill patient and mentoring an injured college student]; United States v. Conoy, 38 F.3d 893 (7th Cir. 1994)[charitable and civic activities may, if exceptional, provide for a basis for departure].

H. Mr. Martin's Support in the Community, Evidenced by the Numerous Letters in Support Submitted on his Behalf.

Evidenced by the volume and quality of letters submitted on his behalf, Mr. Martin's support in the community is truly exceptional, and is a legitimate basis for consideration at sentencing. See, e.g., United States v. Jones, 158 F.3d 492, 500 (10th Cir. 1998) [affirming downward departure for defendant's history of community service and degree of community support]; United States v. Crouse, 145 F.3d 786, 790 (6th Cir. 1998) [affirming downward departure for defendant's civic involvement and charitable works].

PIER 5 LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
FAX: (415) 421-1331

I. Mr. Martin was Not Motivated by Profit; to the Contrary, he has a Negative Net Worth of $147,000 According to the Presentence Investigation.

As noted in the Presentence Report at page 2:

> [U]nlike other individuals that have been charged with similar offense and were proven to have made substantial money from their offense(s), the defendant had a long-standing involvement in the advocacy for medical marijuana. Additionally, the defendant's business practices left him with approximately $150,000 in debt.

This factor may be considered where there is no serious claim that defendant committed the offense "out of a desire to profit, or that he benefitted financially from his participation in the conspiracy" and where the heartland of the cases contemplated offenses "motivated by a desire for financial gain-either personally or commercially." United States v. Rothberg, 222 F.Supp.2d 1009 (N.D. Ill. 2002).

J. Need to Avoid Disparity in Sentencing Given Co-Defendants Anderson and McLinn's Misdemeanor Probationary Sentences.

18 U.S.C.A. §§ 3553(a)(6) allows the court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" in tailoring a sentence.

Mr. Martin concedes that his conduct is different than that for which Mr. Anderson and Mr. McLinn were convicted. However, he submits that the difference is accounted for by their misdemeanor dispositions, whereas he stands convicted of a felony, and that the Court may still consider the fact that no custodial time was imposed as to Anderson and McLinn in determining his fate.

PIER 5 LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
FAX: (415) 421-1331

K. Departure Would Substitute Community Confinement for Incarceration.

Application Note 6 to U.S.S.G. 5C1.1 authorizes a departure that permits substitution of more community confinement than otherwise authorized for an equivalent number of months of imprisonment for imprisonment for treatment ("*e.g.* substitution of twelve months in residential drug treatment for twelve months of imprisonment.")

L. Taxpayer Costs of Incarceration.

According to the Presentence Report (at page 22), it costs $24,922.00 annually for imprisonment in Bureau of Prisons facility; $22,871.00 for community confinement; and $3,621.64 for supervision by probation officers.

M. The Convergence of Mitigating Factors.

The Ninth Circuit has long held that a "combination of factors" can together constitute a mitigating circumstance justifying departure. See United States v. Cook, 938 F.2d 149 (9th Cir. 1991). In Cook, the Court explained that "[t]here was no reason to be so literal minded as to hold that a combination of factors cannot together constitute a 'mitigating circum-stance.'" Id. at 153; *see also* U.S.S.G. § 5K2.0, Grounds for Departure [acknowledging circumstances that warrant departure may not be listed in Guidelines]. The above factors, viewed in the aggregate, support a mitigated sentence other than that contemplated by the Sentencing Guidelines.

One district court has observed that the statutory mandate to consider "the kinds of sentences available" under 18 U.S.C. § 3553(a)(3) is "rarely mentioned in the sentencing courts."

PIER 5 LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
FAX: (415) 421-1331

United States v. Guiro, 887 F.Supp. 66, 68 (E.D.N.Y. 1995). "While the choices are many in theory, they may be fewer in practice." Id. (internal citations omitted). The Guidelines "do not displace the traditional role of the district court in bringing compassion and common sense to the sentencing process. ... In areas where the Sentencing Commission has not spoken ... district courts should not hesitate to use their discretion in devising sentences that provide individualized justice." United States v. Williams, 65 F.3d 301, 309-310 (2nd Cir. 1995).

Mr. Martin seeks substitute confinement, which would allow him to remain with his family and thereby continue to support them emotionally and financially; continue his employment; continue his counseling and recovery; and continue his positive contributions to society.

## IV.

## A SENTENCE OF ALTERNATIVE CONFINEMENT WOULD BE SUFFICIENT, BUT NOT GREATER THAN NECES-SARY, TO COMPLY WITH THE PURPOSES OF SENTENCING SET FORTH IN 18 U.S.C. § 3553(a)(2).

Title 18 of the United States Code § 3553(a) states in relevant part:

> The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider ––
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed--
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for

PIER 5 LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
FAX: (415) 421-1331

the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner....

A. Seriousness of Offense; Respect for Law; "Just Punishment."

The "seriousness of the offense" should be considered in light of Mr. Martin's proposed factors in mitigation. Respect for the law by the public can only be commensurate with a legal system that metes out "just punishment" to each defendant as an individual.

B. Adequate Deterrence

Mr. Martin's felony conviction; seizure of minimal assets; and curtailment of liberty, in any form, as well as the inherent stress of withstanding a prosecution in federal court, is arguably adequate deterrence.

C. Protect the Public

This factor is difficult on these facts, where there is no "victim," and to the contrary, there is evidence of benefit to the public by way of letters from medical marijuana patients whom the edible products helped.

D. Provide the Defendant with Needed Educational or Vocational Training, Medical care, or Other Correctional Treatment in the Most Effective Manner.

Evidence by the correspondence from Dr. Von Glinski (Exhibit D), Mr. Martin needs knee surgery (presently scheduled for September 25, 2008) which will require lengthy

PIER 5 LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
FAX: (415) 421-1331

rehabilitation. Additionally, he has participated in counseling before and since his arrest to address depression, anxiety and alcohol abuse to which he appears to be responding well. Substitute confinement would certainly fulfill this purpose.

CONCLUSION

Mr. Martin is worthy of consideration for a substitute confinement sentence. Considering all of the circumstances, such a sentence would be sufficient, but not greater than necessary, to fulfill the purposes of sentencing.

Dated: August 22, 2008

Respectfully submitted,

/s/ SARA ZALKIN
J. TONY SERRA
SARA ZALKIN
Attorneys for Defendant
MICHAEL MARTIN

PIER 5 LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
FAX: (415) 421-1331

Michele Gibney
2349 Platt Drive
Martinez, CA 94553
(925) 759-4182
michele.gibney@gmail.com

June 14, 2008

To the Honorable Judge Wilken:

My name is Michele Gibney and I am a graduate student at San Jose State University earning my master's degree in Library and Information Science. I have lived in the Bay Area since I was three years old. Though extensively traveled (Asia, Europe, the U.S. and Canada), I am always thrilled to be back in California and consider the Bay Area an ideal place to live. The reason I am writing is to plead for leniency in the case of Michael Martin who, I believe, deserves to remain out of jail and with his family in this wonderful area.

I have been friends with Elinor Clark, Mickey's wife, since 2001 and have been acquainted with Mickey for the last six years as well. Ellie and I met while working in a book-store in Concord, CA and have remained friends even after we both moved on from our positions there. We keep in contact through phone and email and generally get together approximately once a week. Before Ellie and Mickey became parents, our outings generally consisted of movie dates. In fact, Ellie told me she was pregnant with Tyler—their first born—at a movie theater! Since the births of Tyler and Lucas, we meet at local parks, each other's houses, bookstores, and libraries in order to include the children since Ellie is a stay-at-home mom by choice. My time spent with Ellie, Tyler, and Lucas does not generally include Mickey's physical presence, but it's impossible to be around Mickey's family and not feel his influence.

Over the last six years I've heard accounts from Ellie of Mickey's pursuit of education—a BA from Saint Mary's in Lafayette, CA—and job ventures including Tainted and the bounce house business, Boing. Ellie's pride in Mickey's accomplishments, respect for him as a partner, and love for his familial devotion is clear in every word she says about him. He's smart, incredibly motivated, and highly entrepreneurial. Since Tyler learned to talk I have been regaled with tales of trips to Disneyland, presents received, and baseball played. Tyler's absolute, unconditional love for his father is apparent every time he speaks of him. When Tyler was only a year and a half old and I would visit him and Ellie during the day while Mickey was at work, he would say "Daa?" over and over again. Tyler was seemingly hopeful that if he just said it enough times his father would magically appear, swoop him up, and cover him with kisses. All he wanted then, and all he still wants now, is to see his father at every opportunity. Lucas is only one year old and the very image of his father but I'm afraid that I won't get to hear stories of the love and admiration he'll develop for his father in his formative years if Mickey is sentenced to the maximum jail time. I would very much like to hear the stories Lucas has to tell next year, the year after, and the year after that. A future childhood of happy stories which will only be possible if you show leniency in Michael's Martin's case and allow him to remain with his family.

A



When Tainted was shut-down by the government, Mickey immediately complied with the authorities and disassembled the business. He worked quickly to sell off the cooking paraphernalia such as bowls, Mixmasters, appliances, etc. He ingeniously used the left-over sugar, flour, and cake mixes to hold a bake sale fundraiser garnering money and support for his court case. What's more, he developed a new business model of bounce house rentals in order to continue being the financial supporter of his family. Mickey did everything he could to take care of his family because they are what's most important to him. In turn, Ellie, Tyler, and Lucas have been there for him every step of the way with their love and gratitude. None of them can get along without the others nor do I think they should have to try. Michael Martin is an amazing father and husband. His family needs him just as he needs them. I hope that you can see how important his continued presence in their lives is on a daily and immediate basis and will show clemency.

Sincerely,

Michele Gibney

June 27,2008

My name is Donald E. Robertson Sr.and I'm Mickey's-Michael Martins Uncle. His Mother is My Sister. I pray to God You as a Human Being will grant leniency in the honor of My Nephew.I would really appreaciate this very much for He is a really great Nephew and also a great asset to his community.

As I have mentioned in the above paragraph I mentioned Mickey as My Nephew, and I have known all of His life. I have watched Him grow up.

But as I see this is a way of life. We learn from our mistakes and use caution in the future and try not to repeat those same mistakes and just keep trying to do our humanly best according to God and the Law. In 2003 I had tp quit My job at WalMart because of My poor health and our income went down real low. Mickeys Mom told him about our problem and out of thr kindness of his heart he sent us $300.00 to help us make ends meet.

Mickey has grown into a wonderful young man. Mickey is Married to a fine Young Lady and he has two beautiful young Sons and they all need their Husband and Father to make their futures brighter and better.

Judge Wilken-Mam-I do really hope and pray that You will in the eyes of humanity grant leniency to Michael Martin"Mickey" so he can spend all of his time trying to be a great Husband and Father for his two Sons. I know that if you will grant his leiency that he will strive to do better in the future. Mickey is a great Nephew,my Wife Wanda Raylene Robertson and I are very proud that he has become a wonderful and greatful citizen and Human Being. So Judge Wilken-Mam,we hope that you can see it in your Heart to do this Great and Honorable act in the honor of Michael Martin "Mickey". May God bless Mickey and his Family now and always in the future.

With Mickey,s best interest for the future with Him,His Wife,and His two very young Sons,please grant Him this leniency.Thank You very much Judge Wilken-Mam for Your time and consideration.

Greatfully Yours,

Donald E. Robertson.
20 Woodland Lakes
Sullivan,Mo. 63080
Phone 573-468-5451

Charles C. Lynch
589 Rosemary Ln
Arroyo Grande, CA 93420

The Honorable Judge Wilken
C/O Sara Zalkin
506 Broadway
San Francisco, CA 94133

RE: Sentencing of Mickey Martin

Dear Judge Wilkin,

My name is Charles C. Lynch. I was the owner of a City Sanctioned Medical Marijuana Dispensary in Morro Bay, CA. On March 29, 2007 my home and business were raided by the Local Sheriff's Department and the DEA. I was later arrested on July 17, 2007 and charged with a variety of Federal Crimes related to operating Central Coast Compassionate Caregivers. I had contacted the DEA before opening my business and they told me it was up to the cities and counties to decide how to handle the matter. I was under house arrest and electronic monitoring for nearly 10 months. I chose to go to trial to try and fight the charges against me on a Entrapment by Estoppel defense. The trial was the most unfair situation I have ever been in my entire life and much of my defense was dismissed on 'relevance'.

On August 5, 2005 I was convicted of Federal Crimes as hundreds of Dispensaries continued to operate within miles of the Court House where I was convicted. The conflict between State and Federal Laws puts the Citizens of Medical Marijuana States at an unfair disadvantage in Federal Court. There is something very wrong when the State of California allows something based on a Constitutional Right and then we are prosecuted and sent to jail by our Federal Government.

I am writing to you at this time to show my support for Mickey Martin who will be sentenced by you in the near future. I pray and hope that you can show leniency and not take him away from his home and family. I feel it is unfair and unjust to do so.

Although I have only known Mickey for a short time via the web I believe that Medical Marijuana provides relief for a variety of health problems. I got involved with Medical Marijuana to help with very bad migraine headaches I get every year and a half. I think that if Marijuana would be viewed as a medicine it would change the perception and use of the drug.

Also I would like to point out that although the Federal Government and DEA find no medicinal value for Marijuana, the United States of America Health Department Services holds a patent #6,630,507 on the use of cannabis to alleviate a variety of health problems. There is something wrong and to make the people of the State of California suffer is not the America I learned about in grade school and have believed in for my entire adult life. Please show mercy for Mickey Martin and set him free.

Sincerely,

Charles C. Lynch

Dear Judge Wilken,

I'm writing to implore you for Mickey Martin's and Jessica Sanders' freedom, I'm genuinely optimistic that you will deem the positions within this letter and permit them to maintain their freedom with other productive tax-paying individuals in our community, rather than incarcerating them.

The Federal Controlled Substance Act's scheduling of Cannabis as a Schedule 1 drug is the cause for their prosecution. The DEA maintains that ALL Schedule 1 have NO medical benefits and are highly addictive. Their position has repeatedly been proven inaccurate by hundreds of peer-review studies showing the magnitude of medical advantages of marijuana and the limited likelihood for abuse.

For example, the University of California at San Diego reported within the last year that moderate amounts of Tetrahydrocannabinol (THC) one of the main therapeutic compounds from smoked cannabis alleviate neurological pain ~~[see attachment #1]~~. This study proves just one medically beneficial aspect to cannabis. In addition, Stanford released a study that substantiates cannabis remains less addictive than alcohol, heroin, and tobacco ~~[see attached #2]~~. This study confirms cannabis has little risk of addiction.

The DEA refuses to accept the abundant scientific data regarding cannabis, even against a recommendation from one of their own. The DEA's Chief Administration Law Judge Francis L. Young ruled after extensive hearings that "Marijuana, in its natural form, is one of the safest therapeutically active substances known…" ~~[See attachment #3]~~

I'm a senior at a prominent university, have a superior IQ and am a church goer. I pay taxes, vote, and have over 500 hours of community service, all of which has been voluntary (no institutions have forced it on me). I also happen to be an injured worker. My condition is called Thoracic Outlet Syndrome and it causes me chronic pain.

Since my injury, I've had stomach difficulties and drowsiness problems with most the medicine prescribed to me. In addition to that, my condition is rare and many of the doctors, I visited in the first 2 years of this injury, had no idea what was wrong with me but instead of admitting they were clueless they ended up misdiagnosising me and prescribing treatment plans that made my pain worse. I found cannabis eases my pain and have used Compassion Medicinal Edibles medicated treats to help relieve my symptoms.

Both Mickey Martin and Jessica Sanders have repeatedly demonstrated that they respects the city, county and state laws and poses no danger to themselves, others or society. Nor are they flight risks. Please exercise your power of justice and let these two go free.

Sincerely,

[signature]

11448 Kingsland St
Los Angeles, CA 90066
(310) 694-2523

Honorable Judge Wilken,

I am writing to urge you to give Michael Martin the most lenient sentence possible under the law. I have met Michael on many occasions. Michael has always been a perfect gentleman, and has impressed me as a hard working, sincere, passionate, compassionate human being.

Incarcerating this kind, generous, productive member of society would not further justice. Please consider granting a sentence that allows Michael to remain free from prison.

Thank you,

Peter Keyes
2415 T #8
Sacramento, Ca
95816

ATTN: SARA
JULY 15, 2008
(415) 421-1331
FAX,

DEAR HONORABLE JUDGE CLAUDIA WILKEN,

KENNEDY SAID, "ASK NOT WHAT YOUR COUNTRY CAN DO FOR YOU, ASK WHAT CAN YOU DO FOR YOUR COUNTRY. IT SEEMS TO ME THE CLOSEST THING TO GOD WOULD BE THE POWER TO HEAL. IN THIS COUNTRY AND ITS DIVERSE PEOPLES AND VICES AND SUFFERINGS, COMPASSION IS THE ONLY FREE GIFT LEFT TO OFFER. THOSE THAT ARE ABLE TO PROVIDE COMPASSION, RELIEF, A MOMENT OF JOY TO THE HURTING COMMUNITY ARE FEW. THOSE THAT HAVE THE FORESIGHT THE COURAGE AND STRENGTH THAT IT TAKES TO PRESERVERE TOWARDS THEIR GOAL OF PROVIDING FOR COMPASSION OF SUFFERINGS OF PEOPLE. RATHER THAN CHASTISING A GROUP FOR OFFERING THIS RELIEF, WE SHOULD IN GRATITUDE PROVIDE SUPPORT THAT THEIR FORTITUDE FOR SUCH A PASSION BE INSTEAD COMMENDED AND APPRECIATED, FOR WE NEED MORE MICKEY MARTIN'S IN THIS WORLD TO BREAK THE BARRIERS AND CHOICES TO ALTERNATIVE MEDICINE.

SUCCESS, QUALITY, CONSISTENCY, AND CLIENT LIST WERE ALREADY ACHIEVED WITH MICKEY MARTIN IN HIS MISSION DEDICATED TO THERAPEUTIC HEALING WITH THE NATURES OF CANNABIS.

JUDGE CLAUDIA WILKEN I ASK THAT YOU TREAT MICKEY MARTIN WITH LENIENCY AS IN THE FEDERAL SYSTEM, MARIJUANA CONTINUES TO BE LISTED ON SCHEDULE I AS A SUBSTANCE WITH NO COMMONLY ACCEPTED MEDICAL USE,' EVEN THOUGH OUR GOVERNMENT STILL PROVIDES MEDICAL CANNABIS TO A HANDFUL OF PATIENTS WHO ARE 'GRANDFATHERED IN' FROM THE FEDERAL GOVERNMENT'S 'INVESTIGATIVE NEW DRUG' (IND) PROGRAM.

WHILE THE LAW DEEMS MICKEY MARTIN AS A CRIMINAL, HIS ACTIONS ARE MORE CONSISTENT WITH BEING A PART OF A COMMUNITY DEDICATED TO THE HEALING AND THERAPEUDIC NATURES OF CANNABIS.

AS AN INJURED WORKER, MEDICAL MARIJUANA HAS BEEN A LIFE SAVER AS PRESCRIPTION MEDICATION IS NOT AN OPTION FOR ME. WITHOUT JUSTICE ON YOUR PART, PEOPLE LIKE ME WOULD NOT BE OFFERED THIS RELIEF. THE ACT OF 1996, GAVE US THE RIGHT TO ALTERNATIVE MEDICATION FROM THE NORMAL MEANS OFFERED. THERE AGAIN ARE MANY THAT WOULD PRAY FOR LENIENCY FOR MICKEY MARTIN, HIS FAMILY AND FROM JUSTICE FROM YOU JUDGE. THANK YOU JUDGE,

Kerri Kelley
KERRI KELLEY
SAN JOSE, CA.

SUPPORT OF MICKEY MARTIN
COMPASSION MEDICINAL EDIBLES
888-874-6863

TAINTED LEGAL DEFENSE FUND

Los Angeles Times
CEDARS-SINAI MEDICAL CENTER.
1-800-CEDARS-1
24 hours a day, 7 days a week
Test Your Knowledge About Gynecologic Health
TAKE OUR QUIZ HERE
▶ Minimally Invasive Gynecologic Treatments ▶ Find a Physician ▶ Programs and Services ▶ Health Conditions

http://www.latimes.com/features/health/la-he-marijuana18-2008aug18,0,4886601.story
*From the Los Angeles Times*

## Medical marijuana: What does science say?

A look at the pros and cons of medical marijuana use, a topic that inspires strong opinions on both sides.

By Jill U. Adams
Special to The Times

August 18, 2008

DEPENDING ON whom you ask, marijuana is a dangerous drug that should be kept illegal alongside heroin and PCP, or it's a miracle herb with a trove of medical benefits that the government is seeking to deny the public -- or something in between: a plant with medical uses and drawbacks, worth exploring.

As the political debates over medical marijuana drag on, a small cadre of researchers continues to test inhaled marijuana for the treatment of pain, nausea and muscle spasms.

All drugs have risks, they point out -- including ones in most Americans' medicine cabinets, such as aspirin and other pain-relievers or antihistamines such as Benadryl. Doctors try to balance those risks against the potential for medical good -- why not for marijuana as well, they ask.

The truth, these researchers say, is that marijuana has medical benefits -- for chronic-pain syndromes, cancer pain, multiple sclerosis, AIDS wasting syndrome and the nausea that accompanies chemotherapy -- and attempts to understand and harness these are being hampered. Also, they add, science reveals that the risks of marijuana use, which have been thoroughly researched, are real but generally small.

Dr. Donald Abrams, chief of hematology and oncology at San Francisco General Hospital and professor of clinical medicine at UC San Francisco, says he sees cancer patients in pain, not eating or sleeping well, experiencing nausea and vomiting from treatment, and being depressed about their situation. He says he is glad that he lives in California, where use of medical marijuana is allowed by state law, although federal officials continue to raid cannabis dispensaries in the state and scrutinize practices of physicians who specialize in writing cannabis recommendations for patients.

"I can talk to patients about medicinal cannabis [and] I'm often recommending it to them for these indications," Abrams says.

Read on to learn what science has to say about the medical pros and cons, and some mitigating factors, of *Cannabis sativa*.

If you want other stories on this topic, search the Archives at latimes.com/archives.
TMSReprints
Article licensing and reprint options

Copyright 2008 Los Angeles Times | Privacy Policy | Terms of Service
Home Delivery | Advertise | Archives | Contact | Site Map | Help
partners: Hoy 





Los Angeles Times

http://www.latimes.com/features/health/la-he-marijuanapro18-2008aug18,0,3084928.story
*From the Los Angeles Times*

## Pro: Marijuana use for chronic pain and nausea

Smoked marijuana can bring relief to sufferers of neuropathic pain comparable to that of other painkiller drugs, some studies show.

By Jill U. Adams
Special to The Times

August 18, 2008

Medical marijuana use has a history stretching back thousands of years. In prebiblical times, the plant was used as medicinal tea in China, a stress antidote in India and a pain- reliever for earaches, childbirth and more throughout Asia, the Middle East and Africa.

In recent decades, medical researchers have investigated marijuana's effects on various kinds of pain -- from damaged nerves in people with HIV, diabetes and spinal cord injury; from cancer; and from multiple sclerosis. Marijuana has also been hypothesized to help with nausea induced by chemotherapy and antiretroviral therapy, and with severe loss of appetite as seen in people with the AIDS wasting syndrome.

The weed's actions are due to the active ingredients tetrahydrocannabinol (THC) and some 60 other cannabinoids, which mimic the action of chemicals -- known as endogenous cannabinoids -- that exist naturally in the brain. Those cannabinoids activate receptors in our nerves, triggering physiological responses.

A legal prescription form of THC (Marinol) exists, yet researchers say it's far from a perfect drug. Taken orally, its absorption is highly variable and unpredictable and often delayed, says Dr. Igor Grant, a UC San Diego psychiatrist who directs the university's Center for Medicinal Cannabis Research. "Smoking is a very efficient way to deliver THC," he says.

As a result of its federally illegal status, medicinal use of marijuana is restricted to carefully vetted clinical research studies or to patients in states such as California that have passed laws to allow for personal medical use. Research on the medicinal use of marijuana relies on government-issued marijuana cigarettes, which come in different strengths and are supplied by the National Institute on Drug Abuse.

The UC Center for Medicinal Cannabis Research in San Diego helps coordinate clinical studies to investigate the safety and effectiveness of marijuana. Here's what they've found.

**Neuropathic pain**

Recent research suggests that marijuana can assuage this chronic-pain syndrome in which burning sensations occur and simple touch can feel like hurt. It is unaffected by aspirin-like drugs and fairly resistant to stronger analgesics such as opiates.

In a 2007 study on neuropathic pain related to HIV infection, 50 patients smoked marijuana cigarettes three times a day or marijuana cigarettes from which active ingredients had been extracted. Subjects then rated their pain on a scale ranging from "no pain" to "worst pain imaginable." The results, published in the journal Neurology, showed a 34% reduction in ratings of pain in the marijuana group compared with 17% in the placebo group over five days of treatment.

Another study in 44 patients reported in June in the Journal of Pain found that marijuana alleviated neuropathic pain arising from a variety of conditions, including spinal-cord injury and diabetes. Participants smoked marijuana on a set schedule -- first two puffs, then three puffs an hour later, then four puffs an hour after that -- from a single cigarette containing either 0%, 3.5%, or 7% THC. Average pain ratings before

smoking were 55 on a 100-point scale and decreased by 46% in both treatment groups and by 27% in the placebo group one hour after the last puff.

Analgesic drugs are often tested against experimentally induced pain. Such studies have been conducted for marijuana too. In one 2007 report in the journal Anesthesiology, 15 healthy volunteers received skin injections with capsaicin -- the chemical behind that fiery spice in chile peppers -- and then smoked different-strength marijuana cigarettes. The medium dose, with a 4% THC concentration, lessened the burning pain.

These three pain studies all concluded that smoked marijuana can bring relief to sufferers of neuropathic pain comparable to other analgesic drugs. It is not a cure, Grant says: "It's like other pain medicines, you have to keep taking it."

Study subjects did feel high, an effect that varied among individuals. Marijuana also affected thinking, shown as problems with tasks of memory and complicated reasoning after the strongest marijuana cigarettes were used. Potentially problematic, these effects were tolerated by subjects -- no one opted out of the study because they couldn't think straight.

Grant says it's important to have a choice of treatments because not everyone responds to or can tolerate the available drugs. Antidepressants are used for neuropathic pain but cause dry mouth, constipation and urinary problems, and must be avoided by people with conditions such as glaucoma. Others can't take aspirin-like drugs. "Having an alternative compound is always good," Grant says.

**Multiple sclerosis**

Patients with multiple sclerosis suffer muscle spasms, pain and tremor. Anecdotal reports suggest that marijuana may be helpful, but controlled studies are few. One, presented at an April meeting, had 51 multiple sclerosis patients smoke 0% or 4% THC marijuana cigarettes daily for three days. Intensity of spasms was reduced by 32% and pain ratings by 50% after smoking marijuana, compared with 2% and 22% reductions after placebo cigarettes. Five subjects withdrew, citing side effects: feeling too high, dizzy or fatigued.

Other studies in patients with multiple sclerosis used a cannabis extract that can be taken orally. In a 2007 European Journal of Neurology study, nearly half of 184 patients experienced at least 30% improvement in muscle spasms.

But a 2004 Neurology paper showed no reduction in objective measures of arm tremor with cannabis extract, although five subjects out of 13 reported feeling improvement. This might have resulted from mood-altering effects of the drug or from some aspect of tremor not measured.

**Nausea**

A 2008 review published in the European Journal of Cancer Care analyzed 30 clinical studies using cannabinoid drugs synthesized in the lab and concluded that they were better than standard antinausea drugs in alleviating the nausea and vomiting that accompanies chemotherapy. One such drug is Marinol, a THC preparation approved by the Food and Drug Administration for precisely this purpose.

Survey studies suggest that some people with HIV smoke marijuana to counteract nausea caused by antiretroviral therapy. Researchers at the UC Center for Medicinal Cannabis Research have tried to study the effect of smoked marijuana on nausea and vomiting in patients undergoing chemotherapy but have struggled to enroll enough subjects, Grant says.

Bruce Mirken, director of communications for the Marijuana Policy Project -- a group that lobbies for the decriminalization of marijuana -- says he is all for research on the chemical components in marijuana with the goal of making more-purified and perhaps more-targeted drugs that do not deliver a "high," but does not see "criminalizing use of that plant by people who are ill when you are making its main psychoactive ingredient legal in the form of a very expensive pill."

Tom Riley, a spokesman for the White House Office of National Drug Control Policy, says marijuana advocates are seeking a free pass. "They want to be exempted from the regular [drug] approval process," he says.

If you want other stories on this topic, search the Archives at latimes.com/archives.
TMSReprints
Article licensing and reprint options

Copyright 2008 Los Angeles Times | Privacy Policy | Terms of Service
Home Delivery | Advertise | Archives | Contact | Site Map | Help
partners: ktla cw Hoy

JOHN CONYERS, JR., Michigan
CHAIRMAN

HOWARD L. BERMAN, California
RICK BOUCHER, Virginia
JERROLD NADLER, New York
ROBERT C. "BOBBY" SCOTT, Virginia
MELVIN L. WATT, North Carolina
ZOE LOFGREN, California
SHEILA JACKSON LEE, Texas
MAXINE WATERS, California
WILLIAM D. DELAHUNT, Massachusetts
ROBERT WEXLER, Florida
LINDA T. SÁNCHEZ, California
STEVE COHEN, Tennessee
HENRY C. "HANK" JOHNSON, JR., Georgia
BETTY SUTTON, Ohio
LUIS V. GUTIERREZ, Illinois
BRAD SHERMAN, California
TAMMY BALDWIN, Wisconsin
ANTHONY D. WEINER, New York
ADAM B. SCHIFF, California
ARTUR DAVIS, Alabama
DEBBIE WASSERMAN SCHULTZ, Florida
KEITH ELLISON, Minnesota

ONE HUNDRED TENTH CONGRESS

# Congress of the United States

## House of Representatives

COMMITTEE ON THE JUDICIARY

2138 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6216

(202) 225–3951
http://www.house.gov/judiciary

LAMAR S. SMITH, Texas
RANKING MINORITY MEMBER

F. JAMES SENSENBRENNER, JR., Wisconsin
HOWARD COBLE, North Carolina
ELTON GALLEGLY, California
BOB GOODLATTE, Virginia
STEVE CHABOT, Ohio
DANIEL E. LUNGREN, California
CHRIS CANNON, Utah
RIC KELLER, Florida
DARRELL E. ISSA, California
MIKE PENCE, Indiana
J. RANDY FORBES, Virginia
STEVE KING, Iowa
TOM FEENEY, Florida
TRENT FRANKS, Arizona
LOUIE GOHMERT, Texas
JIM JORDAN, Ohio

April 29, 2008

Acting Administrator Michele Leonhart
Drug Enforcement Administration
Mailstop: AXS
2401 Jefferson Davis Highway
Alexandria, VA 22301

Dear Administrator Leonhart:

I am writing to you because I have received a number of letters from Californians, including mayors and city councils, expressing concerns about DEA enforcement tactics, and urging me to hold oversight hearings in the Judiciary Committee. However, before I consider holding hearings, I want to give you the opportunity to respond to these complaints.

According to the letters, the DEA has dramatically intensified the frequency of paramilitary-style enforcement raids against individuals qualified to use medical cannabis under state law, their caregivers, and the dispensing collectives established to provide a safe place to access medical cannabis. It has also come to my attention that DEA has sent hundreds of letters to property owners, who lease property to medical cannabis dispensaries, threatening them with arrest and forfeiture of their property. I am including with this letter resolutions condemning the DEA's tactics from the California legislature, the cities of San Francisco and Los Angeles, and from Mayors Gavin Newsom and Ron Dellums.

To help me understand the situation better, I would appreciate it if you could answer the following questions:

1. Is the use of civil asset forfeiture, which has typically been reserved for the worst drug traffickers and kingpins, an appropriate tactic to employ against individuals who suffer from severe or chronic illness and are authorized to use medical marijuana under California law? Has the DEA conducted any analysis of the potential economic consequences of using civil asset forfeiture in an area that is experiencing some of the nation's sharpest declines in property values? Lastly, has the DEA considered the consequences of shutting down legally-operated

EXHIBIT C

public dispensaries, and whether that might drive the cannabis sales activity underground?

2. Given the increased level of trafficking and violence associated with international drug cartels across Mexico, South America and elsewhere, do you think the DEA's limited resources are best utilized conducting enforcement raids on individuals and their caregivers who are conducting themselves legally under California law?

3. Have you considered that DEA activities against qualified individuals is negatively impacting the ability of state and local officials across California to collect tax revenue, which they are entitled to under California law?

4. Every month new science supporting the therapeutic value of cannabis is published. As a result, medical and scientific organizations, like the American College of Physicians and the American Psychiatric Association, are urging reform of the laws that place in legal jeopardy physicians or their individual patients who may benefit from the use of cannabis. As the Administrator, you have the discretion to decide whether to continue heightened enforcement activities in California and in other states that have authorized the use of medical cannabis by qualified individuals. Please explain what role, if any, emerging scientific data plays in your decision-making process to conduct enforcement raids on individuals authorized to use or provide medical cannabis under state law.

5. Would you support the creation of an intergovernmental commission comprised of law enforcement, law makers and people affected by the laws, to review policy and provide recommendations that aim to bring harmony to federal and state laws?

Finally, attached with this letter is a list of approximately 60 raids that the DEA conducted between June 2005 and November 2007. Please provide an accounting of the costs, in dollars and resources, used to conduct law enforcement raids on the attached list of individuals. Please include information about: whether any arrests were made in the course of these raids, and, if so, how many people were arrested; under what circumstances was a warrant issued and for what content; whether any criminal or other charges have been brought by the DOJ; what, if any, content was seized or destroyed; and finally, the current status of each of these cases.

Acting Administrator Michele Leonhart
Page 3
April 29, 2008

I am hopeful that we can have a productive relationship   Thank you very much for your attention.  Please respond by July 1, 2008.  I look forward to your reply.

Sincerely,

John Conyers, Jr.
Chairman

cc: The Honorable Lamar Smith
    The Honorable Brian A. Benczkowski

Enclosure

**Federal Medical Marijuana Raid Activity**
**June 2005 – March 2008**

Joe Fortt/American Kenpo School of Public Health; on or about June 7, 2005, in Bakersfield, CA.

3 San Francisco Dispensaries,multiple residences; on or about June 22, 2005, in San Francisco, CA.

Herbal Relief Center, Medicinal Herbal Remedy, Sunset Medicinal Resource Center

Louis Fowler/Alternative Specialties; on or about July 7, 2005, in Sacramento County, CA

Richard Marino/Capitol Compassionate Center; on or about September 3, 2005, in Newcastle, CA.

James Holland; on or about September 8, 2005, in Bakersfield, CA.

Susan Bury; on or about October 17, 2005, in Madera, CA

Michael Payne/Local Patients Cooperative; on or about December 8, 2005 in Alameda, CA

13 San Diego Collectives; on or about December 12, 2005, San Diego, CA.

Steve and Kathy Smith/Hope Net Dispensary; on or about December 20, 2005, San Francisco, CA.

Garry Silva; on or about March 14th, 2006, in Sky Valley, CA.

Kenneth Affolter/Oakland Edible Producers; on or about March 16, 2006, in Oakland and Emeryville, CA.

Mike Ragin & Scott Wright; on or about May 31, 2006, in San Diego, CA.

Michael and Shannon O'Leary/The Healthy Choice; on or about June 16, 2006, in Stanislaus, CA

David Harde & Toby Landis; on or about June 30, 2006, El Dorado County, CA

12 San Diego Collectives (all 2nd raids); on or about July 6, 2006, in San Diego, CA

Tom Cole; on or about August 16, 2006, in Yuba, CA

Trichome Healing Caregivers; on or about August 30, 2006, Van Nuys, CA.

Ricardo Monntes and Luke Scarmazzo/California Healthcare Collective; on or about September 27, 2006, Modesto, CA

North Valley Discount Caregivers; on or about September 28, 2006, Granada Hills, CA

Sparky Rose/New Remedies Cooperative; on or about October 4, 2006, San Francisco and Oakland, CA.

Potent Employment Solutions; on or about October 4, 2006, San Francisco, CA

Palm Canyon, Palm Springs Caregivers; on or about October 4, 2006, in Palm Springs, CA

Green Cross; on or about October 19, 2006, in Torrance, CA

Shon Squier and Valerie Herschel/Local Patients Co-op- on or about December 12, 2006, in Hayward, CA.

The Health Center- on or about December 14, 2006, in Los Angeles (Studio City), CA.

CannaCare; on or about January 12, 2007, in Seattle, WA.

11 Los Angeles & Hollywood Collectives; on or about January 17, 2007, in Hollywood and Los Angeles, CA.

HIP Sherman Oaks, HIP Woodland Hills, Fairfax Venice, Fairfax Hollywood,
Fairfax Sherman Oaks, West Hollywood Center for Compassionate Healing,
Zen Healing Center, West Hollywood Caregivers, Alternative Herbal Health Services, and The Farmacy

Daniel Sevino and Oscar Clark; on or a bout January 18, 2007, in San Diego, CA

Woodland Hills Caregivers; on or about January 26, 2007, Woodland Hills, CA.

Herbal Independent Pharmacy; on or about March 1st, 2007, Los Angeles, CA

Herbal Independent Pharmacy Woodland Hills; on or about March 1, 2007, Los Angeles, CA.

Herbal Independent Pharmacy Sherman Oaks; on or about March 1, 2007, in Los Angeles. CA

John Moreaux/ Ist Hollywood Caregivers, March 6th, 2007, in Ist Hollywood, CA (2nd Raid)

Trichome Healing Caregivers; on or about March 8, 2007, Los Angeles, CA. (2nd Raid)

Hezekiah, Inc; on or about March 21, 2007, in Hollywood, CA

Central Coast Compassionate Caregivers; on or about March 29, 2007, in San Luis Obispo, CA

Nature's Medicinal Cooperative; on or about April 2, 2007, Bakersfield, CA

West Valley Coop; on or about April 11, 2007, in Woodland Hills, CA

Bill Connelly/Seven Seas Collective; on or about April 29, 2007, in Bakersfield, CA (2nd raid on 6/6/07)

Don DuPay; on or about June 14, 2007, in Portland, OR

Farm Assist Caregivers; on or about June 16, 2007, in Pomona, CA

David Chavez/Nature's Medicinal Collective; on or about July 16, 2007, Oildale, CA (2nd raid)

Ronnie Naulls/Healing Nations Collective; on or about July 17, 2007, Corona, CA

Ronnie Naulls/Tree of Life Collective; on or about July 19, 2007, in Riverside, CA (was already in custody)

Central Coast Compassionate Caregivers; on or about July 17, 2007, Morro Bay, CA

7 collectives ; on or about July 25, 2007, in Los Angeles, CA.

Blue Water Industries, California Patients' Group, City of Angels Illness Center

Earth Collective, Kush Mart, Sunset Collective, Hollywood Care Collective

Multiple San Mateo Raids; on or about August 29, 2007, San Mateo, CA.

M.H.T., Patients Choice Resource Cooperative, Peninsula Patients Local Option

Dustan Bagilere; on or about September 5, 2007, in San Diego, CA.

Michael Lombardo, Jared Painter, Erik Cederholm, on or about September 13, 2007, Big Oak Valley, CA

Bill Pearce/River City Patient Center, on or about September 26, 2007, Sacramento, CA

Mickey Martin, Jessica Sanders, and Michael Anderson/ Tainted, Inc., on or about September 26, 2007, in Oakland and San Leandro, CA

Arts District Healing Center, on or about October 11, 2007, Los Angeles, CA

Winslow and Abrahm Norton/Compassionate Patient Cooperative of California, on or about October 30, 2007, Hayward CA

Jimmy McShane; on or about October 30, 2007, in San Diego, CA

Steele Smith/C-3 Collective, on or about November 1, 2007, in Garden Grove, CA

105/405, on or about November 2, 2007, Los Angeles, CA

Long Beach Compassionate Cooperative, on or about November 20, 2007, Long Beach, CA

Herbal Nutrition Center; on or about December 19, 2007, in Los Angeles, CA.

Nature's Wellness Collective; on or about March 4, 2008, in Orange, CA

Marcel Garcia and others/Pacific Greens; on or about March 13, 2008, in Santa Maria, CA

Virgil Grant;  on or about March 20, 2008, in Compton, CA
      The Holistic Caregivers, Western Caregivers Group; Crenshaw Holistic Caregivers Group,
      THC Gardena, Southern California Caregivers Group, Med Ex

City of Los Angeles Resolution in Support of SJR 20

WHEREAS, any official position of the City of Los Angeles with respect to legislation, rules, regulations, or policies proposed before a local, state or federal government body or agency must have first been adopted in the form of a Resolution by the City Council with the concurrence of the Mayor; and

WHEREAS, in 1996, California voters approved Proposition 215, the Compassionate Use Act, which exempts patients and caregivers from certain criminal penalties when they possess or cultivate marijuana for medical use as recommended by a physician; and

WHEREAS, historic practice and scientific research have demonstrated medical marijuana is an effective treatment for many serious medical conditions including AIDS, glaucoma, seizures, chronic muscular pain and cancer; and

WHEREAS, the State of California has recognized medical marijuana dispensaries as retailers that are required to collect, report, and remit tax on the sales of medical marijuana and the revenues derived from those sales to the State Board of Equalization, the Franchise Tax Board, and the Federal Internal Revenue Services; and

WHEREAS, the Drug Enforcement Agency of the United States Department of Justice has conducted raids and shut down dozens of medical marijuana dispensaries in California since 2005, with 28 of these raids occurring since June of 2007 in the City of Los Angeles and in 11 different counties; and

WHEREAS, seizures of the assets of these medical marijuana dispensaries and collectives effectively have blocked payments of taxes to the State of California and the Federal Government; and

WHEREAS, the escalated activities of the Drug Enforcement Agency in removing medical marijuana dispensaries will cause undue suffering to thousands of California patients, rob the State of millions of dollars in tax revenue, and destroy thousands of medical marijuana industry jobs; and

WHEREAS, currently pending in the State Senate is Senate Joint Resolution 20 (Migden), which calls on the President and Congress to enact legislation to require the DEA and all Federal agencies and departments to respect the laws of states, as well as return all assets seized from medical marijuana dispensaries to the states from which they were confiscated; and

WHEREAS, Senate Joint Resolution 20 additionally requests Federal law enforcement to enforce Federal medical marijuana laws in a manner consistent with the laws of the State of California; and

WHEREAS, Senate Joint Resolution 20 sends a strong message to President George W. Bush and members of Congress that California will not stand by and allow such abusive attacks by the Federal Government against the people of California;

NOW, THEREFORE, BE IT RESOLVED, with the concurrence of the Mayor, that by the adoption of this Resolution, the City of Los Angeles hereby included in the 2007-2008 State Legislative Program SUPPORT for SJR 20 (Migden), which requests Congress and the President end the DEA' attacks on our State medical marijuana law.

PRESENTED BY: Dennis P. Zine, Councilman, 3rd District
SECONDED BY: Janice Hahn, Bill Rosendahl

Passed by Los Angeles City Council 9:1 on April 2, 2008



CITY OF
OAKLAND

## STATEMENT FROM MAYOR RON DELLUMS

***Re: DEA's Raids of Medical Cannabis Dispensaries***

"As the mayor of a city that believes in compassionate care, we support Medical Cannabis Dispensaries. We are discouraged to learn of the DEA's actions that appear to be in opposition to the will of the residents of this city. Rep. Conyers, Chair of the U.S. House Judiciary Committee, expressed deep concern over the DEA landlord threats and other efforts to undermine California law, and committed to sharply questioning these tactics as part of the committee's oversight efforts. I am grateful for and supportive of Rep. Conyers' concerns."

FILE NO. 080198 RESOLUTION NO.

[Condemning Drug Enforcement Agency Actions Against Property Owners Leasing Space to Medical Cannabis Dispensaries]

**Resolution reaffirming that the City and County of San Francisco is a sanctuary for medical cannabis, an integral component of which are property owners who, pursuant to City regulations, lease space to authorized Medical Cannabis Dispensaries ("MCD"s) that provide needed services to qualified medical cannabis patients and their caregivers, and that the City vehemently condemns the Drug Enforcement Agency (DEA) for issuing sensational letters to these property owners threatening asset forfeiture and imprisonment.**

WHEREAS, House Judiciary Chairman John Conyers, Jr. has issued a pointed statement regarding the DEA's ratcheting up its draconian tactic of threatening City and County of San Francisco property owners with asset forfeiture and imprisonment for leasing to lawfully operating MCDs that provide medical cannabis to patients qualified under laws of the State of California; and,

WHEREAS, the City and County of San Francisco has incorporated many safeguards against profiteering and patient exploitation into its medical cannabis regulations and policies and on November 6, 2007 passed a resolution endorsing compassionate care for non- and low-income patients; and,

WHEREAS, in 1997 the Board of Supervisors authorized the City and County of San Francisco to pay for defending physicians in federal criminal and administrative proceedings after recommending the use medical cannabis to qualified patients; and,

**Supervisors Chris Daly, Jake McGoldrick, Ross Mirkirimi

WHEREAS, the DEA has repeatedly subverted and undermined California's, and many other states', laws governing medical cannabis by increasingly acting on its irrational policy and hysteria regarding medical cannabis specifically, and the so-called War on Drugs in general; and,

WHEREAS, this DEA heightened activity and policy directly violates the will of the vast majority of the State of California on a matter directly related to health and safety, an issue whose discretion is left to the State under the Constitution of the United States; and,

WHEREAS, the State of California's Board of Equalization collects sales tax from permitted MCDs; now, therefore be it

RESOLVED, That Board of Supervisors condemns the DEA's misguided and sensationally threatening harassment of property owners by issuing letters to property owners threatening asset forfeiture and imprisonment for leasing to lawfully operating MCDs; and, be it

FURTHER RESOLVED, That Board of Supervisors should employ every reasonable measure to secure and reaffirm the City and County of San Francisco's status as a medical cannabis sanctuary status by supporting lawfully operating MCDs, and property owners who lease to them, if and when the DEA acts on their threats; and, be it

FURTHER RESOLVED, That Board of Supervisors signs onto Chairman John Conyers, Jr.'s statement condemning the DEA's threatening letters to property owners and we fully support his convening of hearings into the DEA's alarming tactics to undermine California state law; and, be it

FURTHER RESOLVED, That property owners who lease to lawfully operating MCDs, and the MCDs themselves, should be supported by the City Attorney in any criminal prosecution or property forfeiture action not unlike in 1997 when the City

authorized assistance in defending physicians recommending medical cannabis to qualified patients from possible zealous DEA prosecution; and be it

FURTHER RESOLVED, That the San Francisco Board of Supervisors call on Congress to investigate the DEA's conduct and to amend federal law to respect the power of state to legalize medical cannabis, and, be it

FUTHER RESOLVED, That the Board of Supervisors requests that Mayor Gavin Newsom, San Francisco's State legislators, Attorney General Jerry Brown, and Governor Arnold Schwarzenneggar join with Oakland Mayor and former Congressman Ron Dellums in denouncing the DEA tactics surrounding property right of landlords who rent to MCDs.

**Office of the Mayor**
City & County of San Francisco



**Gavin Newsom**

April 8, 2008

The Honorable John Conyers
Chairman, House Judiciary Committee
U.S. House of Representatives
Washington, D.C. 20515

Dear Chairman Conyers:

As you know, many property owners who lease to medical cannabis dispensaries across the State of California and San Francisco have received notices from the Drug Enforcement Administration (DEA) threatening them with imprisonment and property forfeiture. I am writing to request your support in providing immediate oversight of the DEA's on-going interference with implementation of the law.

It has been many years since Proposition 215 was supported by the voters of California and added Section 11362.5 to the California Health and Safety Code, which exempts patients and defined caregivers who possess or cultivate marijuana for medical treatment recommended by a physician from criminal laws. Proposition 215 also provides that physicians who recommend use of marijuana for medical treatment shall not be punished or denied any right or privilege. San Francisco has systems for identifying patients.

As Mayor of a city with several medical cannabis dispensaries, I remain supportive of physician recommended medical marijuana to combat pain and nausea caused by such illnesses as HIV/AIDS, cancer and multiple sclerosis. Medical cannabis dispensaries provide patients with a safe, clean and compassionate environment for medical treatment and related services.

San Francisco recently passed a Resolution reaffirming that this city is a sanctuary for medical cannabis. Property owners who, pursuant to City regulations, lease space to authorized Medical Cannabis Dispensaries that provide needed services to qualified medical cannabis patients and their caregivers are protected.

Like many major cities San Francisco needs the assistance of the DEA in combating serious drug trafficking. However San Francisco strongly opposes Drug Enforcement Agency (DEA) interference in medical cannabis dispensing and the recent issuing sensational threatening letters to these property owners threatening asset forfeiture and imprisonment.

I strongly urge the House Judiciary Committee to investigate the Drug Enforcement Agency's tactics against vital medical cannabis laws and to set a date for the opening of Congressional hearings on this matter.

Sincerely,

Gavin Newsom
Mayor, City & County of San Francisco

# Senate Joint Resolution No. 20

**Introduced by Senator Migden**

January 10, 2008

Senate Joint Resolution No. 20—Relative to medical marijuana.

LEGISLATIVE COUNSEL'S DIGEST

SJR 20, as introduced, Migden. Medical marijuana.

This measure would urge the President and Congress of the United States to take specified actions relating to the use of marijuana for medical purposes.

Fiscal committee: no.

WHEREAS, In 1996, California voters approved Proposition 215, the Compassionate Use Act, to exempt patients and caregivers from certain criminal penalties when they possess or cultivate marijuana for medical use as recommended by a physician; and

WHEREAS, The California State Legislature subsequently established the Medical Marijuana Program to further the provisions of Proposition 215 by facilitating the registration of qualified patients and their caregivers through a statewide identification system whereby a patient with an identification card and the patient's designated primary caregiver are exempt from arrest for possession, transportation, delivery, or cultivation of marijuana for medical use; and

WHEREAS, In enacting the Medical Marijuana Program, the California State Legislature expressly stated its intent to enhance the access of patients and caregivers to medical marijuana through collective, cooperative cultivation projects, and to address additional issues that were not included in the Compassionate Use

Act and that are needed to be addressed to promote the fair and orderly implementation of that act; and

WHEREAS, Local governments throughout California have worked with dispensaries to ensure that medical marijuana may be provided to seriously and terminally ill patients in a nondisruptive manner; and

WHEREAS, Eleven other states–Alaska, Colorado, Hawaii, Maine, Montana, Nevada, New Mexico, Oregon, Rhode Island, Vermont, and Washington–have enacted laws, similar to California's Compassionate Use Act, that effectively remove state-level criminal penalties for growing or possessing medical marijuana; and

WHEREAS, As affirmed by the California Court of Appeal, Third Appellate District, in the matter of People v. Urziceanu (2005) 132 Cal.App.4th 747, the State of California recognizes that the Compassionate Use Act contemplates the formation and operation of medical marijuana cooperatives that would receive reimbursement for marijuana and the services provided in conjunction with the provision of that medical marijuana; and

WHEREAS, The State of California has recognized medical marijuana dispensaries and collectives as retailers that are required to collect, report, and remit tax on the sales of medical marijuana and the revenues derived from those sales to the State Board of Equalization and the Franchise Tax Board; and

WHEREAS, The Drug Enforcement Agency of the United States Department of Justice has conducted raids and shut down dozens of medical marijuana dispensaries and collectives in California since 2005, with 28 of these raids occurring since June 2007, in 11 different counties; and

WHEREAS, The medical marijuana dispensaries and collectives in California shut down by the Drug Enforcement Agency had been licensed by local governments and were reporting and paying sales taxes to the State Board of Equalization and reporting and paying income taxes to the Franchise Tax Board and the federal Internal Revenue Service; and

WHEREAS, Seizures of the assets of these medical marijuana dispensaries and collectives effectively have blocked payments of taxes to the State of California; and

WHEREAS, The recent, escalated activities of the Drug Enforcement Agency to shut down medical marijuana dispensaries

and collectives by targeting their landlords and seizing their landlords' properties will have serious consequences, including, but not limited to, thousands of California patients no longer being able to access medical marijuana, as recommended by their physicians, because these businesses will be forced to close or move underground; the state and municipalities losing millions of dollars in tax revenue; and thousands of individuals employed in medical marijuana dispensaries or collectives losing well-paying jobs with benefits; and

WHEREAS, The federal government continues to classify all forms of cannabis as Schedule I drugs under the federal Controlled Substances Act and therefore does not recognize medical marijuana; and

WHEREAS, Historic practice and scientific research have demonstrated medical marijuana alone or in combination with other drugs is an effective treatment for many medical conditions, including, but not limited to, nausea reduction for patients with cancer and acquired immune deficiency syndrome (AIDS); increasing the appetite of patients with nausea or other conditions causing dangerous weight loss; reducing intraocular pressure in patients with glaucoma; and controlling muscle spasms, seizures, and chronic muscular pain; and

WHEREAS, In the matter of Gonzales v. Raich (2005) 545 U.S. 1, the United States Supreme Court upheld the authority of the Drug Enforcement Agency to conduct these raids, but left state medical marijuana laws intact; now, therefore, be it

*Resolved by the Senate and the Assembly of the State of California, jointly,* That the Legislature respectfully memorializes the President of the United States and the Congress to enact legislation to require the Drug Enforcement Agency and all other federal agencies and departments to respect the compassionate use laws of states, including returning any assets seized from medical marijuana dispensaries and collectives to the states in which they are located; and be it further

*Resolved,* That the Legislature respectfully memorializes all federal law enforcement agencies to enforce federal drug laws relating to medical marijuana dispensaries and collectives in a manner consistent with the laws of the State of California and its municipalities within the confines of the provisions of the

Compassionate Use Act and the Medical Marijuana Program; and be it further

*Resolved,* That the Secretary of the Senate transmit copies of this resolution to the President and Vice President of the United States, to the Speaker of the House of Representatives, and to each Senator and Representative from California in the Congress of the United States.

O

**The Permanente Medical Group, Inc.**
ORTHOPAEDIC SURGERY
1515 Newell Avenue
Walnut Creek, CA 94596-5120
Dept: 925-295-4130
Main: 925-295-4000

# VISIT VERIFICATION - ORTHOPEDICS

Date: July 22, 2008

Michael Martin was seen in the Orthopedics Clinic on 7/10/2008. It is clear from his evaluation that he will need surgical intervention in the form of a knee arthroscopy and anterior cruciate ligament reconstruction. Ideally, I would like to get to this surgery as soon as possible. Having made that statement, I do not have available operating room time until September. If Mr. Michael Martin's court issues be postponed until after this surgery, that would be ideal. Please take my previous letter into consideration as well.

SIGNATURE AND TITLE

SABINE VON GLINSKI MD

*I hereby authorize the Kaiser Permanente Medical Care Program to verify to my employer/school, upon request, the information contained on this form.*

| SIGNATURE OF PATIENT OR RESPONSIBLE PERSON | RELATIONSHIP TO PATIENT |
| --- | --- |
| | |

EXHIBIT D



**The Permanente Medical Group, Inc.**
ORTHOPAEDIC SURGERY
1515 Newell Avenue
Walnut Creek, CA 94596-5120.
Dept: 925-295-4130
Main: 925-295-4000

# VISIT VERIFICATION - ORTHOPEDICS

Date:July 10, 2008

Michael Martin was seen in the Orthopedics Clinic on 7/10/2008.

He will need surgical intervention in the form of an anterior cruciate ligament reconstruction. This is a surgery that requires very intensive rehabilitation. Should Mr. Michael Martin require sentenceing by the decision made in federal court, please consider house arrest as an option. The reason for this is that I would be able to initiate home health physical therapy. Should he be given house arrest, could he be released for the day of surgery, should this occur after the sentencing?

Please feel free to contact my office should you have a need for futher information.

SIGNATURE AND TITLE

SABINE VON GLINSKI MD

*I hereby authorize the Kaiser Permanente Medical Care Program to verify to my employer/school, upon request, the information contained on this form.*

| SIGNATURE OF PATIENT OR RESPONSIBLE PERSON | RELATIONSHIP TO PATIENT |
| --- | --- |
| | |

Attention: Rozan Retiz

Event Coordinator

Livermore Valley Charter

543 Sonoma Avenue

Livermore, CA, 94550

**Date 8/23/07**

**Event Date: 8/19/07**

| Description | Quantity | Unit Price | Cost |
|---|---|---|---|
| 18 Foot Front-Loader Slide (Wet) | 1 | $250.00 | $250.00 |
| 18 Foot Ocean Slide (Wet) | 1 | $250.00 | $250.00 |
| Adventure Bouncer | 1 | $100.00 | $100.00 |
| Cotton Candy Machine | 1 | $50.00 | $50.00 |
| Cotton Candy Flavors (Blue Raspberry, Cherry) | 2 | $7.00 | $14.00 |
| Cotton Candy Cones (100) | 1 | $5.00 | $5.00 |
| | | | |
| Subtotal | | | $669.00 |
| Less School Discount | | | -$249 |
| **Total** | | | **$420.00** |

Thank you for choosing BOING! Event Specialist to help make your event a memorable one. We look forward to serving you and appreciate your business. Please contact us with any questions and concerns you may have about your special day. Get ready to bounce.

EXHIBIT
E

Attention: Holy Names College (Summerfest)

Accounts payable

3500 Mountain Blvd

Oakland, CA 94619

510.436.1000

**Date 4/21/08**

**Event Date: 8/19/07**

| Description | Quantity | Unit Price | Cost |
|---|---|---|---|
| 18 Foot Front Loader | 1 | $250.00 | $250.00 |
| 15x15 Castle Jumper | 1 | $150.00 | $150.00 |
| Sno-Cone Machine | 1 | $40.00 | $40.00 |
| 3 Sno-Cone Flavors | 3 | $10.00 | $30.00 |
| 200 Sno-Cone Cups | 1 | $10.00 | $10.00 |

| | |
|---|---|
| Subtotal | $480.00 |
| Less School Discount | -$80.00 |
| **Total** | **$400.00** |

Thank you for choosing BOING! Event Specialist to help make your event a memorable one. We look forward to serving you and appreciate your business. Please contact us with any questions and concerns you may have about your special day. Get ready to bounce.

Attention: Maritza Ortiz

Lighthouse Community Charter School

345 12th St

Oakland, CA 94607

**Date 6/5/08**

| Description | Quantity | Unit Price | Cost |
|---|---|---|---|
| 15 Foot Jumbo Slide (Dry) | 1 | $200.00 | $200.00 |

| | |
|---|---|
| Subtotal | $200.00 |
| Less Education Discount 20% | -$40/00 |
| **Total** | **$160.00** |

Thank you for choosing BOING! Event Specialist to help make your event a memorable one. We look forward to serving you and appreciate your business. Please contact us with any questions and concerns you may have about your special day. Get ready to bounce.

Attention: Karen Garrity

The Child Day School

1049 Stuart Street, Lafayette, CA

925-284-7092

**Date 7/1/08**

**Event Date: 06/26, 07/09, 07/29, 08/04, 08/18 Set Up @ 7:00 a.m.**

| Description | Quantity | Unit Price | Cost |
|---|---|---|---|
| 15 x 15 Castle on 06/26 | 1 | $150.00 | $86.00 |
| 15 x 15 Sports on 07/09 | 1 | $150.00 | $86.00 |
| 15 x 15 Jungle + Sno-Cone on 07/29 | 1 | $210.00 | $116.00 |
| 15 ' Waterslide on 08/04 | 1 | $250.00 | $150.00 |
| 15 ' Waterslide on 08/18 + Sno-Cone | 1 | $310.00 | $180.00 |
| Last Minute Castle 15 on 07/01 | 1 | $150.00 | $86.00 |

| | |
|---|---|
| Subtotal | $1220.00 |
| Less Educatonal Weekday Discount | -$516.00 |
| **Total** | **$704.00** |

Thank you for choosing BOING! Event Specialist to help make your event a memorable one. We look forward to serving you and appreciate your business. Please contact us with any questions and concerns you may have about your special day. Get ready to bounce.



June 25, 2008


Michael Martin
Boing House


Dear Michael:


This is to acknowledge your donation of a standard bouncer to Habitat for Humanity East Bay's Family Fun Day picnic on July 26, 2008. It is our understanding that this donation is worth $150.00. We agreed that the bouncer will operate between 10 AM-4PM.

The event will be held at North Lake Temescal Park 6500 Broadway Terrace in Oakland. Again, thanks for the donation. I can be reached at (510) 290-7092.

Sincerely,

Tim Thomas
Community Building Manager

This document was scanned by:
David Rains, Moderator, NORML's Electronic Forum
P.O. Box 1102, Smyrna, GA 30081-1102
Pager (404) 533-5430
Fidonet Address, 1:133/3027
Internet Address, davrains@ix.netcom.com

UNITED STATES DEPARTMENT OF JUSTICE
Drug Enforcement Administration

| In The Matter Of<br>MARIJUANA RESCHEDULING PETITION | Docket No. 86-22 |
|---|---|

OPINION AND RECOMMENDED RULING, FINDINGS OF FACT, CONCLUSIONS OF LAW AND DECISION OF Administrative LAW JUDGE.

FRANCIS L. YOUNG, Administrative Law Judge

DATED: SEP 6 1988

UNITED STATES DEPARTMENT OF JUSTICE
Drug Enforcement Administration

| In The Matter Of<br>MARIJUANA RESCHEDULING PETITION | Docket No. 86-22 |
|---|---|

OPINION AND RECOMMENDED RULING, FINDINGS OF FACT, CONCLUSIONS OF LAW AND DECISION OF ADMINISTRATIVE LAW JUDGE.

FRANCIS L. YOUNG, Administrative Law Judge

APPEARANCES:

KEVIN B. ZEESE, Esq.
ARNOLD S. TREBACH, Esq.
for National Organization For The Reform of Marijuana Laws

FRANK B. STILWELL, III, Esq.
for Alliance for Cannabis Therapeutics

DAVID C. BECK, Esq.
for Cannabis Corporation of America

APPENDIX A

CARL ERIC OLSEN, Pro Se

CHARLOTTE J. MAPES, Esq.
MADELEINE R. SHIRLEY, Esq.
for the Government

KARL BERNSTEIN
for National Federation of Parents for Drug-Free Youth

VIRGINIA PELTIER, Esq.
for the International Association of Chiefs of Police

DATED: SEP 6 1988

CONTENTS

| | | |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | RECOMMENDED RULING | 7 |
| III. | ISSUES | 7 |
| IV. | STATUTORY REQUIREMENTS FOR SCHEDULING | 8 |
| V. | ACCEPTED MEDICAL USE IN TREATMENT - CHEMOTHERAPY | 10 |
| | Findings of Fact | 10 |
| | Discussion | 26 |
| VI. | ACCEPTED MEDICAL USE IN TREATMENT - GLAUCOMA | 35 |
| | Findings of Fact | 35 |
| | Discussion | 38 |
| VII. | ACCEPTED MEDICAL USE IN TREATMENT - MULTIPLE SCLEROSIS, SPASTICITY & HYPERPARATHYROIDISM | 40 |
| | Findings of Fact | 40 |
| | Discussion | 54 |
| VIII. | ACCEPTED SAFETY FOR USE UNDER MEDICAL SUPERVISION | 56 |
| | Findings of Fact | 56 |
| | Discussion | 65 |
| IX. | CONCLUSIONS AND RECOMMENDED DECISION | 67 |
| | CERTIFICATION OF SERVICE | 69 |

UNITED STATES DEPARTMENT OF JUSTICE
Drug Enforcement Administration

In The Matter Of

MARIJUANA RESCHEDULING PETITION

Docket No. 86-22

OPINION AND RECOMMENDED RULING, FINDINGS OF FACT, CONCLUSIONS OF LAW AND DECISION OF ADMINISTRATIVE LAW JUDGE.

1.

INTRODUCTION

This is a rulemaking pursuant to the Administrative Procedure Act, 5 U.S.C. § 551, et seq., to determine whether the marijuana plant (Cannabis sativa L) considered as a whole may lawfully be transferred from Schedule I to Schedule II of the schedules established by the Controlled Substances Act (the Act), 21 U.S.C. § 801, et seq. None of the parties is seeking to "legalize" marijuana generally or for recreational purposes. Placement in Schedule II would mean, essentially, that physicians in the United States would not violate Federal law by prescribing marijuana for their patients for legitimate therapeutic purposes. It is contrary to Federal law for physicians to do this as long as marijuana remains in Schedule I. This proceeding had its origins on May 18, 1972 when the National Organization for the Reform of Marijuana Laws (NORML) and two other groups submitted a petition to the Bureau of Narcotics and Dangerous Drugs (BNDD) [footnote 1], predecessor

1 The powers and authority granted by the Act to the Attorney General were delegated to the Director of BNDD and subsequently to the Administrator of DEA. 28 C.F.R. § 0.100, et seq.

agency to the Drug Enforcement Administration (DEA or the Agency), asking that marijuana be removed from Schedule I and freed of all controls entirely, or be transferred from Schedule I to Schedule V where it would be subject to only minimal controls. The Act by its terms had placed marijuana in Schedule I thereby declaring, as a matter of law that it had no legitimate use in therapy in the United States and subjecting the substance to the strictest level of controls. The Act had been in effect for just over one year when NORML submitted its 1972 petition.

On September 1, 1972 the Director of BNDD announced his refusal to accept the petition for filing, stating that he was not authorized to institute proceedings for the action requested because of the provisions of the Single Convention on Narcotic Drugs, 1961. NORML appealed this action to the United States Court of Appeals for the District of Columbia Circuit. The court held that the Director had erred in rejecting the petition without "a reflective consideration and analysis," observing that the Director's refusal "was not the kind of agency action that promoted the kind of interchange and refinement of

views that is the lifeblood of a sound administrative process." NORML v. Ingersoll, 162 U.S. App. D.C. 67, 497 F.2d 654, 659 (1974). The court remanded the matter in January 1974 for further proceedings not inconsistent with Its opinion, "to be denominated a consideration on the merits." Id.

A three-day hearing was held at DEA [footnote 2] by Administrative Law Judge Lewis Parker in January 1975. The judge found in NORML's favor on several issues but the Acting Administrator of DEA entered a final order denying NORML's petition "in all respects." NORML again petitioned the court for review. Finding fault

2 DEA became the successor agency to BNDD in a reorganization carried out pursuant to Reorganization Plan No. 2 of 1973, eff. July 1, 1973. 38 Fed Reg. 15932 (1973).

with DEA's final order the court again remanded for further proceedings not inconsistent with its opinion. NORML v. DEA, 182 U.S. App. D.C. 114, 559 F.2d 735 (1977). The Court directed the then-Acting Administrator of DEA to refer NORML's petition to the Secretary of the Department of Health, Education and Welfare (HEW) for findings and, thereafter, to comply with the rulemaking procedures outlined in the Act at 21 U.S.C. § 811 (a) and (b).

On remand the Administrator of DEA referred NORML's petition to HEW for scientific and medical evaluation. On June 4, 1979 the Secretary of HEW advised the Administrator of the results of the HEW evaluation and recommended that marijuana remain in Schedule I. Without holding any further hearing the Administrator of DEA proceeded to issue a final order ten days later denying NORML's petition and declining to initiate proceedings to transfer marijuana from Schedule I. 44 Fed. Reg. 36123 (1979). NORML went back to the Court of Appeals.

When the case was called for oral argument there was discussion of the then-present status of the matter. DEA had moved for a partial remand. The court found that "reconsideration of all the issues in this case would be appropriate" and again remanded it to DEA, observing: "We regrettably find it necessary to remind respondents [DEA and HEW] of an agency's obligation on remand not to 'do anything which is contrary to either the letter or spirit of the mandate construed in the light of the opinion of [the] court deciding the case.'" (Citations omitted.) NORML v. DEA, et al., No. 79.1660, United States Court of Appeals for the District of Columbia Circuit, unpublished order filed October 16, 1980. DEA was directed to refer all the substances at issue to the Department of Health and Human Services (HHS), successor agency to HEW, for scien-

tific and medical findings and recommendations on scheduling. DEA did so and HHS has responded. In a letter dated April 1, 1986 the then-Acting Deputy Administrator of DEA requested this administrative law judge to commence hearing procedures as to the proposed rescheduling of marijuana and its components.

After the Judge conferred with counsel for NORML and DEA, a notice was published in the Federal Register on June 24, 1986 announcing that hearings would be held on NORML's petition for the rescheduling of marijuana and its components commencing on August 21, 1986 and giving

any interested person who desired to participate the opportunity to do so. 51 Fed. Reg. 22946 (1986).

Of the three original petitioning organizations in 1972 only NORML is a party to the present proceeding. In addition the following entities responded to the Federal Register notice and have become parties, participating to varying degrees: the Alliance for Cannabis Therapeutics (ACT), Cannabis Corporation of America (CCA) and Carl Eric Olsen, all seeking transfer of marijuana to Schedule II; the Agency, National Federation of Parents for Drug free Youth (NFP) and the International Association of Chiefs of Police (IACP), all contending that marijuanashould remain in Schedule I.

Preliminary prehearing sessions were held on August 21 and December 5, 1986 and on February 20, 1987. [footnote 3] During the preliminary stages, on January 20, 1987, NORML filed an amended petition for rescheduling. This new petition abandoned NORML's previous requests for the complete descheduling of marijuana or rescheduling to Schedule V. It asks only that marijuana be placed in Schedule II.

At a prehearing conference on February 20, 1987 this amended petition was

---

3 Transcripts of these three preliminary prehearing sessions are included in the record.

discuss. [footnote 4] All Parties present stipulated, for the purpose of this proceeding, that marijuana has a high potential for abuse and that abuse of the marijuana plant may lead to severe psychological or physical dependence. They then agreed that the principal issue in this proceeding would be stated thus:

> Whether the marijuana plant, considered as a whole, [footnote 5] may

---

4 The transcript of this prehearing conference and of the subsequent hearing session comprise 15 volumes numbered as follows:

Vol. I - Prehearing Conference, October 16, 1987

Vol. II - Cross Examination, November 19, 1987

Vol. III - Cross Examination, December 8, 1987

Vol. IV - Cross Examination, December 9, 1987

Vol. V - Cross Examination, January 5, 1988

Vol. VI - Cross Examination, January 6, 1988

Vol. VII - Cross Examination, January 7, 1988

Vol. VIII - Cross Examination, January 26, 1988

Vol. IX - Cross Examination, January 27, 1988

Vol. X - Cross Examination, January 28, 1988

Vol. XI - Cross Examination, January 29, 1988

Vol. XII - Cross Examination, February 2, 1988

Vol. XIII - Cross Examination, February 4, 1988

Vol. XIV - Cross Examination, February 5, 1988

Vol. XV - Oral Argument, June 10, 1988

Pages of the transcript are cited herein by volume and page, e.g. "Tr. V- 96"; "G-" identifies an Agency exhibit.

5 Throughout this opinion the term marijuana" refers to "the marijuana plant, consider as a whole".

lawfully be transferred from Schedule I to Schedule II of the schedules established by the Controlled Substances Act.

Two subsidiary issues were agreed on, as follows:

1. Whether the marijuana plant has a currently accepted medical use in treatment in the United States, or a currently accepted medical use with severe restrictions.

2. Whether there is a lack of accepted safety for use of the marijuana plant under medical supervision.

As stated above, the parties favoring transfer from Schedule I to Schedule II are NORML, ACT, CCA and Carl Eric Olsen. Those favoring retaining marijuana in Schedule I are the Agency, NFP and IACP.

During the Spring and Summer of 1987 the parties identified their witnesses and put the direct examination testimony of each witness in writing in affidavit form. Copies of these affidavits were exchanged. Similarly, the parties assembled their proposed exhibits and exchanged copies. Opportunity was provided for each party to submit objections to the direct examination testimony and exhibits proffered by the others. The objections submitted were considered by the administrative law judge and ruled on. The testimony and exhibits not excluded were admitted into the record. Thereafter hearing sessions were held at which witnesses were subjected to cross-examination. These sessions were held in New Orleans, Louisiana on November 18 and 19, 1987; in San Francisco, California on December 8 and 9, 1987; and in Washington, D.C. on January 5 through 8 and 26 through 29, and on February 2, 4 and 5, 1988. The parties have submitted proposed findings and conclusions and briefs. Oral arguments were heard by the judge on June 10, 1988 in Washington.

II.

RECOMMENDED RULING

It is recommended that the proposed findings and conclusions submitted by the parties to the administrative law judge be rejected by the Administrator except to the extent they are included in those hereinafter set forth; for the reason that they are irrelevant or unduly

repetitious or not supported by a preponderance of the evidence. 21 C.F.R. § 1316.65(a)(1).

III.

ISSUES

As noted above, the agreed issues are as follows:

Principle issue:

Whether the marijuana plant, considered as a whole, may lawfully be transferred from Schedule I to Schedule II of the schedules established by the Controlled Substances Act.

Subsidiary issues:

1. Whether the marijuana plant has a currently accepted medical use in treatment in the United States, or a currently accepted medical use with severe restrictions.

2. Whether there is a lack of accepted safety for use of the marijuana plant under medical supervision.

IV.

STATUTORY REQUIREMENTS FOR SCHEDULING

The Act provides (21 U.S.C. § 812(b)) that a drug or other substance may not be placed in any schedule unless certain specified findings are made with respect to it. The findings required for Schedule I and Schedule II are as follows:

Schedule I. -

(A) The drug or other substance has a high potential for abuse.

(B) The drug or other substance has no currently accepted medical use in treatment in the United States.

(C) There is a lack of accepted safety for use of the drug or other substance under medical supervision.

Schedule II. -

(A) The drug or other substance has a high potential for abuse.

(B) The drug or other substance has a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions.

(C) Abuse of the drug or other substances [sic] may lead to severe psychological or physical dependence.

As noted above the parties have stipulated, for the purpose of this

proceeding, that marijuana has a high potential for abuse and that abuse of it may lead to severe psychological or physical dependence. Thus the dispute between the two sides in this proceeding is narrowed to whether or not marijuana has a currently accepted medical use in treatment in the United States, and whether or not there is a lack of accepted safety for use of marijuana under medical supervision.

The issues as framed here contemplate marijuana's being placed only in

Schedule I or Schedule II. The criteria for placement in any of the other three schedules established by the Act are irrelevant to this proceeding.

V.

ACCEPTED MEDICAL USE IN TREATMENT

- CHEMOTHERAPY

With respect to whether or not marijuana has a "currently accepted medical use in treatment in the United States" for chemotherapy patients, the record shows the following facts to be uncontroverted.

Findings Of Fact

1. One of the most serious problems experienced by cancer patients undergoing chemotherapy for their cancer is severe nausea and vomiting caused by their reaction to the toxic (poisonous) chemicals administered to them in the course of this treatment. This nausea and vomiting at times becomes life threatening. The therapy itself creates a tremendous strain on the body. Some patients cannot tolerate the severe nausea and vomiting and discontinue treatment. Beginning in the 1970's there was considerable doctor-to-doctor communication in the United States concerning patients known by their doctors to be surreptitiously using marijuana with notable success to overcome or lessen their nausea and vomiting.

2. Young patients generally achieve better control over nausea and vomiting from smoking marijuana than do older patients, particularly when the older patient has not been provided with detailed information on how to smoke marijuana.

3. Marijuana cigarettes in many cases are superior to synthetic THC capsules in reducing chemotherapy-induced nausea and vomiting. Marijuana

cigarettes have an important, clear advantage over synthetic THC capsules in that the natural marijuana is inhaled and generally takes effect more quickly than the synthetic capsule which is ingested and must be processed through the digestive system before it takes effect.

4. Attempting to orally administer the synthetic THC capsule to a vomiting patient presents obvious problems - it is vomited right

back up before it can have any effect.

5. Many physicians, some engaged in medical practice and some teaching in medical schools, have accepted smoking marijuana as effective in controlling or reducing the severe nausea and vomiting (emesis) experienced by some cancer patients undergoing chemotherapy for cancer.

6. Such physicians include board-certified internists, oncologists and psychiatrists. (Oncology is the treatment of cancer through the use of highly toxic chemicals, or chemotherapy.)

7. Doctors who have come to accept the usefulness of marijuana in controlling or reducing emesis resulting from chemotherapy have dose so as the result of reading reports of studies and anecdotal reports in their professional literature, and as the result of observing patients and listening to reports directly from patients.

8. Some cancer patients who have acknowledged to doctors that they smoke marijuana for emesis control have indicated in their discussions that, although they may have first smoked marijuana recreationally, they accidentally found that doing so helped reduce the emesis resulting from their chemotherapy. They consistently indicated that they felt better and got symptomatic relief from the intense nausea and vomiting caused by the chemotherapy. These patients

were no longer simply getting high, but were engaged in medically treating their illness, albeit with an illegal substance. Other chemotherapy patients began smoking marijuana to control their emesis only after hearing reports that the practice had proven helpful to others. Such patients had not smoked marijuana recreationally.

9. This successful use of marijuana has given many cancer chemotherapy patients a much more positive outlook on their overall treatment, once they were relieved of the debilitating, exhausting and extremely unpleasant nausea and vomiting previously resulting from their chemotherapy treatment.

10. In about December 1977 the previously underground patient practice of using marijuana to control emesis burst into the public media in New Mexico when a young cancer patient, Lynn Pearson, began publicly to discuss his use of marijuana. Mr. Pearson besought the New Mexico legislature to pass legislation making marijuana available legally to seriously ill patients whom it might help. As a result, professionals in the public health sector in New Mexico more closely examined how marijuana might be made legally available to assist in meeting what now openly appeared to be a widely recognized patient need.

11. In many cases doctors have found that, in addition to suppressing nausea and vomiting, smoking marijuana is a highly successful appetite stimulant. The importance of appetite stimulation in cancer therapy cannot be overstated. Patients receiving chemotherapy often lose tremendous amounts of weight. They endanger their lives because they lose interest in food and in eating. The resulting sharp reduction in weight may well affect their prognosis. Marijuana smoking induces some patients to eat. The benefits are obvious, doctors have found. There is no significant loss of weight. Some patients will gain weight.

This allows them to retain strength and makes them better able to fight the cancer. Psychologically, patients who can continue to eat even while receiving chemotherapy maintain a balanced outlook and are better able to cope with their disease and its treatment, doctors have found.

12. Synthetic anti-emetic agents have been in existence and utilized for a number of years. Since about 1980 some new synthetic agents have been developed which appear to be more effective in controlling and reducing chemotherapy-induced nausea and vomiting than were some of those available in the 1970's. But marijuana still is found more effective for this purpose in some people than any of the synthetic agents, even the newer ones.

13. By the late 1970's in the Washington, D.C. area there was a growing recognition among health care professionals and the public that marijuana had therapeutic value in reducing the adverse effects of some chemotherapy treatments. With this increasing public awareness came increasing pressure from patients on doctors for information about marijuana and its therapeutic uses. Many patients moved into forms of unsupervised self-treatment. While such self-treatment often proved very effective, it has certain hazards, ranging from arrest for purchase or use of an illegal drug to possibly serious medical complications from contaminated sources or adulterated materials. Yet, some patients are willing to run these risks to obtain relief from the debilitating nausea and vomiting caused by their chemotherapy treatments.

14. Every oncologist known to one Washington, D.C. practicing internist and board-certified oncologist has had patients who used marijuana with great success to prevent or diminish chemotherapy-induced nausea and vomiting. Chemotherapy patients reporting directly to that Washington doctor that they

have smoked marijuana medicinally vomit less and eat better than patients who do not smoke it. By gaining control over their severe nausea and vomiting these patients undergo a change of mood and have a better mental outlook than patients who, using the standard anti-emetic drugs, are unable to gain such control.

15. The vomiting induced by chemotherapeutic drugs may last up to four days following the chemotherapy treatment. The vomiting can be intense, protracted and, in some instances, is unendurable. The nausea which follows such vomiting is also deep and prolonged. Nausea may prevent a patient from taking regular food or even much water for periods of weeks at a time.

16. Nausea and vomiting of this severity degrades the quality of life for these patients, weakening them physically, and destroying the will to fight the cancer. A desire to end the chemotherapy treatment in order to escape the emesis can supersede the will to live. Thus the emesis, itself, can truly be considered a life-threatening consequence of many cancer treatments. Doctors have known such cases to occur. Doctors have known other cases where marijuana smoking has enabled the patient to endure, and thus continue, chemotherapy treatments with the result that the cancer has gone into remission and the patient has returned to a full, active satisfying life.

17. In San Francisco chemotherapy patients were surreptitiously using marijuana to control emesis by the early 1970's. By 1976 virtually every young cancer patient receiving chemotherapy at the University of California in San Francisco was using marijuana to control emesis with great success. The use of marijuana for this purpose had become generally accepted by the patients and increasingly by their physicians as a valid and effective form of treatment. This was particularly true for younger cancer patients, somewhat less common for

older ones. By 1979 about 25% to 30% of the patients seen by one San Francisco oncologist were using marijuana to control emesis, about 45 to 50 patients per year. Such percentages and numbers vary from city to city. A doctor in Kansas City who sees about 150 to 200 new cancer patients per year found that over the 15 years 1972 to 1987 about 5% of the patients he saw, or a total of about 75, used marijuana medicinally.

18. By 1987 marijuana no longer generated the intense interest in the world of oncology that it had previously, but it remains a viable tool, commonly employed, in the medical treatment of chemotherapy patients. There has evolved an unwritten but accepted standard of treatment within the community of oncologists in the San Francisco, California area which readily accepts the use of marijuana.

19. As of the Spring of 1987 in the San Francisco area, patients receiving chemotherapy commonly smoked marijuana in hospitals during their treatments. This in-hospital use, which takes place in rooms behind closed doors, does not bother staff, is expected by physicians and welcomed by nurses who, instead of having to run back and forth with containers of vomit, can treat patients whose emesis is better controlled than it would be without marijuana. Medical institutions in the Bay area where use of marijuana obtained on the streets is quite common, although discrete, include the University of California at San Francisco Hospital, the Mount Zion Hospital and the Franklin Hospital. In effect, marijuana is readily accepted throughout the oncologic community in the bay area for its benefits in connection with chemotherapy. The same situation exists in other large metropolitan areas of the United States.

20. About 50% of the patients seen by one San Francisco oncologist

during the year 1987 were smoking marijuana medicinally. This is about 90 to 95 individuals. This number is higher than during the previous ten years due to the nature of this physician's practice which includes patients from the "tenderloin" area of San Francisco, many of whom are suffering from AIDS-related lymphosarcoma. These patients smoke marijuana to control their nausea and vomiting, not to "get high." They self-titrate, i.e., smoke the marijuana only as long as needed to overcome the nausea, to prevent vomiting.

21. The State of New Mexico set up a program in 1978 to make marijuana available to cancer patients pursuant to an act of the State legislature. The legislature had accepted marijuana as having medical use in treatment. It overwhelmingly passed this legislation so as to make marijuana available for use in therapy, not just for research. Marijuana and synthetic THC were given to patients, administered under medical supervision, to control or reduce emesis. The marijuana was in

the form of cigarettes obtained from the Federal government. The program operated from 1979 until 1986, when funding for it was terminated by the State. During those seven years about 250 cancer patients in New Mexico received either marijuana cigarettes or THC. Twenty or 25 physicians in New Mexico sought and obtained marijuana cigarettes or THC for their cancer patients during that period. All of the oncologists in New Mexico accepted marijuana as effective for some of their patients. At least ten hospitals involved in this program in New Mexico, in which cancer patients smoked their marijuana cigarettes. The hospitals accepted this medicinal marijuana smoking by patients. Voluminous reports filed by the participating physicians make it clear that marijuana is a highly effective anti-emetic substance. It was found in the New Mexico program to be far superior to the best available conventional

anti-emetic drug, compazine, and clearly superior to synthetic THC pills. More than 90% of the patients who received marijuana within the New Mexico program reported significant or total relief from nausea and vomiting. Before the program began cancer patients were surreptitiously smoking marijuana in New Mexico to lessen or control their emesis resulting from chemotherapy treatments. They reported to physicians that it was successful for this purpose. Physicians were aware that this was going on.

22. In 1978 the Louisiana legislature became one of the first- State legislatures in the nation to recognize the efficacy of marijuana in controlling emesis by enacting legislation intended to make marijuana available by prescription for therapeutic use by chemotherapy patients. This enactment shows that there was widespread acceptance in Louisiana of the therapeutic value of marijuana. After a State Marijuana Prescription Review Board was established, pursuant to that legislation, it became apparent that, because of Federal restrictions, marijuana could be obtained legally only for use in cumbersome, formal research programs. Eventually a research program was entered into by the State, utilizing synthetic THC, but without much enthusiasm, since most professionals who had wanted to use marijuana clinically, to treat patients, had neither the time, resources nor inclination to get involved in this limited, formal study. The original purpose of the Louisiana legislation was frustrated by the Federal authorities. Some patients, who had hoped to obtain marijuana for medical use legally after enactment of the State legislation, went outside the law and obtained it illicitly. Some physicians in Louisiana accept marijuana as having a distinct medical value in the treatment of the nausea and vomiting associated with certain types of chemotherapy treatments.

23. In 1980 the State of Georgia enacted legislation authorizing a therapeutic research program for the evaluation of marijuana as a medically recognized therapeutic substance. Its enactment was supported by letters from a number of Georgia oncologist and other Georgia physician, including the Chief of oncology at Grady Hospital and staff oncologist at Emory University Medical Clinic. Sponsors of the legislation originally intended the enactment of a law making marijuana available for clinical, therapeutic use by patients. The bill was referred to as the "Marijuana-as-Medicine" bill. The final legislation was crafted, however, of necessity, merely to set up a research program in order to obtain marijuana from the one legitimate

source available - the Federal Government, which would not make the substance available for any other purpose other than conducting a research program. The act was passed by an overwhelming majority in the lower house of the legislature and unanimously in the Senate. In January 1983 an evaluation of the program, which by then had 44 evaluable marijuana smoking patient- participants, accepted marijuana smoking as being an effective anti-emetic agent.

24. In Boston, Massachusetts in 1977 a nurse in a hospital suggested to a chemotherapy patient, suffering greatly from the therapy and at the point of refusing further treatment, that smoking marijuana might help relieve his nausea and vomiting. The patient's doctor, when asked about it later, stated that many of his younger patients were smoking marijuana. Those who did so seemed to have less trouble with nausea and vomiting. The patient in question obtained some marijuana and smoked it, in the hospital, immediately before his next chemotherapy treatment. Doctors, nurses, and orderlies coming into the room as he finished smoking realized what the patient had been doing. None of them

made any comment. The marijuana was completely successful with this patient, who accepted it as effective in controlling his nausea and vomiting. Instead of being sick for weeks following chemotherapy, and having trouble going to work, as had been the case, the patient was ready to return to work 48 hours after that chemotherapy treatment. The patient thereafter always smoked marijuana, in the hospital, before chemotherapy. The doctors were aware of it, openly approved of it and encouraged him to continue. The patient resumed eating regular meals and regained lost eight, his mood improved markedly, he became more active and outgoing and began doing things together with his wife that he had not done since beginning chemotherapy.

25. During the remaining two years of this patient's life, before his cancer ended it, he came to know other cancer patients who were smoking marijuana to relieve the adverse effects of their chemotherapy. Most of these patients had learned about using marijuana medically from their doctors who, having accepted its effectiveness, subtly encouraged them to use it.

26. A Boston psychiatrist and professor, who travels about the country, has found a minor conspiracy to break the law among oncologists and nurses in every oncology center he has visited to let patients smoke marijuana before and during cancer chemotherapy. He has talked with dozens of these health care oncologists who encourage their patients to do this and who regard this as an accepted medical usage of marijuana. He has known nurses who have obtained marijuana for patients unable to obtain it for themselves.

27. A cancer patient residing in Beaverton, Michigan smoked marijuana medicinally in the nearby hospital where he was undergoing chemotherapy from early 1979 until he died of his cancer in October of that year. He smoked it in

his hospital room after his parents made arrangements with the hospital for him to do so. Smoking marijuana controlled his post-chemotherapy nausea and vomiting, enabled him to eat regular-meals again with his family, and he became outgoing and talkative. His parents accepted his

marijuana smoking as effective and helpful. Two clergymen, among others, brought marijuana to this patient's home. Many people at the hospital supported the patient's marijuana therapy, none doubted its helpfulness or discouraged it. This patient was asked for help by other patients. He taught some who lived nearby how to form the marijuana cigarettes and properly inhale the smoke to obtain relief from nausea and vomiting. When an article about this patient's smoking marijuana appeared in a local newspaper, he and his family heard from many other cancer patients who were doing the same. Most of them made an effort to inform their doctors. Most Physicians who knew their patients smoked marijuana medicinally approved, accepting marijuana's therapeutic helpfulness in reducing nausea and vomiting.

28. In October 1979 the Michigan legislature enacted legislation whose underlying purpose was to make marijuana available therapeutically for cancer patients and others. The State Senate passed the bill 29-5, the House of Representatives 100-0. In March 1982 the Michigan legislature passed a resolution asking the Federal Congress to try to alter Federal policies which prevent physicians from prescribing marijuana for legitimate medical applications and prohibit its use in medical treatments.

29. In Denver, Colorado a teenage cancer patient has been smoking marijuana to control nausea and vomiting since 1986. He has done this in his hospital room both before and after chemotherapy. His doctor and hospital staff know he does this. The doctor has stated that he would prescribe marijuana for

this patient if it were legal to do so. Other patients in the Denver area smoke marijuana for the same purpose. This patient's doctor, and nurses with whom he comes in contact, understand that cancer patients smoke marijuana to reduce or control emesis. They accept it.

30. In late 1980 a three year old boy was brought by his parents to a hospital in Spokane, Washington. The child was diagnosed as having cancer. Surgery was performed. Chemotherapy was begun. The child became extremely nauseated and vomited for days after each chemotherapy treatment. He could not eat regularly. He lost strength. He lost weight. His body's ability to ward off common infections, other life-threatening infections, significantly decreased. Chemotherapy's after-effects caused the child great suffering. They caused his watching parents great suffering. Several standard, available anti-emetic agents were tried by the child's doctors. None of them succeeded in controlling his nausea or vomiting. Learning of the existence of research studies with THC or marijuana the parents asked the child's doctor to arrange for their son to be the subject of such a study so that he might have access to marijuana. The doctor refused, citing the volume of paperwork and record-keeping detail required in such programs and his lack of administrative personnel to handle it.

31. The child's mother read an article about marijuana smoking helping chemotherapy patients. She obtained some marijuana from friends. She baked cookies for her child with marijuana in them. She made tea for him with marijuana in it. When the child ate these cookies or drank this tea in connection with his chemotherapy, he did not vomit. His strength returned. He regained lost weight. His spirits revived. The parents told the doctors and nurses at the hospital of their giving marijuana to their child. None objected.

They all accepted smoking marijuana as effective in controlling chemotherapy induced nausea and vomiting. They were interested to see the results of the cookies.

32. Soon this child was riding a tricycle in the hallways of the Spokane hospital shortly after his chemotherapy treatments while other children there were still vomiting into pans, tied to intravenous bottles in an attempt to re-hydrate them, to replace the liquids they were vomiting up. Parents of some of the other patients asked the parents of this "lively" child how he seemed to tolerate his chemotherapy so well. They told of the marijuana use. Of those parents who began giving marijuana to their children, none ever reported back encountering any adverse side effects. In the vast majority of these cases, the other parents reported significant reduction in their children's vomiting and appetite stimulation as the result of marijuana. The staff, doctors and nurses at the hospital knew of this passing on of information about marijuana to other parents. They approved. They never told the first parents to hide their son's medicinal use of marijuana. They accepted the effectiveness of the cookies and the tea containing marijuana.

33. The first child's cancer went into remission. Then it returned and spread. Emotionally drained, the parents moved the family back to San Diego, California to be near their own parents. Their son was admitted to a hospital in San Diego. The parents informed the doctors, nurses and social workers there of their son's therapeutic use of marijuana. No one objected. The child's doctor in San Diego strongly supported the parent's giving marijuana to him. Here in California, as in Spokane, other parents noticed the striking difference between their children after chemotherapy and the first child.

- 22 -

Other parents asked the parents of the first child about it, were told of the use of marijuana, tried it with their children, and saw dramatic improvement. They accepted its effectiveness. In the words of the mother of the first child: ". . . When your kid is riding a tricycle while his other hospital buddies are hooked up to IV needles, their heads hung over vomiting buckets, you don't need a federal agency to tell you marijuana is effective. The evidence is in front of you, so stark it cannot be ignored." [footnote 6]

34. There is at least one hospital in Tucson, Arizona where medicinal use of marijuana by chemotherapy patients is encouraged by the nursing staff and some physicians.

35. In addition to the physicians mentioned in the Findings above, mostly oncologists and other practitioners, the following doctors and health care professionals, representing several different areas of expertise, accept marijuana as medically useful in controlling or reducing emesis and testified to that effect in these proceedings:

a. George Goldstein, Ph.D., psychologist, Secretary of Health for the State of New Mexico from 1978 to 1983 and chief administrator in the implementation of the New Mexico program utilizing marijuana;

b. Dr. Daniel Danzak, psychiatrist and former head of the

New Mexico program utilizing marijuana;

c. Dr. Tod Mikuriya, psychiatrist and editor of Marijuana: Medical Papers, a book presenting an historical perspective of marijuana's medical use;

d. Dr. Norman Zinberg, general psychiatrist and Professor of Psychiatry at Harvard Medical School since 1951;

6 Affidavit of Janet Andrews, ACT rebuttal witness, par. 98.

e. Dr. John Morgan, psychopharmacologist, Board-certified in Internal Medicine, full Professor and Director of Pharmacology at the City University of New York;

f. Dr. Phillip Jobe, neuropsychopharmacologist with a practice in Illinois and former Professor of Pharmacology and Psychiatry at the Louisiana State University School of Medicine in Shreveport, Louisiana, from 1974 to 1984;

g. Dr. Arthur Kaufman, formerly a general practitioner in Maryland, currently Vice-President of a private medical consulting group involved in the evaluation of the quality of care of all the U.S. military hospitals throughout the world, who has had extensive experience in drug abuse treatment and rehabilitation programs;

h. Dr. J. Thomas Ungerleider, a full Professor of Psychiatry at the University of California in Los Angeles with extensive experience in research on the medical use of drugs;

i. Dr. Andrew Weil, ethnopharmacologist, Associate Director of Social Perspectives in Medicine at the College of Medicine at the University of Arizona, with extensive research on medicinal plants; and

j. Dr. Lester Grinspoon, a practicing psychiatrist and Associate Professor at Harvard Medical School.

36. Certain law enforcement authorities have been outspoken in their acceptance of marijuana as an antiemetic agent. Robert T. Stephan, Attorney General of the State of Kansas, and himself a former cancer patient, said of chemotherapy in his affidavit in this record: "The treatment becomes a terror." His cancer is now in remission. He came to know a number of health care professionals whose medical judgment he respected. They had accepted marijuana

as having medical use in treatment. He was elected Vice President of the National Association of Attorneys General (NAAG) in 1983. He was instrumental in the adoption by that body in June 1983 of a resolution acknowledging the efficacy of marijuana for cancer and glaucoma patients. The resolution expressed the support of NAAG for legislation then pending in the Congress to make marijuana available on prescription

to cancer and glaucoma patients. The resolution was adopted by an overwhelming margin. NAAG's President, the Attorney General of Montana, issued a statement that marijuana does have accepted medical uses and is improperly classified at present. The Chairman of NAAG's Criminal Law and Law Enforcement Committee, the Attorney General of Pennsylvania, issued a statement emphasizing that the proposed rescheduling of marijuana would in no way affect or impede existing efforts by law enforcement authorities to crack down on illegal drug trafficking.

37. At least one court has accepted marijuana as having medical use in treatment for chemotherapy patients. On January 23, 1978 the Superior Court of Imperial County, California issued orders authorizing a cancer patient to possess and use marijuana for therapeutic purposes under the direction of a physician. Another order authorized and directed the Sheriff of the county to release marijuana from supplies on hand and deliver it to that patient in such form as to be usable in the form of cigarettes.

38. During the period 1978-1980 polls were taken to ascertain the degree of public acceptance of marijuana as effective in treating cancer and glaucoma patients. A poll in Nebraska brought slightly over 1,000 responses - 83% favored making marijuana available by prescription, 12% were opposed, 5% were undecided. A poll in Pennsylvania elicited 1,008 responses - 83.1% favored availability by prescription, 12.2% were opposed, 4.7% were undecided. These

two surveys were conducted by professional polling companies. The Detroit Free Press conducted a telephone poll in which 85.4% of those responding favored access to marijuana by prescription. In the State of Washington the State Medical Association conducted a poll in which 80% of the doctors belonging to the Association favored controlled availability of marijuana for medical purposes.

Discussion

From the foregoing uncontroverted facts it is clear beyond any question that many people find marijuana to have, in the words of the Act, an "accepted medical use in treatment in the United States" in effecting relief for cancer patients. Oncologists, physicians treating cancer patients, accept this. Other medical practitioners and researchers accept this. Medical faculty professors accept it. Nurses performing hands-on patient care accept it.

Patients accept it. As counsel for CCA perceptively pointed out at oral argument, acceptance by the patient is of vital importance. Doctors accept a therapeutic agent or process only if it "works" for the patient. If the patient does not accept, the doctor cannot administer the treatment. The patient's informed consent is vital. The doctor ascertains the patient's acceptance by observing and listening to the patient. Acceptance by the doctor depends on what he sees in the patient and hears from the patient. Unquestionably, patients in large numbers have accepted marijuana as useful in treating their emesis. They have found that it "works". Doctors, evaluating their patients, can have no basis more sound than that for their own acceptance.

Of relevance, also, is the acceptance of marijuana by state attorneys-

general, officials whose primary concern is law enforcement. A large number of them have no fear that placing marijuana in Schedule II, thus making it available for legitimate therapy, will in any way impede existing efforts of law enforcement authorities to crack down on illegal drug trafficking.

The Act does not specify by whom a drug or substance must be "accepted [for] medical use in treatment" in order to meet the Act's "accepted" requirement for placement in Schedule II. Department of Justice witnesses told the Congress during hearings in 1970 preceding passage of the Act that "the medical Profession" would make this determination, that the matter would be "determined by the medical community." The Deputy Chief Counsel of BNDD, whose office had written the bill with this language in it, told the House subcommittee that "this basic determination . . . is not made by any part of the federal government. It is made by the medical community as to whether or not the drug has medical use or doesn't". [footnote 7]

No one would seriously contend that these Justice Department witnesses meant that the entire medical community would have to be in agreement on the usefulness of a drug or substance. Seldom, if ever, do all lawyers agree on a point of law. Seldom, if ever, do all doctors agree on a medical question. How many are required here? A majority of 51%? It would be unrealistic to attempt a plebiscite of all doctors in the country on such a question every time it arises, to obtain a majority vote.

In determining whether a medical procedure utilized by a doctor is actionable as malpractice the courts have adopted the rule what it is acceptable

7 Drug Abuse Control Amendments - 1970: Hearings on H.R. 11701 and H.R. 13743 Before the Subcommittee on Public Health and Welfare of the House Committee on Interstate and Foreign Commerce, 91st Congress, 2d Sess. 678, 696, 718 (1970) (Statement of John E. Ingersoll, Director, BNDD).

for a doctor to employ a method of treatment supported by a respectable minority of physicians.

In Hood v. Phillips, 537 S.W. 2d 291 (1976) the Texas Court of Civil Appeals was dealing with a claim of medical malpractice resulting from a surgical procedure claimed to have been unnecessary. The court quoted from an Arizona court decision holding that

> a method of treatment, as espoused and used by . . . a respectable minority of physicians in the United States, cannot be said to be an inappropriate method of treatment or to be malpractice as a matter of law even though it has not been accepted as a proper method of treatment by the medical profession generally.

Ibid. at 294. Noting that the Federal District court in the Arizona case found a "respectable minority" composed of sixty-five physicians throughout the United States, the Texas court adopted as "the better rule" to apply in its case, that

> a physician is not guilty of malpractice where the method of treatment used is supported by a respectable minority of physicians.

Ibid.

In Chumbler v. McClure, 505 F.2d 489 (6th Cir. 1974) the Federal courts were dealing with a medical malpractice case under their diversity jurisdiction, applying Tennessee law, The Court of Appeals said:

> . . . The most favorable interpretation that may be placed on the testimony adduced at trial below is that there is a division of opinion in the medical profession regarding the use of Premarin in the Treatment of cerebral vascular insufficiency, and that Dr. McClure was alone among neurosurgeons in Nashville in using such therapy. The test for malpractice and for community standards is not to be determined solely by a plebiscite. Where two or more schools of thought exist among competent members of the medical profession concerning proper medical treatment for a given ailment, each of which is supported by responsible

> medical authority, it is not malpractice to be among the minority in a given city who follow: one of the accepted schools.

505 F.2d at 492 (Emphasis added). See, also, Leech v. Bralliar, 275 F.Supp. 897 (D.Ariz., 1967).

How do we ascertain whether there exists a school of thought supported by responsible medical authority, and thus "accepted"? We listen to the physicians.

> The court and jury must have a standard measure which they are to use in measuring the acts of a doctor to determine whether he exercised a reasonable degree of care and skill; they are not permitted to set up and use any arbitrary or artificial standard of measurement that the jury may wish to apply. The proper standard of measurement is to be established by testimony of physicians, for it is a medical question.

Hayes v. Brown, 133 S.E. 2d. 102 (Ga., 1963) at 105.

As noted above, there is no question but that this record shows a great many physicians, and others, to have "accepted" marijuana as having a medical use in the treatment of cancer patients' emesis. True, all physicians have not "accepted" it. But to require universal, 100% acceptance would be unreasonable. Acceptance by "a respectable minority" of physicians is all that can reasonably be required. The record here establishes conclusively that at least "a respectable minority" of physicians has "accepted" marijuana as having a "medical use in treatment in the United states." That others may not makes no difference.

The administrative law judge recommended this same approach for determining whether a drug has an "accepted medical use in treatment" in The Matter Of MDMA Scheduling, Docket No. 84-48. The Administrator, in his first final rule in that proceeding, issued on October 8, 1986 [footnote 8], declined to adopt this approach. He

8 51 Fed. Reg. 36552 (1986).

ruled, instead, that DEA's decision on whether or not a drug or other substance had an accepted medical use in treatment in the United States would be determined simply by ascertaining whether or not "the drug or other substance is lawfully marketed in the United States pursuant to the Federal Food, Drug and Cosmetic Act of 1938 . . . ." [footnote 9]

The United States Court of Appeals for the First Circuit held that the Administrator erred in so ruling. [footnote 10] That court vacated the final order of October 8, 1986 and remanded the matter of MDMA's scheduling for further consideration. The court directed that, on remand, the Administrator would not be permitted to treat the absence of interstate marketing approval by FDA as conclusive evidence on the question of accepted medical use under the Act.

In his third final rule [footnote 11] of the matter of the scheduling of MDMA the Administrator made a series of findings of fact as to MDMA, the drug there under consideration, with respect to the evidence in that record. On those findings he based his last final rule in the case. [footnote 12]

9 Ibid., at 36558.

10 Grinspoon v. Drug Enforcement Administration, 828 F.2d 881 (1st. Cir., 1987).

11 53 Fed. Reg. 5156 (1988). A second final rule had been issued on January 20, 1988. It merely removed MDMA from Schedule I pursuant to the mandate of the Court of Appeals which had voided the first final rule placing it there. Subsequently the third final rule was issued, without any further hearings, again placing MDMA in Schedule I. There was no further appeal.

12 In neither the first nor the third final rule in the MDMA case does the Administrator take any cognizance of the statements to the Congressional committee by predecessor Agency officials that the determination as to "accepted medical use in treatment" is to be made by the medical community and not by any part of the federal government. See page 27, above. It is curious that the administrator makes no effort whatever to show how the BNDD representatives were mistaken or to explain why he now has abandoned their interpretation. They wrote that language into the original bill.

That third final rule dealing with MDMA is dealing with a synthetic, "simple", "single-action" drug. What might be appropriate criteria for a

"simple" drug like MDMA may not be appropriate for a "complex" substance with a number of active components. The criteria applied to MDMA, a synthetic drug, are not appropriate for application to marijuana, which is a natural plant substance.

The First Circuit Court of Appeals in the MDMA case told the Administrator that he should not treat the absence of FDA interstate marketing approval as conclusive evidence of lack of currently accepted medical use. The court did not forbid the Administrator from considering the absence of FDA approval as a factor when determining the existence of accepted medical use. Yet on remand, in his third final order, the Administrator adopted by reference 18 of the numbered findings he had made in the first final order. Each of these findings had to do with requirements imposed by FDA for approval of a new drug application (NDA) or of an investigational new drug exemption (IND). These requirements deal with data resulting from controlled studies and scientifically conducted investigations and test.

Among those findings incorporated into the third final MDMA order from the first, and relied on by the Administrator, was the determination and recommendation of the FDA that the drug there in question was not "accepted". In relying on the FDA's action the Administrator apparently overlooked the fact that the FDA clearly stated that it was interpreting "accepted medical use" in the Act as being equivalent to receiving FDA approval for lawful marketing under the FDCA. Thus the Administrator accepted as a basis for his MDMA third final rule the FDA recommendation which was based upon a statutory interpretation which the Court

of Appeals had condemned.

The Administrator in that third final rule made a series of further findings. Again, the central concern in these findings was the content of test results and the sufficiency or adequacy of studies and scientific reports. A careful reading of the criteria considered in the MDMA third final order reveals that the Administrator was really considering the question: Should the drug be accepted for medical use?; rather than the question: Has the drug been accepted for medical use? By considering little else but scientific test results and reports the Administrator was making a determination as to whether or not, in his opinion, MDMA ought to be accepted for medical use in treatment.

The Agency's arguments in the present case are to the same effect. In a word, they address the wrong question. It is not for this Agency to tell doctors whether they should or should not accept a drug or substance for medical use. The statute directs the Administrator merely to ascertain whether, in fact, doctors have done so.

The MDMA third final order mistakenly looks to FDA criteria for guidance in choosing criteria for DEA to apply. Under the Food, Drug and Cosmetic Act the FDA is deciding - properly, under that statute - whether a new drug should be introduced into interstate commerce. Thus it is appropriate for the FDA to rely heavily on test results and scientific inquiry to ascertain whether a drug is effective and whether it is safe. The FDA must look at a drug and pass judgment on its intrinsic qualities. The DEA, on the other hand, is charged by 21 U.S.C. § 812(b)(1)(B) and (2)(B) with ascertaining what it is that other people have done with respect to a drug or substance: "Have they accepted it?;"

not "Should they accept it?"

In the MDMA third final order DEA is actually making the decision that doctors have to make, rather than trying to ascertain the decision which doctors have made. Consciously or not, the Agency is undertaking to tell doctors what they should or should not accept. In so doing the Agency is acting beyond the authority granted in the Act.

It is entirely proper for the Administrator to consider the pharmacology of a drug and scientific test results in connection with determining abuse potential. But abuse potential is not in issue in this marijuana proceeding.

There is another reason why DEA should not be guided by FDA criteria in ascertaining whether or not marijuana has an accepted medical use in treatment. These criteria are applied by FDA pursuant to Section 505 of the Federal Food, Drug and Cosmetic Act (FDCA), as amended. [footnote 13] When the FDA is making an inquiry pursuant to that legislation it is looking at a synthetically formed new drug. The marijuana plant is anything but a new drug. Uncontroverted evidence in this record indicates that marijuana was being used therapeutically by mankind 2000 years before the Birth of Christ. [footnote 14]

Uncontroverted evidence further establishes that in this country today "new drugs" are developed by pharmaceutical companies possessing resources sufficient to bear the enormous expense of testing a new drug, obtaining FDA approval of its efficacy and safety, and marketing it successfully. No company undertakes the investment required unless it has a patent on the drug, so it can recoup its development costs and make a profit. At oral argument Government counsel conceded that "the FDA system is constructed for pharmaceutical companies. I won't

13 21 U.S.C. § 355.

14 Alice M. O'Leary, direct, par. 9.

deny that." [footnote 15]

Since the substance being considered in this case is a natural plant rather than a synthetic drug, it is unreasonable to make FDA-type criteria determinative of the issue in this case, particularly so when such criteria are irrelevant to the question posed by the act: does the substance have an accepted medical use in treatment?

Finally, the Agency in this proceeding relies in part on the FDA's recommendation that the Administrator retain marijuana in Schedule I. But, as in the MDMA case, that recommendation is based upon FDA's equating "accepted medical use" under the Act with being approved for marketing by FDA under the Food, Drug and Cosmetic Act, the interpretation condemned by the First Circuit in the MDMA case. See Attachment A, p.24, to exhibit G-1 and exhibit G-2.

The overwhelming preponderance of the evidence in this record establishes that marijuana has a currently accepted medical use in treatment in the United States for nausea and vomiting resulting from chemotherapy treatments in some cancer patients. To conclude otherwise,

on this record, would be unreasonable, arbitrary and capricious.

15 Tr. XV-37.

VI.

ACCEPTED MEDICAL USE IN TREATMENT
- GLAUCOMA

Findings of Fact

The preponderance of the evidence establishes the following facts with respect to the accepted medical use of marijuana in the treatment of glaucoma.

1. Glaucoma is a disease of the eye characterized by the excessive accumulation of fluid causing increased intraocular pressure, distorted vision and, ultimately, blindness. In its early stages this pressure can sometimes be relieved by the administration of drugs. When such medical treatment fails adequately to reduce the intraocular pressure (IOP), surgery is generally resorted to. Although useful in many cases, there is a high incidence of failure with some types of surgery. Further, serious complications can occur as a result of invasive surgery. Newer, non-invasive procedures such as laser trabeculoplasty are thought by some to offer much greater efficacy with fewer complications. Unless the IOP is relieved and brought to a satisfactory level by one means or another, the patient will go blind.

2. Two highly qualified and experienced ophthalmologists in the United States have accepted marijuana as having a medical use in treatment for glaucoma. They are John C. Merritt, M.D. and Richard D. North, M.D. Each of them is both a clinician, treating patients, and a researcher. Dr. Merritt is also a professor of ophthalmology. Dr. North has served as a medical officer in ophthalmology for the Department of Health, Education and Welfare and has worked with the Public Health Service and FDA.

3. Dr. Merritt's experience with glaucoma patients using marijuana medicinally includes one Robert Randall and, insofar as the evidence here establishes per petitioners' briefs, an unspecified number of other patients, something in excess of 40.

4. Dr. North has treated only one glaucoma patient using marijuana medicinally - the same Robert Randall mentioned immediately above. Dr. North had monitored Mr. Randall's medicinal use of marijuana for nine years as of May 1987

5. Dr. Merritt has accepted marijuana as having an important place in the treatment of "End Stage" glaucoma. "End Stage" glaucoma, essentially, defines a patient who has already lost substantial amounts of vision; available glaucoma control drugs are no longer able adequately to reduce the intraocular pressure (IOP) to prevent further, progressive sight loss; the patient, lacking additional IOP reductions, will go blind.

6. Robert S. Hepler, M.D., is a highly qualified and experienced ophthalmologist. He has done research with respect to the effect of smoking marijuana on glaucoma. In December 1975 he prescribed

marijuana for the same Robert Randall mentioned above as a research subject. Dr. Hepler found that large dosages of smoked marijuana effectively reduced Robert Randall's IOP into the safe range over an entire test day. He concluded that the only known alternative to preserve Randall's sight which would avoid the significant risks of surgery is to include marijuana as part of Randall's prescribed medical regimen. He further concluded in 1977 that, if marijuana could have been legally prescribed, he would have prescribed it for Randall as part of Randall's regular glaucoma maintenance program had he been Randall's personal physician.

Nonetheless, in 1987 Dr. Hepler was of the opinion that marijuana did not have a currently accepted medical use in the United States for the treatment of glaucoma.

7. Four glaucoma patients testified in these proceedings. Each has found marijuana to be of help in controlling IOP.

8. In 1984 the treatment of glaucoma with Cannabis was the subject of an Ophthalmology Grand Rounds at the University of California, San Francisco. A questionnaire was distributed which queried the ophthalmologists on cannabis therapy for glaucoma patients refractory to standard treatment. Many of them have glaucoma patients who have asked about marijuana. Most of the responding ophthalmologists believed that THC capsules or smoked marijuana need to be available for patients who have not benefited significantly from standard treatment.

9. In about 1978 an unspecified number of persons in the public health service sector in New Mexico, including some physicians, accepted marijuana as having medical use in treating glaucoma.

10. A majority of an unspecified number of ophthalmologists known to Arthur Kaufman, M.D., who was formerly in general practice but now is employed as a medical program administrator, accept marijuana as having medical use in treatment of glaucoma.

11. In addition to the physicians identified and referred to in the findings above, the testimony of patients in this record establishes that no more than three or four other physicians consider marijuana to be medically useful in the treatment of glaucoma in the United States. One of those Physicians actually wrote a prescription for marijuana for a patient, which, of course, she was unable to have filled.

12. There are test results showing that smoking marijuana has reduced the IOP in some glaucoma patients. There is continuing research underway in the United States as to the therapeutic effect of marijuana on glaucoma.

Discussion

Petitioners' briefs fail to show that the preponderance of the evidence in the record with respect to marijuana and glaucoma establishes that a respectable minority of physicians accepts marijuana as being useful in the treatment of glaucoma in the United States.

This conclusion is not to be taken in any way as criticism of the opinions of the ophthalmologists who testified that they accept marijuana for this purpose. The failure lies with petitioners. In their briefs they do not point out hard, specific evidence in this record sufficient to establish that a respectable minority of physicians has accepted their position.

There is a great volume of evidence here, and much discussion in the briefs, about the protracted case of Robert Randall. But when all is said and done, his experience presents but one case. The record contains sworn testimony of three ophthalmologists who have treated Mr. Randall. One of them tells us of a relatively small number of other glaucoma patients whom he has treated with marijuana and whom he knows to have responded favorably. Another of these three doctors has successfully treated only Randall with marijuana. The third testifies, despite his successful experience in treating Randall, that marijuana does not have an accepted use in such treatment.

In addition to Robert Randall, Petitioners point to the testimony of three other glaucoma patients. Their case histories are impressive, but they contribute

little to the carrying of Petitioner's burden of showing that marijuana is accepted for medical treatment of glaucoma by a respectable minority of physicians. See pages 26-29, above.

Petitioners have in evidence copies of a number of newspaper clippings reporting statements by persons claiming that marijuana has helped their glaucoma. The administrative law judge is unable to give significant weight to this evidence. Had these persons testified so as to have been subject to cross-examination, a different situation would be presented. But these newspaper reports of extra-judicial statements, neither tested by informed inquiry nor supported by a doctor's opinion, are not entitled to much weight. They are of little, if any, materiality.

Beyond the evidence referred to above there is a little other "hard" evidence, pointed out by petitioners, of Physicians accepting marijuana for treatment of glaucoma. Such evidence as that concerning a survey of a group of San Francisco ophthalmologists is ambiguous, at best. The relevant document establishes merely that most of the doctors on the grand round, who responded to an inquiry, believed that the THC capsules or marijuana ought to be available.

In sum, the evidence here tending to show that marijuana is accepted for treatment of glaucoma falls far, far short of quantum of evidence tending to show that marijuana is accepted for treatment of emesis in cancer patients. The preponderance of the evidence here, identified by petitioners in their briefs, does not establish that a respectable minority of physicians has accepted marijuana for glaucoma treatment.

VII.

ACCEPTED MEDICAL USE IN TREATMENT
- MULTIPLE SCLEROSIS, SPASTICITY

AND HYPERPARATHYROIDISM

Findings Of Fact

The preponderance of the evidence clearly establishes the following facts with respect to marijuana's use in connection with multiple sclerosis, spasticity and hyperparathyroidism.

1. Multiple sclerosis is the major cause of neurological disability among young and middle-aged adults in the United States today. It is a life-long disease. It can be extremely debilitating to some of its victims but it does not shorten the life span of most of them. Its cause is yet to be determined. It attacks the myelin sheath, the coating or insulation surrounding the message-carrying nerve fibers in the brain and spinal cord. Once the myelin sheath is destroyed, it is replaced by plaques of hardened tissue known as sclerosis. During the initial stages of the disease nerve impulses are transmitted with only minor interruptions. As the disease progresses, the plaques may completely obstruct the impulses along certain nerve systems. These obstructions produce malfunctions. The effects are sporadic in most individuals and the effects often occur episodically, triggered either by malfunction of the nerve impulses or by external factors.

2. Over time many patients develop spasticity, the involuntary and abnormal contraction of muscle or muscle fibers. (Spasticity can also result from serious injuries to the spinal cord, not related to multiple sclerosis.)

3. The symptoms of multiple sclerosis vary according to the area of

the nervous system which is affected and according to the severity of the disease. The symptoms can include one or more of the following: weakness, tingling, numbness, impaired sensation, lack of coordination, disturbances in equilibrium, double vision, loss of vision, involuntary rapid movement of the eyes (nystagmus), slurred speech, tremors, stiffness, spasticity, weakness of limbs, sexual dysfunction, paralysis, and impaired bladder and bowel functions.

4. Each person afflicted by multiple sclerosis is affected differently. In some persons, the symptoms of the disease are barely detectable, even over long periods of time. In these cases, the persons can live their lives as if they did not suffer from the disease. In others, more of the symptoms are present and acute, thereby limiting their physical capabilities. Moreover, others may experience sporadic, but acute, symptoms.

5. At this time, there is no known prevention or cure for multiple sclerosis. Instead, there are only treatments for the symptoms of the disease. There are very few drugs specifically designed to treat spasticity. These drugs often cause very serious side effects. At the present time two drugs are approved by FDA as "safe" and "effective" for the specific indication of spasticity. These drugs are Dantrium and Lioresal baclofen.

6. Unfortunately, neither Dantrium nor Lioresal is a very effective spasm control drug. Their marginal medical utility, high toxicity and potential for serious adverse effects make these drugs

difficult to use in spasticity therapy.

7. As a result, many physicians routinely prescribe tranquilizers, muscle relaxants, mood elevators and sedatives such as Valium to patients experiencing spasticity. While these drugs do not directly reduce spasticity

they may weaken the patient's muscle tone, thus making the spasms less noticeable. Alternatively, they may induce sleep or so tranquilize the patient that normal mental and physical functions are impossible.

8. A healthy, athletic young woman named Valerie Cover was stricken with multiple sclerosis while in her early twenties. She consulted several medical specialists and followed all the customary regimens and prescribed methods for coping with this debilitating disease over a period of several years. None of these proved availing. Two years after first experiencing the symptoms of multiple sclerosis her active, productive life - as an athlete, Navy officer's wife and mother - was effectively over. The Social Security Administration declared her totally disabled. To move about her home she had to sit on a skateboard and push herself around. She spent most of her time in bed or sitting in a wheelchair.

9. An occasional marijuana smoker in her teens, before her marriage, she had not smoked it for five years as of February 1986. Then a neighbor suggested that marijuana just might help Mrs. Cover's multiple sclerosis, having read that it had helped cancer patient's control their emesis. Mrs. Cover acceded to the suggestion.

10. Just before smoking the marijuana cigarette produced by her neighbor, Mrs. Cover had been throwing up and suffering from spasms. Within five minutes of smoking part of the marijuana cigarette she stopped vomiting, no longer felt nauseous and noticed that the intensity of her spasms was significantly reduced. She stood up unaided.

11. Mrs. Cover began smoking marijuana whenever she felt nauseated. When she did so it controlled her vomiting, stopped the nausea and increased her

appetite. It helped ease and control her spasticity. Her limbs were much easier to control. After three months of smoking marijuana she could walk unassisted, had regained all of her lost weight, her seizures became almost nonexistent. She could again care for her children. She could drive an automobile again. She regained the ability to lead a normal life.

12. Concerned that her use of this illegal substance might jeopardize the career of her Navy officer husband, Mrs. Cover stopped smoking marijuana several times. Each time she did so, after about a month, she had retrogressed to the point that her multiple sclerosis

again had her confined to bed and wheelchair or skateboard. As of the Spring of 1987 Mrs. Cover had resumed smoking marijuana regularly on an "as needed" basis. Her multiple sclerosis symptoms are under excellent control. She has obtained a full-time job. She still needs a wheelchair on rare occasions, but generally has full use of her limbs and can walk around with relative ease.

13. Mrs. Cover's doctor has accepted the effectiveness of marijuana in her case. He questioned her closely about her use of it, telling her that it is the most effective drug known in reducing vomiting. Mrs. Cover and her doctor are now in the process of filing an Investigational New Drug (IND) application with FDA so that she can legally obtain the marijuana she needs to lead a reasonably normal life.

14. Martha Hirsch is a young woman in her mid-thirties. She first exhibited symptoms of multiple sclerosis at age 19 and it was diagnosed at that time. Her condition has grown progressively worse. She has been under the care of physicians and hospitalized for treatment. Many drugs have been prescribed for her by her doctors. At one point In 1983 she listed the drugs that had been

prescribed for her. There were 17 on the list. None of them has given her the relief from her multiple sclerosis symptoms that marijuana has.

15. During the early stages in the development of her illness Ms. Hirsch found that smoking marijuana improved the quality of her life, keeping her spasms under control. Her balance improved. She seldom needed to use her cane for support. Her condition lately has deteriorated. As of May 1987 she was experiencing severe, painful spasms. She had an indwelling catheter in her bladder. She had lost her locomotive abilities and was wheelchair bound. She could seldom find marijuana on the illegal market and, when she did, she often could not afford to purchase it. When she did obtain some, however, and smoked it, her entire body seemed to relax, her spasms decreased or disappeared, she slept better and her dizzy spells vanished. The relaxation of her leg muscles after smoking marijuana has been confirmed by her personal care attendant's examination of them.

16. The personal care attendant has told Ms. Hirsch that she, the attendant, treats a number of patients who smoke marijuana for relief of multiple sclerosis symptoms. In about 1980 another patient told Ms. Hirsch that he knew many patients who smoke marijuana to relieve their spasms. Through him she met other patients and found that marijuana was commonly used by many multiple sclerosis patients. Most of these persons had told their doctors about their doing so. None of those doctors advised against the practice and some encouraged it.

17. Among the drugs prescribed by doctors for Ms. Hirsch was ACTH. This failed to give her any therapeutic benefit or to control her spasticity. It did produce a number of adverse effects, including severe nausea and vomiting which, in turn, were partly controlled by rectally administered anti-emetic

drugs.

18. Another drug prescribed for her was Lioresal, intended to

reduce her spasms. It was not very effective in doing. But it did cause Ms. Hirsch to have hallucinations. On two occasions, while using this drug, Ms. Hirsch "saw" a large fire in her bedroom and called for help. There was no fire. She stopped using that drug. Ms. Hirsch has experienced no adverse reactions with marijuana.

19. Ms. Hirsch's doctor has accepted marijuana as beneficial for her. He agreed to write her a prescription for it, if that would help her obtain it. She has asked him if he would file an IND application with the FDA for her. He replied that the paperwork was "overwhelming". He indicated willingness to put the paper work together.

20. When Greg Paufler was in his early twenties, employed by Prudential Insurance Company, he began to experience the first symptoms of multiple sclerosis. His condition worsened as the disease intensified. He had to be hospitalized. He lost the ability to walk, to stand. Diagnosed as having multiple sclerosis, a doctor prescribed ACTH for him, an intensive form of steroid therapy. He lost all control over his limbs and experienced severe, painful spasms. His arms and legs became numb.

21. ACTH had no beneficial effects. The doctor continued to prescribe it many months. ACTH made Paufler ravenously hungry and he began gaining a great deal of weight. ACTH caused fluid retention and Paufler became bloated, rapidly gaining weight. His doctor thought Paufler should continue this steroid therapy, even though it caused the adverse effects mentioned plus the possibility of sudden heart attack or death due to respiratory failure. Increased dosages

of this FDA-approved drug caused fluid to press against Paufler's lungs making it difficult for him to breathe and causing his legs and feet to become swollen. The steroid therapy caused severe, intense depression marked by abrupt mood shifts. Throughout, the spasms continued and Paufler's limbs remained out of control. The doctor insisted that ACTH was the only therapy likely to be of any help with the multiple sclerosis, despite its adverse effects. Another, oral, steroid was eventually substituted.

22. One day Paufler became semi-catatonic while sitting in his living room at home. He was rushed to the hospital emergency room. He nearly died. Lab reports indicated, among other things, a nearly total lack of potassium in his body. He was given massive injections of potassium in the emergency room and placed on an oral supplement. Paufler resolved to take no more steroids.

23. From time to time, prior to this point, Paufler had smoked marijuana socially with visiting friends, seek some relief from his misery in a temporary "high". He now began smoking marijuana more often. After some weeks he found that he could stand and then walk a bit. His doctor dismissed the idea that marijuana could be helpful with multiple sclerosis, and Paufler, himself, was skeptical at first. He began discontinuing it for a while, then resuming.

24. Paufler found that when he did not smoke marijuana his condition worsened, he suffered more intense spasms more frequently. When he smoked marijuana, his condition would stabilize and then improve; spasms were more controlled and less severe; he felt better; he regained

control over his limbs and could walk totally unaided. His vision, often blurred and unfocused, improved. Eventually he began smoking marijuana on a daily basis. He ventured outdoors. He was soon walking half a block. His eyesight returned to normal.

His central field blindness cleared up. He could focus well enough to read again. One evening he went out with his children and found he could kick a soccer ball again.

25. Paufler has smoked marijuana regularly since 1980. Since that time his multiple sclerosis has been well controlled. His doctor has been astonished at Paufler's recovery. Paufler can now run. He can stand on one foot with his eyes closed. The contrast with his condition, several years ago, seems miraculous. Smoking marijuana when Paufler feels an attack coming on shortens the attack. Paufler's doctor has looked Paufler in the eye and told him to keep doing whatever it is he's doing because it works. Paufler and his doctor are exploring the possibility of obtaining a compassionate IND to provide legal access to marijuana for Paufler.

26. Paufler learned in about 1980 of the success of one Sam Diana, a multiple sclerosis patient, in asserting the defense of "medical necessity" in court when charged with using or possessing marijuana. He learned that doctors, researchers and other multiple sclerosis patients had supported Diana's position in the court proceeding.

27. Irwin Rosenfeld has been diagnosed as having Pseudo Pseudo Hypoparathyroidism. This uncommon disease causes bone spurs to appear and grow all over the body. Over the patient's lifetime hundreds of these spurs can grow, any one of which can become malignant at any time. The resulting cancer would spread quickly and the patient would die.

28. Even without development of a malignancy, the disease causes enormous pain. The spurs press upon adjacent body tissue, nerves and organs. In Rosenfeld's case, he could neither sit still nor lie down, nor could he walk,

without experiencing pain. Working in his furniture store in Portsmouth, Virginia, Mr. Rosenfeld was on his feet moving furniture all day long. The lifting and walking caused serious problems as muscles and tissues rubbed over the spurs of bone. He tore muscles and hemorrhaged almost daily.

29. Rosenfeld's symptoms first appeared about the age of ten. Various drugs were prescribed for him for pain relief. He was taking extremely powerful narcotics. By the age of 19 his therapy included 300 mg. of Sopor (a powerful sleeping agent) and very high doses of Dilaudid. He was found to be allergic to barbiturates. Taking massive doses of pain control drugs, as prescribed, made it very difficult for Rosenfeld to function normally. If he took enough of them to control the pain, he could barely concentrate on his schoolwork. By the time he reached his early twenties Rosenfeld's monthly drug intake was between 120 to 140 Dilaudid tablets, 30 or more Sopor sleeping pills and dozens of muscle relaxants.

30.  At college in Florida Rosenfeld was introduced to marijuana by classmates.  He experimented with it recreationally.  He never experienced a "high" or "buzz" or "floating sensation" from it.  One day he smoked marijuana while playing chess with a friend.  It had been very difficult for him to sit for more than five or ten minutes at a time because of tumors in the backs of his legs.  Suddenly he realized that, absorbed in his chess game, and smoking marijuana, he had remained sitting for over an hour - with no pain.  He experimented further and found that his pain was reduced whenever he smoked marijuana.

31.  Rosenfeld told his doctor of his discovery.  The doctor opined that it was possible that the marijuana was relieving the pain. Something

- 48 -

certainly was - there was a drastic decrease in Rosenfeld's need for such drugs as Dilaudid and Demerol and for sleeping pills.  The quality of pain relief which followed his smoking of marijuana was superior to any he had experienced before.  As his dosages of powerful conventional drugs decreased, Rosenfeld became less withdrawn from the world, more able to interact and function.  So he has continued to the present time.

32.  After some time Rosenfeld's doctor accepted the fact that the marijuana was therapeutically helpful to Rosenfeld and submitted an IND application to FDA to obtain supplies of it legally for Rosenfeld. The doctor has insisted, however, that he not be publicly identified. After some effort the IND application was granted.  Rosenfeld is receiving supplies of marijuana from NIDA.  Rosenfeld testified before a committee of the Virginia legislature in about 1979 in support of legislation to make marijuana available for therapeutic purposes in that State.

33.  In 1969, at age 19, David Branstetter dove into the shallow end of a swimming pool and broke his neck.  He became a quadriplegic, losing control over the movement of his arms and legs.  After being hospitalized for 18 months he returned home.  Valium was prescribed for him to reduce the severe spasms associated with his condition.  He became mildly addicted to Valium.  Although it helped mask his spasms, it made Branstetter more withdrawn and less able to take care of himself.  He stopped taking Valium for fear of the consequences of long-term addiction.  His spasms then became uncontrollable, often becoming so bad they would throw him from his wheelchair.

34.  In about 1973 Branstetter began smoking marijuana recreationally.  He discovered that his severe spasms stopped whenever he smoked marijuana.

- 49 -

Unlike Valium, which only masked his symptoms and caused him to feel drunk and out of control, marijuana brought his spasmodic condition under control without impairing his faculties.  When he was smoking marijuana regularly he was more active, alert and outgoing.

35.  Marijuana controlled his spasms so well that Branstetter could go out with friends and he began to play billiards again.  The longer he smoked marijuana the more he was able to use his arms and hands.  Marijuana also improved his bladder control and bowel movements.

36. At times the illegal marijuana Branstetter was smoking became very expensive and sometimes was unavailable. During periods when he did not have marijuana his spasms would return, preventing Branstetter from living a "normal" life. He would begin to shake uncontrollably, his body would feel tense, and his muscles would spasm.

37. In 1979 Branstetter was arrested and convicted of possession of marijuana. He was placed on probation for two years. During that period he continued smoking marijuana and truthfully reported this, and the reason for it, to his probation officer whenever asked about it. No action was taken against Branstetter by the court or probation authorities because of his continuing use of marijuana, except once in the wake of his publicly testifying about it before the Missouri legislature. Then, although adverse action was threatened by the judge, nothing was actually done.

38. In 1981 Branstetter and a friend, a paraplegic, participated in a research study testing the therapeutic effects of synthetic THC on spasticity. Placed on the THC Branstetter found that it did help control his spasms but appeared to became less effective with repeated use. Also, unlike marijuana,

synthetic THC had a powerful mind-altering effect he found annoying. When the study ended the researcher strongly suggested that Branstetter continue smoking marijuana to control his spasms.

39. None of Branstetter's doctors have told him to stop smoking marijuana while several, directly and indirectly, have encouraged him to continue. Branstetter knows of almost 20 other patients, paraplegics, quadriplegics and multiple sclerosis sufferers, who smoke marijuana to control their spasticity.

40. In 1981 a State of Washington Superior Court judge, sitting without a jury, found Samuel D. Diana not guilty of the charge of unlawful possession of marijuana. In so doing the judge upheld Diana's defense of medical necessity. Diana had been a multiple sclerosis patient since at least 1973. He testified that smoking marijuana relieved his symptoms of double vision, tremors, unsteady walk, impaired hearing, tendency to vomit in the mornings and stiffness in the joints of his hands and legs.

41. Among the witnesses was a physician who had examined defendant Diana before and after he had used marijuana. This doctor testified that marijuana had been effective therapeutically for Diana, that other medication had proven ineffective for Diana and that, while marijuana may have some detrimental effects, Diana would receive more benefit than harm from smoking it. The doctor was not aware of any other drug that would be as effective as marijuana for Mr. Diana. Other witnesses included three persons afflicted with multiple sclerosis who testified in detail as to marijuana's beneficial effect on their illness.

42. In acquitting defendant Diana of unlawful possession of marijuana the trial judge found that the three requirements for the defense of medical necessity had been established, namely: defendant's

reasonable belief that his



use of marijuana was necessary to minimize the effects of multiple sclerosis; the benefits derived from its use are greater than the harm sought to be prevented by the controlled substances law; and no drug is as effective as marijuana in minimizing the effects of the disease in the defendant.

43. Denis Petro, M.D., is a neurologist of broad experience, ranging from active practice in neurology to teaching the subject in medical school and employment by FDA as a medical officer reviewing IND's and NDA's. He has also been employed by pharmaceutical companies and has served as a consultant to the State of New York. He is well acquainted with the case histories of three patients who have successfully utilized marijuana to control severe spasticity when other, FDA-approved drugs failed to do so. Dr. Petro knows of other cases of patients who, he has determined, have effectively used marijuana to control their spasticity. He has heard reports of additional patients with multiple sclerosis, paraplegia and quadriplegia doing the same. There are reports published in the literature known to Dr. Petro, over the period at least 1970 - 1986, of clinical tests demonstrating that marijuana and THC are effective in controlling or reducing spasticity in patients.

44. Large numbers of paraplegic and quadriplegic patients, particularly in Veterans Hospitals, routinely smoke marijuana to reduce spasticity. While this mode of treatment is illegal, it is generally tolerated, if not openly encouraged, by physicians in charge of such wards who accept this practice as being of benefit to their patients. There are many spinal cord injury patients in Veterans Hospitals.

45. Dr. Petro sought FDA approval to conduct research with spasticity patients using marijuana. FDA refused but, for reasons unknown to him, allowed



him to make a study using synthetic THC. He and colleagues made such a study. They concluded that synthetic THC effected a significant reduction in spasticity among multiple sclerosis patients, but study participants who had also smoked marijuana reported consistently that marijuana was more effective.

46. Dr. Petro accepts marijuana as having a medical use in the treatment of spasticity in the United States. If it were legally available and he was engaged in an active medical practice again, he would not hesitate to prescribe marijuana, when appropriate, to patients afflicted with uncontrollable spasticity.

47. Dr. Petro presented a paper to a meeting of the American Academy of Neurology. The paper was accepted for presentation. After he presented it Dr. Petro found that many of the neurologists present at this most prestigious meeting were in agreement with his acceptance of marijuana as having a medical use in the treatment of spasticity.

48. Dr. Andrew Weil, a general medicine practitioner in Tucson, Arizona, who also teaches at the University of Arizona College of Medicine, accepts marijuana as having a medical use in the treatment of spasticity. In multiple sclerosis patients the muscles become tense and

rigid because their nerve supply is interrupted. Marijuana relieves this spasticity in many patients, he has found. He would prescribe it to selected patients if it were legally available,

49. Dr. Lester B. Collins, III, a neurologist, then treating about 20 multiple sclerosis patients a year, seeing two or three new ones each year, stated in 1983 that he had no doubt that marijuana worked symptomatically for some multiple sclerosis patients. He said that it does not alter the course of

the disease but it does relieve the symptoms of spasticity.

50. Dr. John P. Morgan, board certified in internal medicine, Professor of Medicine and Director of Pharmacology at CCNY Medical School in New York and Associate Professor of Medicine and Pharmacology at Mt. Sinai School of Medicine, accepts marijuana as having medical use in treatment in the United States. If he were practicing medicine and marijuana were legally available he would prescribe it when indicated to patients with legitimate medical needs.

Discussion

Based upon the rationale set out in pages 26 to 34, above, the administrative law judge concludes that, within the meaning of the Act, 21 U.S.C. § 812(b)(2)(B), marijuana "has a currently accepted medical use in treatment in the United States" for spasticity resulting from multiple sclerosis and other causes. It would be unreasonable, arbitrary and capricious to find otherwise. The facts set out above, uncontroverted by the Agency, establish beyond question that some doctors in the United States accept marijuana as helpful in such treatment for some patients. The record here shows that they constitute a significant minority of physicians. Nothing more can reasonably be required. That some doctors would have more studies and test results in hand before accepting marijuana's usefulness here is irrelevant.

The same is true with respect to the hyperparathyroidism from which Irvin Rosenfeld suffers. His disease is so rare, and so few physicians appear to be familiar with it, that acceptance by one doctor of marijuana as being useful in treating it ought to satisfy the requirement for a significant minority. The Agency points to no evidence of record tending to establish that marijuana is

not accepted by doctors in connection with this most unusual ailment. Refusal to acknowledge acceptance by a significant minority, in light of the case history detailed in this record, would be unreasonable, arbitrary and capricious.

VIII.

ACCEPTED SAFETY FOR USE UNDER MEDICAL SUPERVISION

With respect to whether or not there is "a lack of accepted safety for use of [marijuana] under medical supervision", the record shows the

following facts to be uncontroverted.

Findings of Fact

1. Richard J. Gralla, M.D., an oncologist and Professor of Medicine who was an Agency witness, accepts that in treating cancer patients oncologists can use the cannabinoids with safety despite their side effects.

2. Andrew T. Weil, M.D., who now practices medicine in Tucson, Arizona and is on the faculty of the College of Medicine, University of Arizona, was a member of the first team of researchers to perform a Federal Government authorized study into the effects of marijuana on human subjects. This team made its study in 1968. These researchers determined that marijuana could be safely used under medical supervision. In the 20 years since then Dr. Weil has seen no information that would cause him to reconsider that conclusion. There is no question in his mind but that marijuana is safe for use under appropriate medical supervision.

3. The most obvious concern when dealing with drug safety is the possibility of lethal effects. Can the drug cause death?

4. Nearly all medicines have toxic, potentially lethal effects. But marijuana is not such a substance. There is no record in the extensive medical literature describing a proven, documented cannabis-induced fatality.

5. This is a remarkable statement. First, the record on marijuana encompasses 5,000 years of human experience. Second, marijuana is now used daily by enormous numbers of people throughout the world. Estimates suggest that from twenty million to fifty million Americans routinely, albeit illegally, smoke marijuana without the benefit of direct medical supervision. Yet, despite this long history of use and the extraordinarily high numbers of social smokers, there are simply no credible medical reports to suggest that consuming marijuana has caused a single death.

6. By contrast aspirin, a commonly used, over-the-counter medicine, causes hundreds of deaths each year.

7. Drugs used in medicine are routinely given what is called an LD-50. The LD-50 rating indicates at what dosage fifty percent of test animals receiving a drug will die as a result of drug induced toxicity. A number of researchers have attempted to determine marijuana's LD-50 rating in test animals, without success. Simply stated, researchers have been unable to give animals enough marijuana to induce death.

8. At present it is estimated that marijuana's LD-50 is around 1:20,000 or 1:40,000. In layman terms this means that in order to induce death a marijuana smoker would have to consume 20,000 to 40,000 times as much marijuana as is contained in one marijuana cigarette. NIDA-supplied marijuana cigarettes weigh approximately .9 grams. A smoker would theoretically have to consume nearly 1,500 pounds of marijuana within about fifteen minutes to induce a lethal response.

9. In practical terms, marijuana cannot induce a lethal response as a result of drug-related toxicity.

10. Another common medical way to determine drug safety is called the therapeutic ratio. This ratio defines the difference between a therapeutically effective dose and a dose which is capable of inducing adverse effects.

11. A commonly used over-the-counter product like aspirin has a therapeutic ratio of around 1:20. Two aspirins are the recommended dose for adult patients. Twenty times this dose, forty aspirins, may cause a lethal reaction in some patients, and will almost certainly cause gross injury to the digestive system, including extensive internal bleeding.

12. The therapeutic ratio for prescribed drugs is commonly around 1:10 or lower. Valium, a commonly used prescriptive drug, may cause very serious biological damage if patients use ten times the recommended (therapeutic) dose.

13. There are, of course, prescriptive drugs which have much lower therapeutic ratios. Many of the drugs used to treat patients with cancer, glaucoma and multiple sclerosis are highly toxic. The therapeutic ratio of some of the drugs used in antineoplastic therapies, for example, are regarded as extremely toxic poisons with therapeutic ratios that may fall below 1:1.5. These drugs also have very low LD-50 ratios and can result in toxic, even lethal reactions, while being properly employed.

14. By contrast, marijuana's therapeutic ratio, like its LD-50, is impossible to quantify because it is so high.

15. In strict medical terms marijuana is far safer than many foods we commonly consume. For example, eating ten raw potatoes can result in a toxic response. By comparison, it is physically impossible to eat enough marijuana to induce death.

16. Marijuana, in its natural form, is one of the safest therapeutically

active substances known to man. By any measure of rational analysis marijuana can be safely used within a supervised routine of medical care.

17. Some of the drugs most widely used in chemotherapy treatment of cancer have adverse effects as follows:

> Cisplatin, one of the most powerful chemo-therapeutic agents used on humans - may cause deafness; may lead to life-threatening kidney difficulties and kidney failure; adversely affects the body's immune system, suppressing the patient's ability to fight a host of common infections.
>
> Nitrogen Mustard, a drug used in therapy for Hodgkins disease - nauseates; so toxic to the skin that, if dropped on the skin, this chemical literally

eats it away along with other tissues it contacts; if patient's intravenous lead slips during treatment and this drug gets on or under the skin the patient may suffer serious injury including temporary, and in extreme cases, permanent, loss of use of the arm.

Procarbizine, also used for Hodgkins disease - has known psychogenic, i.e., emotional, effects.

Cyoxin, also known as Cyclophosphanide - suppresses patient's immune system response; results in serious bone marrow depletion; studies indicate this drug may also cause other cancers, including cancers of the bladder.

Adriamycan, has numerous adverse effects; is difficult to employ in long term therapies because it destroys the heart muscle.

While each of these agents has its particular adverse effects, as indicated above, they also cause a number of similar, disturbing adverse effects. Most of these drugs cause hair loss. Studies increasingly indicate all of these drugs may cause other forms of cancer. Death due to kidney, heart or respiratory failure is a very real possibility with all of these agents and the margin for error is minimal. Similarly, there is a danger of overdosing a patient weakened by his cancer. Put simply, there is very great risk associated with the medical

use of these chemicals agents. Despite these high risks, all of these drugs are considered "safe" for use under medical supervision and are regularly administered to patients on doctor's orders in the United States today.

18. There have been occasional instances of panic reaction in patients who have smoked marijuana. These have occurred in marijuana-naive persons, usually older persons, who are extremely anxious over the forthcoming chemotherapy and troubled over the illegality of their having obtained the marijuana. Such persons have responded to simple person-to-person communication with a doctor and have sustained no long term mental or physical damage. If marijuana could be legally obtained, and administered in an open, medically-supervised session rather than surreptitiously, the few instances of such adverse reaction doubtless would be reduced in number and severity.

19. Other reported side effects of marijuana have been minimal. Sedation often results. Sometimes mild euphoria is experienced. Short periods of increased pulse rate and of dizziness are occasionally experienced. Marijuana should not be used by persons anxious or depressed or psychotic or with certain other health problems. Physicians could readily screen out such patients if marijuana were being employed as an agent under medical supervision.

20. All drugs have "side effects" and all drugs used in medicine for their therapeutic benefits have unwanted, unintended, sometimes adverse effects.

21. In medical treatment "safety" is a relative term. A drug deemed "safe" for use in treating a life-threatening disease might be "unsafe" if prescribed for a patient with a minor ailment. The concept

of drug "safety" is relative.  Safety is measured against the
consequences a patient would confront in the absence of therapy.  The
determination of "safety" is made in terms of

- 60 -

whether a drug's benefits outweigh its potential risks and the risks of
permitting the disease to progress.

22.  In the context of glaucoma therapy, it must be kept in
mind that glaucoma, untreated, progressively destroys the optic nerve
and results in eventual blindness.  The danger, then, to patients with
glaucoma is an irretrievable loss of their sight.

23.  Glaucoma is not a mortal disease, but a highly specific,
selectively incapacitating condition.  Glaucoma assaults and destroys
the patient's most evolved and critical sensory ability, his or her
vision. The vast majority of patients afflicted with glaucoma are adults
over the age of thirty.  The onset of blindness in middle age or later
throws patients into a wholly alien world.  They can no longer do the
work they once did.  They are unable to read a newspaper, drive a car,
shop, walk freely and do all the myriad things sighted people take for
granted. Without lengthy periods of retraining, adaptation and great
effort these individuals often lose their sense of identity and ability
to function. Those who are young enough or strong-willed enough will
regain a sense of place, hold meaningful jobs, but many aspects of the
life they once took for granted cannot be recaptured.  Other patients
may never fully adjust to their new, uncertain circumstances.

24.  Blindness is a very grave consequence.  Protecting
patients from blindness is considered so important that, for
ophthalmologists generally, it justifies the use of toxic medicines and
uncertain surgical procedures which in other contexts might be
considered "unsafe."  In practice, physicians often provide glaucoma
patients with drugs which have many serious adverse effects.

25.  There are only a limited number of drugs available for the

- 61 -

treatment of glaucoma.  All of these drugs produce adverse effects.
While several government witnesses lightly touched on the side effects
of these drugs, none provided a full or detailed description of their
known adverse consequences.

26.  The adverse physical consequences resulting from the
chronic use of commonly employed glaucoma control drugs include a vast
range of unintended complications from mild problems like drug induced
fevers, skin rashes, headaches, anorexia, asthma, pulmonary
difficulties, hypertension, hypotension and muscle cramps to truly
serious, even life-threatening complications including the formation of
cataracts, stomach and intestinal ulcers, acute respiratory distress,
increases and decreases in heart rate and pulse, disruption of heart
function, chronic and acute renal disease, and bone marrow depletion.

27.  Finally, each FDA-approved drug family used in glaucoma
therapy is capable of producing a lethal response, even when properly
prescribed and used.  Epinephrine can lead to elevated blood pressure
which may result in stroke or heart attack.  Miotic drugs suppress
respiration and can cause respiratory Paralysis.  Diuretic drugs so

alter basic body chemistry they cause renal stones and may destroy the patient's kidneys or result in death due to heart failure. Timolol and related beta-blocking agents, the most recently approved family of glaucoma control drugs, can trigger severe asthma attacks or cause death due to sudden cardiac arrhythmias often producing cardiac arrest.

28.  Both of the FDA-approved drugs used in treating the symptoms of multiple sclerosis, Dantrium and Lioresal, while accepted as "safe" can, in fact, be very dangerous substances.  Dantrium or dantrolene sodium carries a boxed warning in the Physician's Desk Reference (PDR) because of its very high toxicity.  Patients using this drug run a very real risk of developing sympto-

- 62 -

matic hepatitis (fatal and nonfatal).  The list of sublethal toxic reactions also underscores just how dangerous Dantrium can be.  The PDR, in part, notes Dantrium commonly causes weakness, general malaise and fatigue and goes on to note the drug can also cause constipation, GI bleeding, anorexia, gastric irritation, abdominal cramps, speech disturbances, seizure, visual disturbances, diplopia, tachycardia, erratic blood pressure, mental confusion, clinical depression, renal disturbances, myalgia, feelings of suffocation and death due to liver failure.

29.  The adverse effects associated with Lioresal baclofen are somewhat less severe, but include possibly lethal consequences, even when the drug is properly prescribed and taken as directed.  The range on sublethal toxic reactions is similar to those found with Dantrium.

30.  Norman E, Zinberg, M.D., one of Dr. Weil's colleagues in the 1968 study mentioned in finding 2, above, accepts marijuana as being safe for use under medical supervision.  If it were available by prescription he would use it for appropriate patients.

31.  Lester Grinspoon, M.D., practicing psychiatrist researcher and Associate Professor of Medicine at Harvard Medical School, accepts marijuana as safe for use under medical supervision.  He believes its safety is its greatest advantage as a medicine in appropriate cases.

32.  Tod H. Mikuriya, M.D., a psychiatrist practicing in Berkley, California who treats substance abusers as inpatients and outpatients, accepts marijuana as safe for use under medical supervision.

33.  Richard D. North, M.D., who has treated Robert Randall for glaucoma with marijuana for nine years, accepts marijuana as safe for use by his patient

- 63 -

under medical supervision.  Mr. Randall has smoked ten marijuana cigarettes a day during that period without any evidence of adverse mental or physical effects from it.

34.  John C. Merritt, M.D., an expert in ophthalmology, who has treated Robert Randall and others with marijuana for glaucoma, accepts marijuana as being safe for use in such treatment.

35.  Deborah B. Goldberg, M.D., formerly a researcher in

oncology and now a practicing physician, having worked with many cancer patients, observed them, and heard many tell of smoking marijuana successfully to control emesis, accepts marijuana is proven to be an extremely safe anti-emetic agent. When compared with the other, highly toxic chemical substances routinely prescribed to cancer patients, Dr. Goldberg accepts marijuana as clearly safe for use under medical supervision. (See finding 17, above.)

36. Ivan Silverberg, M.D., board certified in oncology and practicing that specialty in the San Francisco area, has accepted marijuana as a safe anti-emetic when used under medical supervision. Although illegal, it is commonly used by patients in the San Francisco area with the knowledge and acquiescence of their doctors who readily accept it as being safe for such use.

37. It can be inferred that all of the doctors and other health care professionals referred to in the findings in Sections V, VI and VII, above, who tolerate or permit patients to self-administer illegal marijuana for therapeutic benefit, accept the substance as safe for use under medical supervision.

- 64 -

Discussion

The Act, at 21 U.S.C. § 812(b)(1)(C), requires that marijuana be retained in Schedule I if "[t]here is a lack of accepted safety for use of [it] under medical supervision." If there is no lack of such safety, if it is accepted that this substance can be used with safety under medical supervision, then it is unreasonable to keep it in Schedule I.

Again we must ask - "accepted" by whom? In the MDMA proceeding the Agency's first Final Rule decided that "accepted" here meant, as in the phrase "accepted medical use in treatment", that the FDA had accepted the substance pursuant to the provisions of the Food, Drug and Cosmetic Act. 51 Fed. Reg. 36555 (1986). The Court of Appeals held that this was error. On remand, in its third Final Rule on MDMA, the Agency made the same ruling as before, relying essentially on the same findings, and on others of similar nature, just as it did with respect to "accepted medical use." 53 Fed. Reg. 5156 (1988).

The administrative law judge finds himself constrained not to follow the rationale in that MDMA third Final Order for the same reasons as set out above in Section V with respect to "accepted medical use" in oncology. See pages 30 to 33. Briefly, the Agency was looking primarily at the results of scientific tests and studies rather than at what physicians had, in fact, accepted. The Agency was wrongly basing its decision on a judgment as to whether or not doctors ought to have accepted the substance in question as safe for use under medical supervision. The criteria the Agency applied in the MDMA third Final Rule are inappropriate. The only proper question for the Agency here is: Have a significant minority of physicians accepted marijuana as safe for use under medical supervision?

- 65 -

The gist of the Agency's case against recognizing marijuana's acceptance as safe is to assert that more studies, more tests are needed. The Agency has presented highly qualified and respected experts, researchers and others, who hold that view. But, as demonstrated in the

discussion in Section V above, it is unrealistic and unreasonable to require unanimity of opinion on the question confronting us. For the reasons there indicated, acceptance by a significant minority of doctors is all that can reasonably be required. This record makes it abundantly clear that such acceptance exists in the United States.

Findings are made above with respect to the safety of medically supervised use of marijuana by glaucoma patients. Those findings are relevant to the safety issue even though the administrative law judge does not find accepted use in treatment of glaucoma to have been shown.

Based upon the facts established in this record and set out above one must reasonably conclude that there is accepted safety for use of marijuana under medical supervision. To conclude otherwise, on this record, would be unreasonable, arbitrary and capricious.

IX.

## CONCLUSION AND RECOMMENDED DECISION

Based upon the foregoing facts and reasoning, the administrative law judge concludes that the provisions of the Act permit and require the transfer of marijuana from Schedule I to Schedule II. The Judge realizes that strong emotions are aroused on both sides of any discussion concerning the use of marijuana. Nonetheless it is essential for this Agency, and its Administrator, calmly and dispassionately to review the evidence of record, correctly apply the law, and act accordingly.

Marijuana can be harmful. Marijuana is abused. But the same is true of dozens of drugs or substances which are listed in Schedule II so that they can be employed in treatment by physicians in proper cases, despite their abuse potential.

Transferring marijuana from Schedule I to Schedule II will not, of course, make it immediately available in pharmacies throughout the country for legitimate use in treatment. Other government authorities, Federal and State, will doubtless have to act before that might occur. But this Agency is not charged with responsibility, or given authority, over the myriad other regulatory decisions that may be required before marijuana can actually be legally available. This Agency is charged merely with determining the placement of marijuana pursuant to the provisions of the Act. Under our system of laws the responsibilities of other regulatory bodies are the concerns of those bodies, not of this Agency,

There are those who, in all sincerity, argue that the transfer of marijuana

to Schedule II will "send a signal" that marijuana is "OK" generally for recreational use. This argument is specious. It presents no valid reason for refraining from taking an action required by law in light of the evidence. If marijuana should be placed in Schedule II, in obedience to the law, then that is where marijuana should be placed,

[illegible] action is taken. The fear of sending such a signal cannot be permitted to override the legitimate need, amply demonstrated in this record, of countless sufferers for the relief marijuana can provide when prescribed by a physician in a legitimate case.

The evidence in this record clearly shows that marijuana has been accepted as capable of relieving the distress of great numbers of very ill people, and doing so with safety under medical supervision. It would be unreasonable, arbitrary and capricious for DEA to continue to stand between those sufferers and the benefits of this substance in light of the evidence in this record.

The administrative law judge recommends that the Administrator conclude that the marijuana plant considered as a whole has a currently accepted medical use in treatment in the United States, that there is no lack of accepted safety for use of it under medical supervision and that it may lawfully be transferred from Schedule I to Schedule II. The judge recommends that the Administrator transfer marijuana from Schedule I to Schedule II.

Dated: SEP 6 1988

Francis L. Young
Administrative Law Judge

CERTIFICATE OF SERVICE

This is to certify that the undersigned on SEP 6 1988, caused a copy of the foregoing to be delivered to

Madeleine R. Shirley, Esq.
Office of Chief Counsel
Drug Enforcement Administration
1405 I Street, N.W.
Washington, D.C. 20537

and caused a copy to be mailed, postage paid, to each of the following:

National Organization for the Reform of Marijuana Laws
Attn: Kevin B. Zeese, Esq.
Zwerling, Mark, Ginsberg and Lieberman, P.C.
1001 Duke Street
Alexandria, Virginia 22313

National Federation of Parents for Drug-Free Youth
Attn: Karl Bernstein
Vice President
02139
8730 Georgia Avenue
Suite 200
Silver Spring, Maryland 20910

Alliance for Cannabis Therapeutics

Carl Eric Olsen
Post Office Box 5034
Des Moines, Iowa 50306

Cannabis Corporation of America
Attn: Laurence O. McKinney
President
c/o McKinney & Company
881 Massachusetts Avenue
Cambridge, Massachusetts

International Association of Chiefs of Police
Attn: Virginia Peltier, Esq.
Assistant Legal Counsel

c/o Frank B. Stillwell, III, Esq.
Steptoe & Johnson
Attorneys at Law
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036

13 Firstfield Road
P.O. Box 6010
Gaithersburg, Maryland 20878

David C. Beck, Esq.
McDermott, Will & Emery
1850 K Street, N.W.
Washington, D.C. 20006
Attorney for Cannabis Corporation of America

Dianne L. Martin
Hearing Clerk

BEFORE THE UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN SERVICES
INFORMATION QUALITY GUIDELINES STAFF

Re: HHS Review of the 1995 Marijuana Rescheduling Petition: 66 Federal Register 20040 (April 18, 2001) at pages 20039 & 20051-52 ) ) ) ) )

**Docket No.**

**REQUEST FOR CORRECTION OF INFORMATION DISSEMINATED BY HHS REGARDING THE MEDICAL USE OF MARIJUANA**

AMERICANS FOR SAFE ACCESS
1700 SHATTUCK AVENUE #317
BERKELEY, CA 94709

Date: October 4, 2004

APPENDIX B

**Request for Correction of Information Contained in**
**HHS Review of the Marijuana Rescheduling Petition of 1995**

**Filed by: Americans for Safe Access**

**ISSUE:** The U.S. Department of Health and Human Services ("HHS") has blocked legal action to make marijuana available to *bona fide* medical patients under their physicians' supervision. In so doing, HHS repeatedly misstates the scientific evidence and ignores numerous reports and studies demonstrating the medical utility of marijuana and its constituent compounds. HHS disseminates these misstatements in correspondence and government websites. These disseminations violate the Data Quality Act requirement that information used and disseminated by federal agencies meet standards for "quality, objectivity, utility, and integrity of information." These standards have been defined as requiring lack of bias, consistency, and disclosure of the underlying rational basis for the agency's conclusion.

Specifically, in 2001, HHS issued statements in its review of the Marijuana Rescheduling Petition of 1995 that violate both government-wide data quality standards and the HHS guidelines implementing those standards. The conclusion of HHS that "marijuana has no currently accepted medical use in treatment in the United States" lacks objectivity, utility, transparency, peer review, and public participation. Thus, HHS has failed to ensure that the information it disseminates is based on sound science, as required by law.

Americans for Safe Access ("ASA") files this Request for Correction pursuant to the Data Quality Act amendments to the Paperwork Reduction Act, 44 U.S.C. § 3516 Statutory and Historical Notes, P.L. 106-554 ("Data Quality Act"), as implemented through the Office of Management and Budget's government-wide Data Quality Act guidelines, 67 Fed.Reg. 8452 (Feb. 22, 2002) ("OMB Guidelines"), and the HHS Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated to the Public, http:/www.hhs.gov/infoquality/part1.html ("HHS Guidelines").

**PETITIONER:** Americans for Safe Access ("ASA"), a non-profit advocacy group that represents the interests of medical marijuana patients, files this Request for Correction of HHS disseminations of information relating to the efficacy of marijuana for medical use. ASA brings this action on behalf of ill persons across the United States who are deeply and immediately affected by the controverted statements. HHS's statements about the lack of medical usefulness of marijuana harms these individuals in that it contributes to denying them access to medicine which will alleviate their suffering. The seriously ill persons ASA represents suffer variously from cancer and the side-effects of its treatments, Multiple Sclerosis, HIV/AIDS, spinal injury, and other medical conditions that produce chronic pain, nausea, loss of appetite and spasticity. Many of these persons who use marijuana to treat these symptoms cannot tolerate conventional medications or have serious health needs not treatable by pharmaceutical medicine.

**RELIEF REQUESTED:** ASA requests the following corrections:

1. HHS states that "there have been no studies that have scientifically assessed the efficacy of marijuana for any medical condition," which is disseminated on

federal government websites (http://www.access.gpo.gov/su_docs/fedreg/a010418c.html, http://www.deadiversion.usdoj.gov/fed_regs/notices/2001/fr0418/fr0418a.htm) and in the *Federal Register*, 66 Fed.Reg. 20038, 20052 (April 18, 2001).

ASA requests that HHS replace this statement with the following statement: **"Adequate and well-recognized studies show the efficacy of marijuana in the treatment of nausea, loss of appetite, pain and spasticity."**

2. HHS states that "a material conflict of opinion among experts precludes a finding that marijuana has been accepted by qualified experts" and "it is clear that there is not a consensus of medical opinion concerning medical applications of marijuana," which are disseminated on the government websites and in the *Federal Register*, 66 Fed.Reg. 20038, 20052 (April 18, 2001).

   ASA requests that HHS replace this statement with the following statement: **"There is substantial consensus among experts in the relevant disciplines that marijuana is effective in treating nausea, loss of appetite, pain and spasticity. It is accepted as medicine by qualified experts."**

3. HHS states that "a complete scientific analysis of all the chemical components found in marijuana has not been conducted," which is disseminated on the government websites and in the *Federal Register*, 66 Fed.Reg. 20038, 20051 (April 18, 2001).

   ASA requests that HHS replace this statement with the following statement: **"The chemistry of marijuana is known and reproducible."**

4. HHS states that marijuana "has no currently accepted medical use in treatment in the United States," which is disseminated on the government websites and in the *Federal Register*, 66 Fed.Reg. 20038, 20039 (April 18, 2001).

   Based on the corrections above, ASA requests that HHS replace this statement with the following statement: **"Marijuana has a currently accepted use in treatment in the United States."**

ASA files this Request for Correction pursuant to the Data Quality Act amendments to the Paperwork Reduction Act, 44 U.S.C. § 3516 Statutory and Historical Notes, P.L. 106-554 ("Data Quality Act"), as implemented through the Office of Management and Budget's government-wide Data Quality Act guidelines, 67 Fed.Reg. 8452 (Feb. 22, 2002) ("OMB Guidelines"), and the HHS Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated to the Public, http:/www.hhs.gov/infoquality/part1.html ("HHS Guidelines").

**FACTUAL BACKGROUND:** In 1995, Dr. Jon Gettman petitioned the Drug Enforcement Administration ("DEA") to initiate rulemaking proceedings to reschedule marijuana and other cannabinoids, pursuant to 21 U.S.C. § 811(a). In 1998, DEA requested that HHS conduct a scientific and medical evaluation of the available data and provide a scheduling recommendation for marijuana and the other cannabinoids. HHS's recommendations are binding on the DEA with respect to scientific and medical matters. 21 U.S.C. § 811(b).

HHS referred the matter to its Food and Drug Administration's ("FDA") Controlled Substances Staff, which found that marijuana had not met three of the five criteria it employs to determine whether a substance has a "currently accepted medical use." 66 Fed.Reg. 20038, 20051 (April 18, 2001).[1] Although the FDA recognized that FDA-approved safety studies had been carried out on marijuana and did not dispute that the scientific evidence is widely available (elements two and five), it found that marijuana had not satisfied the first, third and fourth requirements for accepted medical use. *Id.* at 20051-52. In particular, the agency found:

> [T]here have been no studies that have scientifically assessed the efficacy of marijuana for any medical condition.
>
> A material conflict of opinion among experts precludes a finding that marijuana has been accepted by qualified experts. At this time, it is clear that there is not a consensus of medical opinion concerning medical applications of marijuana. *Id.*
>
> [A] complete scientific analysis of all the chemical components found in marijuana has not been conducted. . . .

Based on these disputed findings, HHS determined that marijuana "has no currently accepted medical use in treatment in the United States," 66 Fed.Reg. 20038, 20039 (April 18, 2001), and recommended that marijuana continue to be subject to control under Schedule I of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.* ("CSA"). HHS continues to disseminate these disputed statements to the public through federal government websites, such as (http://www.access.gpo.gov/su_docs/fedreg/a010418c.html, http://www.deadiversion.usdoj.gov/fed_regs/notices/2001/fr0418/fr0418a.htm). Consequently, these disputed statements are disseminations of information subject to the Data Quality Act Standards and Guidelines. *See* 67 Fed.Reg. 8452, 8460 (Feb. 22, 2002) (OMB Guidelines); HHS Guideline D.3.

---

[1] These criteria are as follows:

a. The drug's chemistry is known and reproducible;
b. There are adequate safety studies;
c. There are adequate and well-controlled studies proving efficacy;
d. The drug is accepted by qualified experts;
e. The scientific evidence is widely available.

*Id.* (citing *Alliance for Cannabis Therapeutics v. DEA*, 15 F.3d 1131, 1135 (D.C. Cir. 1994).

## ARGUMENT

### I. LEGAL STANDARDS

Passed as an amendment to the Paperwork Reduction Act, 44 U.S.C. § 3502(1), the Data Quality Act requires administrative agencies to devise guidelines to ensure the "quality, objectivity, utility, and integrity of information" they disseminate and to "[e]stablish administrative mechanisms allowing affected persons to seek and obtain correction of information maintained and disseminated by the agency that does not comply with the guidelines." (44 U.S.C. § 3516, Statutory and Historical Notes.) The HHS Guidelines recognize that "'[q]uality' is an encompassing term comprising utility, objectivity, and integrity." (HHS Guideline D.2.a.) The term "utility" refers to the "usefulness of the information to its intended users, including the public," so agency decisions must be transparent. (HHS Guideline D.2.b.) "Objectivity" refers to both presentation and substance, which requires that "disseminated information [be] presented in an accurate, clear, complete, and unbiased manner." (HHS Guideline D.2.c.) HHS must identify the supporting data and models in its scientific evaluations, so "the public can assess for itself whether there may be some reason to question the objectivity of the sources." (HHS Guideline D.2.c.) In short, the agency "must make their methods transparent by providing documentation, ensure quality by reviewing the underlying methods used, by consulting as needed with both experts and users, and by keeping users notified about corrections and revisions." 67 Fed.Reg. 8452, 8459 (Feb. 22, 2002).

Furthermore, where the agency is responsible for disseminating "influential" scientific, financial, or statistical information, it has heightened responsibilities under the Act to ensure that the data and methods employed in its decisionmaking is transparent. (HHS Guideline D.2.c.2.) "Influential" information "means that the agency can reasonably determine that dissemination of the information will have or does have a clear and substantial impact on important public policies or important private sector decisions." (HHS Guideline D.2.i.) Agencies responsible for dissemination of "vital health and medical information" have additional responsibilities to "ensur[e] the timely flow of vital information from agencies to medical providers, patients, health agencies, and the public." (HHS Guideline D.2.c.2.) The HHS Guidelines recognize that "attention to information quality [is] a total and continuing process," which requires the agency to "stay informed of information needs and develop new data, and information products where appropriate." (HHS Guideline D.2.d & e.).

///

///

///

///

## II. HHS'S STATEMENTS ABOUT MARIJAUNA AS MEDICINE VIOLATE THE DATA QUALITY ACT'S UTILITY AND OBJECTIVITY STANDARDS BECAUSE THOSE STATEMENTS DO NOT REVEAL THE DATA ON WHICH THEY ARE BASED, IGNORE OPPOSING PEER-REVIEWED SCIENTIFIC STUDIES, AND HAVE BEEN CONTRADICTED BY NEW DATA

### A. Numerous Peer-Reviewed Studies, Including the Institute of Medicine Study Commissioned by the Federal Government to Review the Medical Usefulness of Marijuana, Establish that Marijuana Is Effective in Treating Various Illnesses

Only by ignoring numerous peer-reviewed studies establishing that marijuana is effective in treating various illnesses can HHS assert that "there have been no studies that have scientifically assessed the efficacy of marijuana for any medical condition." 66 Fed.Reg. 20038, 20052 (April 18, 2001). Despite the federal government's refusal to either approve studies or make marijuana available to researchers, more than 6,500 published scientific articles on medical applications for marijuana are found in the National Library of Medicine's database (http:/pubmed.com). Of these, many are clinical studies that show marijuana's efficacy for treating pain, nausea, loss of appetite and spasticity. HHS's conclusion is even contradicted by data cited in a report to which HHS refers, *Marijuana as Medicine: Assessing the Science Base*, a comprehensive review of the therapeutic uses of marijuana prepared in 1999 by the Institute of Medicine ("IOM") commissioned by the White House's Office of National Drug Control Policy. That report found a medical basis for using marijuana as treatment for a variety of conditions.

Specifically, with respect to pain management, the IOM cited three double-blind, placebo-controlled studies on treating cancer pain, which found marijuana's primary psychoactive component to be comparable to codeine in effectiveness, but without the nausea and other debilitating side effects. (Noyes Jr R, Brunk SF, Baram DA, Canter A 1975a; Noyes R, Jr, Brunk SF, Avery DH, Canter A 1975b; Staquet M, Gantt C, Machin D 1978). The IOM also reports that an experimental study on pain showed that "cannabinoids were comparable with opiates in potency and efficacy. . . ."

Other research on marijuana's efficacy for pain management that HHS either failed to adequately consider or acknowledge includes a human study showing statistically significant increases in pain threshold after smoking marijuana (Milstein, MacCannell, Karr & Clark 1975) as well as numerous case studies of patients who voluntarily employed marijuana to treat painful conditions, including a woman whose severe juvenile rheumatoid arthritis was resistant to standard medicine but responsive to marijuana therapy (Grinspoon & Bakalar 1997, Randall 1991, Noyes & Baram 1974). As noted in the chapter on "The Role of Cannabis and Cannabinoids in Pain Management" in the sixth edition of *Pain Management: A Guide for Clinicians* (Russo 2003), "these accounts fulfill criteria of 'N-of-1 studies' and have been accepted by epidemiologists as proof of efficacy in rare conditions or ones in which blinded controlled trials are technically difficult (Guyatt, et al 1990, Larson 1990)." On the basis of these studies and other research published before the HHS response, a review of indications for medical treatment with marijuana concluded "any patient with pain unrelieved by conventional analgesics should have access to smoked marijuana" (Hollister 2000).

On treating nausea, the IOM reported on numerous clinical studies – including "a carefully controlled double-blind study" and a "a double-blind, cross-over, placebo-controlled study" – showing that both marijuana and select cannabinoids are effective antiemetics for patients suffering nausea and lack of appetite related to both cancer treatment and HIV/AIDS. In fact, the IOM concluded that marijuana is not only effective, but "[f]or patients such as those with AIDS or who are undergoing chemotherapy and who suffer simultaneously from severe pain, nausea, and appetite loss, cannabinoid drugs might offer broad-spectrum relief not found in any other single medication."

Indeed, HHS ignores not only the data used but the conclusions reached by the IOM. Although the IOM report contains, as noted, information contradicting HHS's assertions, HHS refers only to the report's conclusions that "smoked marijuana is a crude drug delivery system that exposes patients to a significant number of harmful substances" and that additional studies are needed to assess its full medical efficacy. 66 Fed.Reg. 20038, 20047 (April 18, 2001). In doing this, HHS ignores the overall sense of the report's conclusions, which Principal Investigator Dr. John Benson, at the news conference releasing the IOM report, characterized as: "We concluded that there are some limited circumstances in which we recommend smoking marijuana for medical uses." HHS fails the objectivity standard of the Data Quality Act and its own Guidelines when it fails to consider the pertinent data used and conclusions reached by a study it cites. *See* HHS Guideline D.2.c ("in disseminating certain types of information to the public, other information must also be presented in order to ensure an accurate, clear, complete, and unbiased presentation").

Moreover, since the release of the IOM report and the HHS response, additional clinical studies on the medical efficacy of marijuana have been published in peer-reviewed journals. A review of clinical studies conducted in several states during the past two decades has shown that, in 768 patients, marijuana was a highly effective antiemetic in chemotherapy (Musty and Rossi 2001). Recent double-blind, placebo-controlled studies of HIV/AIDS patients showed that marijuana both reduced neuropathic pain and produced weight gain without immunological compromise (Abrams et al. 2003). Clinical studies of Multiple Sclerosis, for which there are few effective treatments, have shown cannabis extracts to be effective for spasticity and other symptoms (Wade et al. 2003; Zajicek et al. 2003), as well as chronic pain (Notcutt and Rangappa 2004). Three additional articles supporting the benefit of marijuana in treating MS patients for spasticity (Vaney), pain, sleep and spasticity (Wade) and bladder function (Brady) appear in the August 2004 issue of the journal *Multiple Sclerosis*. The non-psychoactive marijuana component cannibidol (CBD) has also been shown to have numerous medical applications as an anti-inflammatory and neuroprotective agent (Mechoulam, Parker, and Gallily 2002; Pertwee 2004; Russo 2003) (Mechoulam, Parker, and Gallily 2002; Pertwee 2004; Russo 2003) and as a treatment for rheumatoid arthritis (Malfait et al. 2000).

Lastly, a study of patients who have used standardized, heat-sterilized, quality-controlled medical marijuana as part of the federal government's Compassionate Investigational New Drug Program demonstrated the long-term clinical effectiveness of marijuana in treating chronic musculoskeletal pain, spasm and nausea, and spasticity of Multiple Sclerosis (Russo 2002). After using medical marijuana supplied by the federal government for periods ranging from 11 to 27 years, these patients showed no functionally significant problems in their physiological

systems, as determined by MRI scans of the brain, pulmonary function tests, chest X-ray, neuropsychological tests, hormone and immunological assays, electroencephalography, P300 testing, and neurological clinical examination.

In the face of these carefully controlled scientific studies, many of which are funded and approved by the federal government, as well as the IOM report HHS cites, it is hardly accurate, or objective, to conclude that the efficacy of marijuana has not been scientifically assessed for any medical condition. Therefore, ASA requests that HHS withdraw its statement that "there have been no studies that have scientifically assessed the efficacy of marijuana for any medical condition," which is disseminated on federal government websites and in the *Federal Register*, 66 Fed.Reg. 20038, 20052 (April 18, 2001), and HHS replace it with the following statement: "Adequate and well-recognized studies show the efficacy of marijuana in the treatment of nausea, loss of appetite, pain and spasticity."

**B. Qualified Experts Accept Marijuana for Medical Use**

Without citing the basis for its finding, HHS states: "A material conflict of opinion among experts precludes a finding that marijuana has been accepted by qualified experts. At this time, it is clear that there is not a consensus of medical opinion concerning medical applications of marijuana." 66 Fed.Reg. 20038, 20052 (April 18, 2001). Because HHS does not reveal the data on which it relies in reaching this conclusion, it fails the utility and objectivity standards of the Data Quality Act, as the Act requires that agency decision-making be transparent. *See* HHS Guideline D.2.b & D.2.c.

Moreover, even if some unidentified experts still opine that marijuana is not appropriate for medical use, the majority opinion is to the contrary -- numerous experts agree that marijuana is effective in treating a variety of illnesses. As noted above, the IOM's Principal Investigator stated that the panel of experts convened by the IOM "concluded that there are some limited circumstances in which we recommend smoking marijuana for medical uses." And they are not alone. Before the enactment of any state laws legalizing the use of marijuana as medicine, a Harvard study found that 44% of oncologists were already recommending marijuana to their cancer patients (Doblin 1991). Even more indicated that they would advise their patients to use it if it were legal to do so. That widespread acceptance is also reflected in the numerous professional health organizations which have endorsed the medical use of marijuana. They include the American Public Health Association, the American Academy of Family Physicians, the American Nurses Association, the California Medical Association, the American Preventive Medical Association, the American Society of Addiction Medicine, and many more.

The current acceptance of marijuana as medicine in the United States is further evidenced by the thousands of American doctors who have recommended it to their patients, the tens of thousands of patients who are using it safely and effectively, and millions of American voters and two state legislatures that have approved its legal use as medicine. Furthermore, while the actions of other nations do not bear on the question of whether a practice is accepted in the United States, on the question of acceptance by experts, it is fair to note that marijuana is available by prescription in pharmacies in the Netherlands, and Health Canada is growing and distributing marijuana to patients there.

In any event, HHS's statement regarding consensus is doubly in error. First, no less an authority than the IOM Report cited by HHS states "there is substantial consensus among experts in the relevant disciplines" that marijuana is effective in treating pain, nausea, loss of appetite and anxiety. Secondly, even if there was not such agreement, universal agreement is not a reasonable standard for assessing medical practice, nor is it one of the five published requirements for an established medical use. In his 1988 ruling in favor of an earlier marijuana rescheduling petition, the DEA's Chief Administrative Law Judge Francis L. Young noted the standard for accepted medical use includes acceptance among patients and the public, which is incontrovertible for medical marijuana (Young 1988). That some experts might disagree does not deprive marijuana of its medical efficacy, if considered objectively. HHS's published criteria for accepted medical use requires only that "[t]he drug is accepted by qualified experts," 66 Fed.Reg. 20038, 20052 (April 18, 2001), not "a consensus of medical opinion," as HHS demands for marijuana. HHS fails the objectivity requirement of the Data Quality Act when it deviates from its published criteria in order to reach a decision. *See D&F Afonso Realty Trust v. Garvey*, 216 F.3d 1191, 1195 (D.C. Cir. 2000) ("we conclude that the FAA acted arbitrarily by issuing a hazard determination inconsistent with established standards"); *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C.Cir.1996) ("A long line of precedent has established that an agency action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations differently"); *Airmark Corp. v. FAA*, 758 F.2d 685, 691 & 692 (D.C. Cir. 1985) ("Deference to agency authority or expertise . . . 'is not a license to . . . treat like cases differently.'" "At the very least, 'an agency . . . must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored'") (quotation omitted); *see also United States v. Diapulse Corporation of America*, 748 F.2d 56, 62 (D.C. Cir. 1984) ("we must insist that the FDA apply its scientific conclusions evenhandedly").

ASA requests that HHS retract its statements that "a material conflict of opinion among experts precludes a finding that marijuana has been accepted by qualified experts" and "[a]t this time, it is clear that there is not a consensus of medical opinion concerning medical applications of marijuana," which is disseminated on the federal government website and in the *Federal Register*, 66 Fed.Reg. 20038, 20052 (April 18, 2001). ASA requests that HHS replace it with the following statement: "There is substantial consensus among experts in the relevant disciplines that marijuana is effective in treating nausea, loss of appetite, pain and spasticity."

### C. Peer-Reviewed Studies Establish that Marijuana's Chemistry Is Known and Reproducible

HHS fails the objectivity requirement for similar reasons in its treatment of the "known chemistry" requirement for accepted medical use. Whereas HHS has adopted and disseminated the FDA's finding that "a complete scientific analysis of all the chemical components found in marijuana has not been conducted," the known chemistry requirement published in the *Federal Register* requires only that the "drug's chemistry is known and reproducible," not that every one of its components be scientifically evaluated and analyzed. *See* 66 Fed.Reg. 20038, 20051 (April 18, 2001). Marijuana easily meets the published criterion. Numerous peer-reviewed studies characterize in detail the chemistry of marijuana. Its active components of marijuana are well known and well described, as are the mechanisms of biologic action in humans. The primary

psychoactive component, delta-9 tetrahydrocannabinol, was synthesized in the 1960s and is currently available in the United States as the Schedule III drug Dronabinol. Since the 1960s, researchers have isolated, synthesized and stereochemically defined 66 cannabinoid components, as well as scores of inactive metabolites. HHS makes clear, of those 66 cannabinoids, most are closely related, falling into only 10 groups, many of which differ by only a single chemical moiety, suggesting they are merely midpoints along biochemical pathways, such as degradation products, precursors, or byproducts. (Ross, Elsohly 1995; Turner, Elsohly, Boeren 1980.)

As the HHS report details, the biologic pathways of action are also well described, as are the CB1 and CB2 receptor sites of the endogenous cannabinoid system, with which marijuana interacts. Research on marijuana chemistry published between the time of the original petition and HHS's response seemingly was overlooked (Mechoulam and Ben-Shabat 1999), while additional research published since the HHS response further describes the chemistry of marijuana (Russo 2003; McPartland and Russo 2001; Elsohly 2002).

Only by ignoring these peer-reviewed studies and deviating from its announced criteria can HHS continue to disseminate to the public the statement that "a complete scientific analysis of all the chemical components found in marijuana has not been conducted." 66 Fed.Reg. 20038, 20051 (April 18, 2001). Both reveal bias on HHS's part and violate the objectivity requirement of the Data Quality Act and its Guidelines. *Cf.* HHS Guideline D.2.c. ("in disseminating certain types of information to the public, other information must also be presented in order to ensure an accurate, clear, complete, and unbiased presentation"); *D&F Afonso Realty Trust v. Garvey*, 216 F.3d 1191, 1195 (D.C. Cir. 2000) ("FAA acted arbitrarily by issuing a hazard determination inconsistent with established standards"); *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C.Cir.1996) ("agency action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations differently"); *Airmark Corp. v. FAA*, 758 F.2d 685, 691 & 692 (D.C. Cir. 1985) ("At the very least, 'an agency . . . must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored'") (quotation omitted).

ASA requests that HHS withdraw its statement that "a complete scientific analysis of all the chemical components found in marijuana has not been conducted," which is disseminated on federal government websites and in the *Federal Register*, 66 Fed.Reg. 20038, 20051 (April 18, 2001), and replace it with the following statement: "The chemistry of marijuana is known and reproducible."

### D. Marijuana Has A Currently Accepted Medical Use

Once HHS corrects the disputed statements described above, it must also correct its conclusion that marijuana "has no currently accepted medical use in treatment in the United States." 66 Fed.Reg. 20038, 20039 (April 18, 2001). This conclusion is based on the FDA's finding that marijuana fails the first, third and fifth requirements for accepted medical use. 66 Fed.Reg. 20038, 20051-52 (April 18, 2001). The corrections sought by petitioner, however, would reverse these findings, and necessitate the conclusion that marijuana does, in fact, have a currently accepted medical use in treatment in the United States.

ASA, therefore, requests that, if HHS makes the other three requested corrections, it withdraw its statement that marijuana "has no currently accepted medical use in treatment in the United States, which is disseminated on federal government websites and in the *Federal Register*," 66 Fed.Reg. 20038, 20039 (April 18, 2001). ASA requests that HHS replace it with the following statement: "Marijuana has a currently accepted use in treatment in the United States."

## III. ASA REPRESENTS SERIOUSLY ILL PERSONS WHO ARE DEEPLY AND IMMEDIATELY AFFECTED BY THE CONTROVERTED STATEMENTS BY HHS

ASA represents seriously ill persons across the United States who are deeply and immediately affected by the controverted statements by HHS.[2] HHS's statements about the lack of medical usefulness of marijuana harms these individuals in that it denies them access to medicine which will alleviate their suffering because these statements deter doctors from discussing and recommending marijuana to their patients. ASA seeks to ensure that doctors not be chilled in this manner by requesting that HHS's review of the medical efficacy of marijuana be based on sound science. Several HHS Guidelines recognize that application of the requirements of the Data Quality Act is especially appropriate to correct scientifically flawed statements about important public health and policy issues, of which this is one. *See* HHS Guidelines D.2.c.2, D.2.i & D.2.c.2; *see also* HHS Guideline D.2.h (noting that "[s]everal HHS agencies are responsible for dissemination of authoritative health, medical and safety information on a real time basis in order to protect the health of the public against urgent and emerging threats").

More importantly, HHS's statements play a crucial role in the DEA's marijuana rescheduling determination, as HHS's scientific and medical recommendations are binding on the DEA. 21 U.S.C. § 811(b). Should marijuana be rescheduled, its availability for medical use and additional research would increase tremendously, thereby alleviating the suffering of numerous medical marijuana patients throughout the United States represented by ASA, as well as the millions of Americans with conditions for which marijuana has been shown to be effective but who are unwilling to violate federal law to act on their doctors' considered expert advice.

DATED: October 4, 2004

Respectfully submitted,

JOSEPH D. ELFORD
Attorney for Petitioner
AMERICANS FOR SAFE ACCESS

STEPH SHERER
Executive Director for Petitioner
AMERICANS FOR SAFE ACCESS

[2] Steph Sherer, the Executive Director for ASA, is a medical marijuana patient who uses marijuana to treat chronic pain in her neck, upper back, and jaw, after conventional pain treatments proved harmful to her internal organs.

**BIBLIOGRAPHY OF REFERENCES**

(*Note:* Legal citations are included in the body of the petition)

Abrams DI, Hilton JF, Leiser RJ, Shade SB, Elbeik TA, Aweeka FT, Benewitz NL, Bredt BM, Kosel B, Aberg JA, Deeks SG, Mitchell TF, Mulligan K, Bacchetti P, McCune JM, Schambelan M. 2003. Short-term effects of cannabinoids in patients with HIV-1 infection. A randomized, placebo-controlled clinical trial. *Annals of Internal Medicine* 139:258-266.

Brady CM, DasGupta R, Dalton C, Wiseman OJ, Berkley KJ, Fowler CJ. 2004. An open-label pilot study of cannabis-based extracts for bladder dysfunction in advanced multiple sclerosis. *Multiple Sclerosis* 10:425-433.

Doblin R, Kleiman MA. 1991. Marijuana as antiemetic medicine: A survey of oncologists' experiences and attitudes. *Journal of Clinical Oncology* 9:1314-1319.

ElSohly M. 2002. Chemical constituents of *Cannabis.* In Grotenhermen F, Russo EB (Eds.), *Cannabis and cannabinoids: pharmacology, toxicology and therapeutic potential.* Binghamton, NY: Haworth Press.

Grinspoon L, Bakalar JB. 1993. *Marihuana: The Forbidden Medicine.* New Haven: Yale University Press.

Guyatt GH, Keller JL, Jaeschke R, Rosenbloom D, Adachi JD, Newhouse MT. 1990. The N-of-1 randomized controlled trial—clinical usefulness: Our three-year experience. *Annals of Internal Medicine* 112:293-299.

Hollister LE. 2000. An approach to the medical marijuana controversy. *Drug and Alcohol Dependency* 58:3-7.

Joy JE, Watson SJ, Benson Jr JA (Eds.). 2000. *Marijuana and medicine: assessing the science base*. Washington, DC: National Academy Press.

Larson EB. 1990. N-of-1 clinical trials. A technique for improving medical therapeutics. *Western Journal of Medicine* 152:52-56.

Malfait AM, Gallily R, Sumariwalla PF, Malik AS, Andreakos E, Mechoulam R, Feldmann M. 2000. The nonpsychoactive cannabis constituent cannabidiol is an oral anti-arthritic therapeutic in murine collagen-induced arthritis. *Proceedings of the National Academy of Sciences of the United States of America* 97:9561-9566.

McPartland JM, Russo EB. 2001. Cannabis and cannabis extracts: Greater than the sum of their parts? *Journal of Cannabis Therapeutics* 2001(3/4):103-132.

Mechoulam R, Ben-Shabat S. 1999. From *gan-zi-gun-nu* to anandamide and 2-arachidonoylglycerol: the ongoing story of cannabis. *Natural Products Reports* 16:131-143.

Mechoulam R, Parker LA, Gallily R. 2002. Cannabidiol: an overview of some pharmacological aspects. *Journal of Clinical Pharmacology* 42:11S-19S.

Milstein SL, MacCannell K, Karr G, Clark S. 1975. Marijuana-produced impairments in coordination: Experienced and nonexperienced subjects. *Journal of Nervous Mental Disease* 161:26-31.

Musty RE, Rossi R. 2001. Effects of smoked cannabis and oral delta-9-tetrahydrocannabinol on nausea and emesis after cancer chemotherapy: A review of state clinical trials. *Journal of Cannabis Therapeutics* 2001(1):26-56.

Notcutt W, Rangappa D. 2004. A response to 'Cannabis abuse and anaesthesia', Mills P M and Penfold N, Anaesthesia 58:1125. *Anaesthesia* 59:519.

Noyes Jr R, Baram DA. 1974. Cannabis analgesia. *Comprehensive Psychiatry* 15:531-535.

Noyes Jr R, Brunk SF, Baram DA, Canter A. 1975a. Analgesic effect of delta-9-tetrahydrocannabinol. *Journal of Clinical Pharmacology* 15:139-143.

Noyes Jr R, Brunk SF, Avery DH, Canter A. 1975b. The analgesic properties of delta-9-tetrahydrocannabinol and codeine. *Clinical Pharmacology and Therapeutics* 18:84-89.

Pertwee RG. 2004. The pharmacology and therapeutic potential of cannabidiol. In DiMarzo V (Ed.), *Cannabinoids*. Dordrecht, Netherlands: Kluwer Academic Publishers.

Ross SA, Elsohly MA. 1995. Constituents of *Cannabis sativa L.* XXVIII. A review of the natural constituents: 1980—1994. *Zagazig Journal for Pharmaceutical Sciences* 4:1-10.

Russo, EB. 2002. Role of cannabis and cannabinoids in pain management. In Weiner RS (Ed.), *Pain management: A practical guide for clinicians.* Boca Raton, FL: CRC Press.

Russo, EB. 2003. Future of cannabis and cannabinoids in therapeutics. *Journal of Cannabis Therapeutics* 2003(3/4):163-174.

Staquet M, Gantt C, Machin D. 1978. Effect of a nitrogen analog of tetrahydrocannabinol on cancer pain. *Clinical Pharmacology and Therapeutics* 23:397-401.

Turner CE, Elsohly MA, Boeren EG. 1980. Constituents of *Cannabis sativa L.* XVII. A review of the natural constituents. *Journal of Natural Products* 43:169-234.

Vaney C, Heinzel-Gutenbrunner M, Jobin P, Tschopp F, Gattlen B, Hagen U, Schnelle M, Reif M. 2004. Efficacy, safety and tolerability of an orally administered cannabis extract in the treatment of spasticity in patients with multiple sclerosis: a randomized, double-blind, placebo-controlled, crossover study. *Multiple Sclerosis* 10:417-24.

Wade DT, Makela P, Robson P, House H, Bateman C. 2004. Do cannabis-based medicinal extracts have general or specific effects on symptoms in multiple sclerosis? A double-blind, randomized, placebo-controlled study on 160 patients. *Multiple Sclerosis* 10:434-41.

Wade DT, Robson P, House H, Makela P, Aram J. 2003. A preliminary controlled study to determine whether whole-plant cannabis extracts can improve intractable neurogenic symptoms. *Clinical Rehabilitation* 17:18-26.

Watson SJ, Benson Jr JA, Joy JE. 2000. Marijuana and medicine: assessing the science base: Summary of the Institute of Medicine 1999 report. *Archives of General Psychiatry* 57: 547-552.

Young FL. 1988. Opinion and Recommended Ruling, Findings of Fact, Conclusions of Law and Decision of Administrative Law Judge. *In the matter of marijuana rescheduling petition*, Docket No. 86-22. U.S. Department of Justice, Drug Enforcement Administration. September 6, 1988.

Zajicek J, Fox P, Sanders H, Wright D, Vickery J, Nunn A, Thompson A. 2003. Cannabinoids for treatment of spasticity and other symptoms related to multiple sclerosis (CAMS study): multicentre randomised placebo-controlled trial. *Lancet* 362:1517-26.

# Medical Marijuana Endorsements and Statements of Support

The following is a representative sample of the large number of government panels, medical organizations, health charities and individuals of note who have publicly stated their support for medical access to marijuana and/or their opposition to criminal penalties for medical marijuana users.

- "Nausea, appetite loss, pain and anxiety are all afflictions of wasting, and all can be mitigated by marijuana."

— Institute of Medicine, "Marijuana and Medicine: Assessing the Science Base," 1999

- "[T]here will likely always be a subpopulation of patients who do not respond well to other medications ... The critical issue is not whether marijuana or cannabinoid drugs might be superior to the new drugs, but whether some group of patients might obtain added or better relief from marijuana or cannabinoid drugs ... Although some medications are more effective than marijuana for these problems, they are not equally effective in all patients."

— Institute of Medicine, "Marijuana and Medicine: Assessing the Science Base," 1999

- "ACP urges review of marijuana status as a Schedule I controlled substance and reclassification into a more appropriate schedule, given the scientific evidence regarding marijuana's safety and efficacy in some clinical conditions ... Given marijuana's proven efficacy at treating certain symptoms and its relatively low toxicity, reclassification would reduce barriers to research and increase availability of cannabinoid drugs to patients who have failed to respond to other treatments."
- "ACP strongly urges protection from criminal or civil penalties for patients who use medical marijuana as permitted under state laws."

—American College of Physicians (representing 124,000 members, ACP is the largest specialty and second largest medical society in the U.S.), January 2008

- "[T]he Leukemia & Lymphoma Society supports legislation to remove criminal and civil sanctions for the doctor-advised, medical use of marijuana by patients with serious physical medical conditions ... [the] Leukemia & Lymphoma Society strongly urge that in a state where patients are permitted to use marijuana medicinally for serious and/or chronic illnesses and a patient's physician has recommended its use in accordance with that state's law and that state's medical practice standards, the patient should not be subject to federal criminal penalties for such medical use."

— Leukemia & Lymphoma Society, July 2007

- "The American Academy of Addiction Psychiatry endorses the Institute of Medicine (IOM) report supporting the therapeutic value of cannabinoid drugs for pain relief, control of nausea and vomiting and appetite stimulations for debilitating conditions such as AIDS. We are in favor of compassion for the ill and the availability of marijuana for medical purposes based on current evidence."

— American Academy of Addiction Psychiatry, "Medical Use of Marijuana," June 2002, www.aaap.org/policies/marijuana.html





• "[The AAFP accepts the use of medical marijuana] under medical supervision and control for specific medical indications."

— American Academy of Family Physicians, 1989, reaffirmed in 2001

• "When appropriately prescribed and monitored, marijuana/cannabis can provide immeasurable benefits for the health and well-being of our patients."

— American Academy of HIV Medicine, 2003

• "Therefore be it resolved that the American Nurses Association will: ... Support the right of patients to have safe access to therapeutic marijuana/cannabis under appropriate prescriber supervision."

— American Nurses Association, resolution, 2003

• "Approved medical uses for marijuana or [THC] for treatment of glaucoma, illnesses associated with wasting such as AIDS, the emesis associated with chemotherapy, or other uses ... should be administered only under the supervision of a knowledgeable physician."

— American Society of Addiction Medicine, April 16, 1997

• "The CMA has always recognized and acknowledged the unique requirements of those individuals suffering from a terminal illness or chronic disease for which conventional therapies have not been effective and for whom marijuana for medicinal purposes may provide relief."

— Canadian Medical Association, January 2006, www.cma.ca/index.cfm/ci_id/3396/la_id/1.htm

• "Present evidence indicates that [cannabinoids] are remarkably safe drugs, with a side-effects profile superior to many drugs used for the same indications."

— British Medical Association, November 1997

• "For a significant number of patients, clinical experience and research confirm that marijuana serves as the only effective medicine for relieving pain, suppressing nausea or stimulating appetite. Numerous studies by blue-ribbon government panels and federally funded, peer-reviewed scientific studies have consistently found that marijuana is effective for treating <u>certain</u> debilitating symptoms."

— American Pain Foundation, American Medical Women's Association, Lymphoma Foundation of America, American Nurses Association, California Nurses Association, AIDS Action Council, National Women's Health Network, Doctors of the World-USA, Gay Men's Health Crisis, Amici Curiae in Support of Petitioner, *Ross v. Ragingwire*, 2006 WL 3244938 (August 7, 2006 Appellate Brief)

• "[M]arijuana has an extremely wide acute margin of safety for use under medical supervision and cannot cause lethal reactions ... [G]reater harm is caused by the legal consequences of its prohibition than possible risks of medicinal use."

— American Public Health Association, Resolution #9513, "Access to Therapeutic Marijuana/Cannabis," 1995



- "[T]he use of marijuana may be appropriate when prescribed by a licensed physician solely for use in alleviating pain and nausea in patients who have been diagnosed as chronically ill with life threatening disease, when all other treatments have failed."

— The Medical Society of the State of New York, May 3, 2004



- "[T]here is sufficient evidence for us to support any physician-patient relationship that believes the use of marijuana will be beneficial to the patient."

— Rhode Island Medical Society, 2004



- "[The] CMA continue to support the ability of physicians to discuss and make recommendations concerning the potential benefits or harm to the patient of smoked herbal cannabis consistent with state and federal law and oppose criminal prosecution of patients who possess or use smoked herbal cannabis for medical reasons upon the recommendation of a physician."

— California Medical Association, October 30, 2006



- "[I]t cannot seriously be contested that there exists a small but significant class of individuals who suffer from painful chronic, degenerative, and terminal conditions, for whom marijuana provides uniquely effective relief."

— HIV Medicine Association of the Infectious Diseases Society of America, American Medical Students Association, Lymphoma Foundation of America, Dr. Barbara Roberts, and Irvin Rosenfeld, Amicus Curiae brief filed in the U.S. Supreme Court (in the case of *Gonzales v. Raich*), October 2004



- "We think people who use cannabis to relieve the pain of arthritis should be able to do so."

— Arthritis Research Campaign, October 23, 2001



- "Whitman-Walker Clinic supports the valid use of marijuana, under a physician's supervision, to help alleviate AIDS wasting syndrome and nausea associated with treatment regimes."

— Whitman-Walker Clinic, April 1998



- "[F]or cancer patients with advanced cancers who want to improve the quality of their life, a risk versus benefit analysis [of smoked medical marijuana] weighs heavily on the benefit side."

— *Cancer Monthly*, May 2006

- "In states where patients are permitted to use marijuana medicinally for serious and/or chronic illnesses and a patient's physician has recommended its use in accordance with that state's law and that state's medical practice standards, the patient should not be subject to federal criminal penalties for such medical use."

— HIV Medicine Association, October 30, 2006

- "The American Medical Student Association strongly urges the United States government ... to reschedule marijuana to Schedule II of the Controlled Substance Act, and ... end the medical prohibition against marijuana."

— American Medical Students Association, March 1993

- "[We] recommend that the APA support the AMA recommendation, 'The AMA believes that effective patient care requires the free and unfettered exchange of information on treatment and alternatives and that discussion of these alternatives between physicians and patients should not subject either party to criminal sanctions.'"

— Assembly of the American Psychiatric Association, November 3, 2007
(Note: This language has not been yet been adopted as official policy of the APA)

- "[We] support protection for patients and physicians participating in state approved medical marijuana programs."

— Assembly of the American Psychiatric Association, November 3, 2007
(Note: This language has not been yet been adopted as official policy of the APA)

- "[The LFA] urges Congress and the President to enact legislation to reschedule marijuana to allow doctors to prescribe smokable marijuana to patients in need ... [and] urges the U.S. Public Health Service to allow limited access to medicinal marijuana by promptly reopening the Investigational New Drug compassionate access program to new applicants."

— Lymphoma Foundation of America, January 20, 1997

- "[We] support the right of physicians to recommend marijuana for limited medical purposes, consistent with prevailing state laws. [We] recommend that patients be protected when in possession of and/or using legal quantities of marijuana under physician supervision in state-sanctioned medical marijuana programs. [We] recommend to the federal government that it revise its current policies that subject patients to the threat of federal arrest and prosecution even though they are under physician supervision and in possession of legal quantities of medical marijuana under state-sanctioned programs."

—Marijuana: Medical Use Action Paper endorsed by various members of
the American Psychiatric Association in leadership positions,
including seven past presidents, two trustees, and the APA Lifers, November 2007

- "[A] federal policy that prohibits physicians from alleviating suffering by prescribing marijuana for seriously ill patients is misguided, heavy-handed, and inhumane."

— Dr. Jerome Kassirer, "Federal Foolishness and Marijuana,"
editorial, *New England Journal of Medicine*, January 30, 1997

- "[T]he American Association for Social Psychiatry supports full legal status for states to implement their own doctor-advised, medical marijuana programs for patients with serious physical medical conditions ... [T]he American Association for Social Psychiatry strongly urge that in a state where patients are permitted to use marijuana medicinally for serious and/or chronic illnesses and a patient's physician has recommended its use in accordance with that state's law and that state's medical practice standards, the patient should not be subject to federal criminal penalties for such medical use."

— American Association for Social Psychiatry, May 20, 2007

- "[We] support pharmacy participation in the legal distribution of medical marijuana."

— California Pharmacists Association, May 26, 1997

- "The evidence is overwhelming that marijuana can relieve certain types of pain, nausea, vomiting and other symptoms caused by illnesses like multiple sclerosis, cancer and AIDS — or by the harsh drugs sometimes used to treat them. And it can do so with remarkable safety. Indeed, marijuana is less toxic than many of the drugs that physicians prescribe every day."

— former U.S. Surgeon General Joycelyn Elders, M.D.,
"Myths About Medical Marijuana," *Providence Journal*, March 26, 2004

- "We must make sure that the casualties of the war on drugs are not suffering patients who legitimately deserve relief."

— Scott Fishman, president of the American Academy of Pain Medicine, February 2006

- "It [medical marijuana] should be an option for patients who have it recommended by knowledgeable physicians."

— Dr. Jesse L. Steinfeld, former U.S. Surgeon General, July 2003

- "Marijuana, in its natural form, is one of the safest therapeutically active substances known ... The evidence in this record clearly shows that marijuana has been accepted as capable of relieving the distress of great numbers of very ill people, and doing so with safety under medical supervision. It would be unreasonable, arbitrary and capricious for [the] DEA to continue to stand between those sufferers and the benefits of this substance."

— Francis L. Young, DEA Chief Administrative Law Judge, 1988

- "I consider the most important recommendation made by the IOM (Institute of Medicine) panel [to be] that physicians be able to prescribe marijuana to individual patients with debilitating or terminal conditions ... I believe such compassionate use is justified."

— Andrew Weil, M.D., July 1999

- "Cannabinoids and THC also have strong pain-killing powers, which is one reason medical marijuana should be readily available to people with cancer and other debilitating diseases."

— Dean Edell, M.D., March 2, 2000

- "I'm an oncologist as well as an AIDS doctor, and I don't think that a drug that creates euphoria in patients with terminal diseases is having an adverse effect."

— Donald Abrams, M.D. 2005

- "Cannabis will one day be seen as a wonder drug, as was penicillin in the 1940s. Like penicillin, herbal marijuana is remarkably nontoxic, has a wide range of therapeutic applications and would be quite inexpensive if it were legal."

— Dr. Lester Grinspoon, professor of psychiatry at Harvard Medical School,
*Los Angeles Times*, May 5, 2006

- "Not everybody needs marijuana for medical illness. But for those who really do, it's very helpful. As more and more states are taking medical marijuana – New Mexico just did it the other day – eventually it will just be overwhelming. And it will happen. But I'm shocked that it's taken this long."

— Dr. Thomas Ungerleider, Professor Emeritus of psychiatry at UCLA and member of President Nixon's National Commission on Marijuana and Drug Abuse, "3rd Degree," *LA City Beat*, March 29, 2007

- "Overall, by comparison with other drugs used mainly for 'recreational' purposes, cannabis could be rated to be a relatively safe drug … In contrast, cannabis might have beneficial effects in some medical indications … It seems likely that medicinal cannabis will re-enter the pharmacopeia."

— Dr. Leslie Iversen, pharmacologist at Oxford University and member of the British government's Advisory Council on the Misuse of Drugs, "Long-term effects of exposure to cannabis," *Current Opinion in Pharmacology*, 2005

- "Cannabinoids, the active components of cannabis sativa and their derivatives … exert palliative effects in patients with cancer and inhibit tumour growth in laboratory animals."

— Dr. Manuel Guzman, associate professor of biochemistry and molecular biology at Complutense University, Madrid, Spain, "Cannabinoids: Potential Anti-Cancer Agents," *Nature Reviews — Cancer*, October 2003

- "54% of oncologists favor the controlled medical availability of marijuana, and 44% have advised at least one of their cancer patients to obtain marijuana illegally."

— Doblin/Kleiman (Harvard University) scientifically valid, random survey of oncologists, *Journal of Clinical Oncology*, 1990

- "I have spent my entire career in search of more effective treatments for this awful disease [amyotrophic lateral sclerosis (ALS, aka Lou Gehrig's disease)]. We have now found that the cannabinoids, the active ingredients in medical marijuana, work remarkably well in controlling the clinical symptoms of ALS. Even more exciting is that we are now discovering that the cannabinoids actually protect nerve cells and may prolong the life of patients with ALS."

— Gregory Carter, M.D., clinical professor of Rehabilitation Medicine, University of Washington School of Medicine, and co-director, Muscular Dystrophy Association (MDA)/Amyotrophic Lateral Sclerosis (ALS) Center (testimony submitted to Illinois Senate Public Health Committee, March 2007)

- "There is no problem, basically, with marijuana as a medicine ... Marijuana is no different than morphine, no different than codeine, no different than Aspirin."

— Health Canada's Jeremy Mercer, "'We Will Approve Marijuana Prescriptions: Marijuana 'No Different than Aspirin,' Health Canada official says," *Ottawa Citizen*, December 19, 1997

- "[R]esearch has shown that cannabis can be of medicinal use. ... This is an area where public health must prevail."

— Belgian Ministry of Health, Willem Scholten, "Statement of the Health Ministry," IACM Conference, Brussels, September 4, 2003

- "Despite the positive appraisal of the therapeutic potential of cannabinoids ..., they have not been widely used ... Part of the reason for this is that research on the therapeutic use of these compounds has become a casualty of the debate in the United States about the legal status of cannabis ... As a community we do not allow this type of thinking to deny the use of opiates for analgesia. Nor should it be used to deny access to any therapeutic uses of cannabinoid derivatives that may be revealed by pharmacological research."

— Australian National Task Force on Cannabis, Wayne Hall, Nadia Solowij, and Jim Lemon, "The health and psychological consequences of cannabis use," *National Drug Strategy Monograph Series No. 25*, 1994, www.health.gov.au/internet/wcms/publishing.nsf/Content/health-pubs-drug-cannab2-home.htm

- "People can debate marijuana's potential for abuse, but it is increasingly clear that cannabis has definite medicinal benefits. Studies and abundant anecdotal evidence demonstrate that marijuana can stimulate the appetites of people with AIDS and cancer, reduce nausea in chemotherapy patients, and help people with such debilitating conditions as multiple sclerosis, diabetes and glaucoma."

  — Wesley J. Smith, senior fellow at the Discovery Institute,
  *San Francisco Chronicle*, December 2, 2007

- "So let's get this straight: I am against the legalization of marijuana ... However, there are cases when marijuana makes sense, like in medicine. There are a host of serious diseases when smoking pot is the best and sometimes the only relief for pain and suffering. There are plenty of people who abuse all sorts of prescription drugs, but law-abiding citizens can still have access if they need them. So, when I read about the Drug Enforcement Agency, the DEA, raiding ten medical marijuana clinics in California last week, totally legal businesses. I have to agree with the critics that call this case, and the DEA, bullies."

  — Glenn Beck, August 3, 2007

- "[We] recommend ... allow[ing] [marijuana] prescription where medically appropriate."

  — National Association for Public Health Policy, November 15, 1998

- "The National Nurses Society on Addictions urges the federal government to remove marijuana from the Schedule I category immediately, and make it available for physicians to prescribe. NNSA urges the American Nurses Association and other health care professional organizations to support patient access to this medicine."

  — National Nurses Society on Addictions, May 1, 1995

- "Marijuana has proven to be effective in the treatment of people with HIV/AIDS, multiple sclerosis, cancer, and those suffering from severe pain or nausea ... The legalization of medical marijuana would be a step forward for the health of all New Yorkers."

  — New York State Association of County Health Officials, resolution, 2003

- "The SFMS takes a support[ive] position on the California Medical Marijuana Initiative [legalizing medical marijuana]."

  — San Francisco Medical Society, August 1996

- "[The American Bar Association] recognizes that persons who suffer from serious illnesses for which marijuana has a medically recognized therapeutic value have a right to be treated with marijuana under the supervision of a physician."

  — American Bar Association, May 4, 1998

- "If Cannabis were unknown, and bio-prospectors were suddenly to find it in some remote mountain crevice, its discovery would no doubt be hailed as a medical breakthrough. Scientists would praise its potential for treating everything from pain to cancer, and marvel at its rich pharmacopoeia — many of whose chemicals mimic vital molecules in the human body."

  — "Reefer Madness, Marijuana Is Medically Useful Whether Politicians Like It or Not,"
  *The Economist*, April 29, 2006

# Supporting Research into the Therapeutic Role of Marijuana

A Position Paper of the American College of Physicians

This paper, written by Tia Taylor, MPH, was developed for the Health and Public Policy Committee of the American College of Physicians: J. Fred Ralston, MD, FACP, Chair; Molly Cooke, MD, FACP, Vice Chair; Andrew A. Chang, MA, Charles Cutler, MD, FACP; MA, David A. Fleming, MD, FACP; Brian P. Freeman, MD, FACP; Robert Gluckman, MD, FACP; Mark Liebow, MD, FACP; Kenneth Musana, MB, ChB; Robert McLean, MD, FACP; Mark Purtle, MD, FACP; P. Preston Reynolds; and Kathleen Weaver, MD, FACP. It was approved by the Board of Regents in January 2008.

APPENDIX D

**Executive Summary**

Marijuana has been smoked for its medicinal properties for centuries. Preclinical, clinical, and anecdotal reports suggest numerous potential medical uses for marijuana. Although the indications for some conditions (e.g., HIV wasting and chemotherapy-induced nausea and vomiting) have been well documented, less information is available about other potential medical uses. Additional research is needed to clarify marijuana's therapeutic properties and determine standard and optimal doses and routes of delivery. Unfortunately, research expansion has been hindered by a complicated federal approval process, limited availability of research-grade marijuana, and the debate over legalization. Marijuana's categorization as a Schedule I controlled substance raises significant concerns for researchers, physicians, and patients. As such, the College's policy positions on marijuana as medicine are as follows:

**Position 1: ACP supports programs and funding for rigorous scientific evaluation of the potential therapeutic benefits of medical marijuana and the publication of such findings.**

> **Position 1a: ACP supports increased research for conditions where the efficacy of marijuana has been established to determine optimal dosage and route of delivery.**
>
> **Position 1b: Medical marijuana research should not only focus on determining drug efficacy and safety but also on determining efficacy in comparison with other available treatments.**

**Position 2: ACP encourages the use of nonsmoked forms of THC that have proven therapeutic value.**

**Position 3: ACP supports the current process for obtaining federal research-grade cannabis.**

**Position 4: ACP urges review of marijuana's status as a schedule I controlled substance and its reclassification into a more appropriate schedule, given the scientific evidence regarding marijuana's safety and efficacy in some clinical conditions.**

**Position 5: ACP strongly supports exemption from federal criminal prosecution; civil liability; or professional sanctioning, such as loss of licensure or credentialing, for physicians who prescribe or dispense medical marijuana in accordance with state law. Similarly, ACP strongly urges protection from criminal or civil penalties for patients who use medical marijuana as permitted under state laws.**

**Background**

The marijuana plant, cannabis, contains more than 60 chemical compounds, known as cannabinoids. The main psychoactive element in marijuana is delta-9-tetrahydrocannabinol (THC). Cannabidiol (CBD) is the second most abundant cannabinoid, but it has no psychoactive effects. The concentration of THC and other cannabinoids in marijuana is highly variable, depending on growing condition, plant genetics, and processing after harvest (1). This variability in composition has hindered research on and evaluation of the drug's medical value.

Marijuana has been smoked for its medicinal properties for centuries. It was in the U.S. Pharmacopoeia until 1942 when it was removed because federal legislation made the drug illegal (2). The Controlled Substance Act of 1970 placed marijuana in the Schedule I category along with other substances deemed to have no medicinal value and high potential for abuse. Still, the overwhelming number of anecdotal reports on the therapeutic properties of marijuana sparks interest from scientists, health care providers, and patients. Over the past 20 years, researchers have discovered cannabinoid receptors: CB1, which mediates the central nervous system (CNS), and CB2, which occurs outside the CNS and is believed to have anti-inflammatory and immunosuppressive activity (3, 4). These scientific developments have revealed much information supporting expansion of research into the potential therapeutic properties of marijuana and its cannabinoids.

In 1997, the White House Office of National Drug Control Policy asked the Institute of Medicine (IOM) to review scientific evidence and assess the risks and benefits of marijuana. The IOM concluded that scientific developments indicate marijuana and its cannabinoids have therapeutic properties that could potentially treat many illnesses and conditions. The IOM recommended that cannabis research should focus on the development of rapid-onset, reliable, and safe delivery systems (5). Since the IOM report, the body of research on cannabinoids for symptom management has grown slightly.

Potential Medical Uses of Marijuana

*Appetite Stimulation/Antiemetic*

The research supporting THC as an effective appetite stimulant and antiemetic is abundant. In 1986, the U.S. Food and Drug Administration approved Marinol® (dronabinol), an oral synthetic form of THC, to treat severe weight loss associated with AIDS (HIV/AIDS wasting) and nausea and vomiting associated with chemotherapy for patients who fail to respond to other antiemetics. Clinical trials have demonstrated that both oral and smoked marijuana stimulate appetite, increase caloric intake, and result in weight gain among patients experiencing HIV wasting (6–9). Studies of chemotherapy patients with nausea and vomiting found THC to be equivalent or superior to other antiemetics (including prochlorperazine or metoclopramide) for symptom reduction (10). Research has also found that administration of THC along with another antiemetic was more effective that either drug alone, suggesting opportunities for combined therapy. The IOM concluded that cannabinoids are "modest" antiemetics but may be effective for

those who respond poorly to other available antiemetics. THC and other cannabinoids may offer relief not found in other drugs (11).

*Glaucoma*

High intraocular pressure (IOP) is a known risk factor for glaucoma. Cannabinoids have been shown to have neuroprotective properties and to reduce IOP, pupil restriction, and conjunctival hyperemia (12–14). Smoked or eaten marijuana and oral THC can reduce IOP by approximately 25% in people with normal IOP who have visual field changes, with similar results exhibited in healthy adults and glaucoma patients. However, the effects of cannabinoids on IOP are short-lived, and high doses are required to produce any effects at all. There is concern that long-term use of marijuana could reduce blood flow to the optic nerve because of its systemic hypotensive effects and its potential for interaction with other antiglaucoma drugs (15). In addition, the cardiovascular and psychoactive effects of smoked marijuana contraindicate its use in glaucoma patients, many of whom are elderly and have comorbidities. This led to the development and testing of a topical THC, but its effect on IOP was insignificant. As a result, the IOM and American Academy of Ophthalmology concluded that no scientific evidence has demonstrated increased benefits or diminished risks of marijuana use to treat glaucoma compared with the wide variety of pharmaceutical agents currently available (16, 17).

*Neurological and Movement Disorders*

Anecdotal, survey, and clinical trial data suggest that smoked marijuana and oral THC provide relief of spasticity, pain, and tremor in some patients with multiple sclerosis (MS), spinal cord injuries, or other trauma (18, 19). A recent study of patients with HIV-associated sensory neuropathy (HIV–SN) found that those who smoked marijuana 3 times a day reported a decrease of 34% in HIV–SN, compared with 17% in the placebo group. However, the psychoactive effects of THC impaired posture and balance among subjects (20). CBD has some anti-inflammatory properties and inhibits smooth muscle contractions, thus making it a potentially powerful anticonvulsant that does not contain the psychoactive effects of THC. CBD has been indicated as a treatment for several types of seizures and epilepsy, although human research is scant. Preclinical trials revealed that the anticonvulsant properties of cannabinoids differ widely by dose and between species. CBD has been shown to induce seizures in some species and to be strongly anticonvulsant in others (21).

*Analgesic*

Current research on the role of various forms of marijuana as an analgesic is promising. Oral doses of THC resulted in pain reductions similar to that from codeine among cancer patients (22). A randomized, double-blind trial of patients with rheumatoid arthritis found that Sativex®, an oromucosal THC spray, significantly reduced pain on movement and at rest and improved quality of sleep (23). While studies indicate that THC has analgesic properties, there is a very narrow therapeutic window between doses that produce useful analgesia and those that produce unacceptable adverse effects. A recent study found that subjects who smoked 4% THC cigarettes reported reduced pain sensations after 45 minutes. On the other hand, subjects who smoked 8%

THC cigarettes reported an increased sensitivity to pain after 45 minutes (24). In another study, smoked marijuana increased sensitivity to electric shock among normal patients. The biphasic action of THC, stimulation followed by sedation, increases then decreases pain. These properties support the need for research to identify the specific kinds of pain that may be relieved by marijuana and the development of a synthetic cannabinoid with few actions other than analgesia.

Adverse Effects

Acutely, smoked marijuana increases heart rate and may decrease blood pressure on standing; however, some patients find the drug's psychoactive effects more disturbing. Undesired effects include impairment of short-term memory, attention, motor skills, reaction times, and the organization and integration of complex information (25). These effects are generally more severe for oral THC than for smoked marijuana (26).

The chronic effects of smoked marijuana are of much greater concern, as its gas and tar phases contain many of the same compounds as tobacco smoke. Chronic use of smoked marijuana is associated with increased risk of cancer, lung damage, bacterial pneumonia, and poor pregnancy outcomes. Chronic marijuana use has also been linked to the development of tolerance to some effects and the appearance of withdrawal symptoms (restlessness, irritability, mild agitation, insomnia, sleep disturbances, nausea, cramping) with the onset of abstinence. However, these withdrawal symptoms are mild compared with those experienced with opiates or benzodiazepines (27). Moreover, THC, while quite potent in comparison with other psychoactive drugs, has remarkably low lethal toxicity. This led the IOM to conclude that "except for harms associated with smoking, adverse effects of marijuana use are within the range of effects tolerated for other medications (28)."

**Positions**

As with any potential therapeutic drug, there are many factors that should be considered in evaluating its medicinal value. These include the drug's side effects, methods of administration, and availability and comparability of alternatives. However, marijuana's categorization as a Schedule I controlled substance creates additional concerns for researchers, physicians, and patients. As such, the College adopts the following positions on medical marijuana:

**Position 1: ACP supports programs and funding for rigorous scientific evaluation of the potential therapeutic benefits of medical marijuana and the publication of such findings.**

Preclinical and clinical research and anecdotal reports suggest numerous potential medical uses for marijuana. Unfortunately, the debate surrounding marijuana's legalization for general use has obscured scientific findings. Current available data suggest numerous indications for cannabinoids, especially antiemesis, appetite stimulation, and pain relief. For patients with AIDS or those undergoing chemotherapy, who suffer severe pain, nausea, and appetite loss, cannabinoid drugs may provide symptom relief not found in any other medication. The data supporting cannabinoid use for the relief of muscle spasticity and movement disorders is promising, but further research is needed to clarify the roles of cannabinoids in treating these

conditions. For epilepsy and glaucoma, the data is much less convincing, and many of the reports supporting marijuana use for these conditions remain anecdotal. In addition, while the therapeutic effects of THC are well established, less is known about the effects and potential indications of other cannabinoids. Additional research is needed to clarify both the therapeutic properties of cannabinoids and their effects on symptom management. The IOM recommended the following guidelines for clinical trials of marijuana for medical use:

- Clinical trials should involve only short-term use (less than 6 months);

- Clinical trials should be conducted in patients for whom there is a reasonable expectation of efficacy;

- Clinical trials should be approved by institutional review boards; and

- Clinical trials should collect efficacy data (29).

**Position 1a: ACP supports increased research for conditions where the efficacy of marijuana has been established to determine optimal dosage and route of delivery.**

To date, much of the research into the medicinal properties of marijuana has been on oral and smoked forms of THC. The pharmacokinetics of oral and smoked THC differ greatly and therefore have varying implications. The oral, synthetic THC has low and variable bioavailability (30). Oral THC is slow in onset of action but produces more pronounced, and often unfavorable, psychoactive effects that last much longer than those experienced with smoking (31). On the other hand, smoked THC is quickly absorbed into the blood and effects are experienced immediately. Studies have found that patients prefer the immediate effect on symptoms that occurs after smoking marijuana (32, 33). Therefore, there may be some patient populations (e.g., cancer patients who experience nausea and vomiting during chemotherapy) for whom the inhalation route might offer advantages over the currently available capsule formulation (34). Also, many cancer and HIV/AIDS patients may prefer smoking over swallowing a pill.

However, examining the effects of smoked marijuana can be difficult because the absorption and efficacy of THC on symptom relief is dependent on subject familiarity with smoking and inhaling. Experienced smokers are more competent at self-titrating to get the desired results. Thus, smoking behavior is not easily quantified or replicated (35). Other problems with smoked marijuana include difficulty in attempting to match placebo control against smoked marijuana (especially for those with previous marijuana experience) and the no-smoking policy of hospitals and public facilities. Overall, the clinical utility of smoked marijuana is limited by its short duration of action and accompanying side effects. Although the long-term effects of smoked marijuana may not be relevant for patients with terminal illnesses or debilitating symptoms, the residual effects of smoked marijuana are prohibitive for long-term medical use. The IOM concluded that clinical trials of smoked marijuana should be the first step toward the possible development of nonsmoked, rapid-onset cannabinoid delivery systems (36). Additional research is also needed to determine optimal dosage of cannabinoid drugs for symptom management.

Current data has shown that for some indications, particularly pain relief, there is a small margin between clinical benefit and unacceptable adverse events.

**Position 1b: Medical marijuana research should not only focus on determining drug efficacy and safety but also on determining efficacy in comparison with other available treatments.**

Most of the conditions for which efficacy of cannabinoid drugs has been determined already have well-established and effective treatments. However, little is known about how cannabinoids perform in comparison with these other treatments. Because of the availability of an oral form of THC, several studies have compared the effectiveness of both smoked THC and Marinol® to other antiemetic drugs (mainly prochlorperazine). Although the results from these studies varied, they all found that THC was as effective as prochlorperazine at controlling nausea and vomiting. Several studies also found that the combination of THC and other antiemetics was more effective than either drug alone. Research suggests that cannabinoids may have synergistic effects that may indicate its use as an adjunctive therapy to both antiemetics for nausea and vomiting and opioids for pain relief. Further research is needed to compare cannabinoids' efficacy and safety with current treatments and to examine their potential role in combination therapy for some conditions.

**Position 2: ACP encourages the use of nonsmoked forms of THC that have proven therapeutic value.**

The negative effects associated with long-term smoked marijuana use necessitate consideration of varying modes of cannabinoid delivery. Only 2 cannabinoid drugs are currently licensed for sale in the U.S. (dronabinol [Marinol ®] and nabilone [Cesamet ®]), and both are only available in oral form. While useful for some, these drugs have serious limitations. The oral route of administration hampers the effectiveness of THC because of slow absorption. In addition, swallowing a pill may not be feasible for patients with severe nausea and vomiting, for whom oral THC is indicated. To overcome the limitations of oral administration, researchers have focused on developing other nonsmoked, rapid-onset formulations.

Sativex®, an oromucosal spray of natural cannabis, was approved in June 2006 for prescription use in Canada to treat neuropathic pain in patients with MS. The manufacturer, GW Pharmaceuticals, received FDA approval to begin a U.S. clinical trial of Sativex for cancer patients in 2007.

The development of a vapor route for THC delivery offers promise for the future of medical marijuana research. A recent study found that THC administered through the Volcano® vaporizer resulted in higher plasma THC levels than smoked marijuana at both 30 and 60 minutes after administration. It also found that exhaled carbon monoxide increased very little after vapor compared with smoking (37). Those findings, along with patient preference for the vapor method, indicate opportunities for future clinical trials. Vaporization of THC offers the rapid onset of symptom relief without the negative effects from smoking. It allows patients to self-regulate their dosage immediately by ceasing inhalation when or if psychoactive effects become

unpleasant. Scientists are also developing a pulmonary dronabinol to be delivered with a pressurized metered-dosed inhaler. Preliminary studies show rapid absorption, but FDA approval remains distant.

**Position 3: ACP supports the current process for obtaining federal research-grade medical marijuana.**

Some scientists and physicians believe the procedures for obtaining marijuana for research and publishing research findings are particularly arduous because of the debate surrounding its legalization for general use (38). Marijuana's designation as a Schedule I controlled substance does pose a unique challenge for researchers. The federal government is the only legal producer of marijuana for medical research; scientists must therefore apply for both an Investigational New Drug Application (IND) from the FDA and a Schedule I license from the Drug Enforcement Administration (DEA) to receive and dispense marijuana through a designated pharmacy. The marijuana is provided by the National Institute on Drug Abuse (NIDA) in the National Institutes of Health (NIH). Through the Drug Supply Program, NIDA arranges for marijuana to be grown and processed through contracts with the University of Mississippi and the Research Triangle Institute. The University grows, harvests, and dries marijuana, and the Institute processes it into cigarettes. Researchers can obtain marijuana free of charge from NIDA through an NIH-approved grant to investigate marijuana or through a separate protocol review.

Because of the high biovariability in cannabis plants, obtaining research-grade cannabis is critical to conducting well-designed clinical trials on the safety and efficacy of marijuana and its cannabinoids. In addition, because of the drug's widespread general use and high potential for abuse, it is imperative that the federal process is followed for obtaining research-grade marijuana and conducting clinical trials.

**Position 4: ACP urges review of marijuana's status as a Schedule I controlled substance and its reclassification into a more appropriate schedule, given the scientific evidence regarding marijuana's safety and efficacy in some clinical conditions.**

Currently, marijuana is a Schedule I controlled substance, meaning it has no medicinal value and high potential for abuse. An evaluation by several Department of Health and Human Services agencies, including the FDA and NIDA, concluded that no sound scientific studies supported medical use of marijuana for treatment in the United States (39). This conflicts with a review by the IOM, which declared that "for patients such as those with AIDS or who are undergoing chemotherapy and who suffer simultaneously from severe pain, scientific studies support medical use of marijuana for treatment in the United States." The IOM also concluded that compared with other licit and illicit drugs, including alcohol, tobacco, and cocaine, "dependence among marijuana users is relatively rare and dependence appears to be less severe than dependence on other drugs." (40) A clear discord exists between the scientific community and federal legal and regulatory agencies over the medicinal value of marijuana, which impedes the expansion of research.

The concern that marijuana is a "gateway" drug also hinders opportunities to evaluate its potential therapeutic benefits. However, the IOM concluded that marijuana is a gateway drug only in the sense that its use normally precedes, rather than follows, initiation of other illicit drugs. Marijuana has not been proven to be the cause or even the most serious predictor of serious drug abuse. It is also important to note that the data on marijuana's role in illicit drug use progression only pertains to its nonmedical use (41).

Dronabinol, oral THC, is classified as a Schedule III substance. Recently, the DEA proposed a rule that would allow for classification of both synthetic and natural (derived from the cannabis plant) dronabinol products in Schedule III. Opiates are highly addictive yet medically effective substances and are classified as Schedule II substances. There is no evidence to suggest that medical use of opiates has increased perception that their illicit use is safe or acceptable (42). Given marijuana's proven efficacy at treating certain symptoms and its relatively low toxicity, reclassification would reduce barriers to research and increase availability of cannabinoid drugs to patients who have failed to respond to other treatments.

**Position 5: ACP strongly supports exemption from federal criminal prosecution; civil liability; or professional sanctioning, such as loss of licensure or credentialing, for physicians who prescribe or dispense medical marijuana in accordance with state law. Similarly, ACP strongly urges protection from criminal or civil penalties for patients who use medical marijuana as permitted under state laws.**

Reclassification of marijuana into a more appropriate schedule would remove the legal stresses that can affect the physician–patient relationship. Although marijuana is a Schedule I drug, 12 states currently have legislation permitting its use for medicinal purposes. Similar legislation is pending in New York and support has been shown for legislation in Minnesota and New Hampshire. The movement among states to permit the use of marijuana for certain conditions was spearheaded by California's Proposition 215, which received the support of 56% of state voters in 1996. This led to the establishment of a $3 million state-funded Center for Medicinal Cannabis Research (CMCR) at the University of California's San Diego and San Francisco campuses. CMCR receives the marijuana for its research from NIDA.

Despite these state laws and initiatives, possession of marijuana is a punishable federal offense. In 2005, the Supreme Court ruled that state laws confer no immunity from prosecution under federal law, which does not include a medical exemption to the prohibition on marijuana possession. This creates additional concerns for researchers, physicians, and patients. Physicians must be selective in their wording (when discussing the substance) so as not to appear that they are aiding or abetting patients in obtaining cannabis. In addition to the legalities, the lack of availability and standards on dose and route of delivery present medical concerns. Physicians cannot supervise and have very little control over their patient's behavior. Also, the quality of the drug is usually undeterminable.

## Conclusion

Evidence not only supports the use of medical marijuana in certain conditions but also suggests numerous indications for cannabinoids. Additional research is needed to further clarify the therapeutic value of cannabinoids and determine optimal routes of administration. The science on medical marijuana should not be obscured or hindered by the debate surrounding the legalization of marijuana for general use.

## Notes

1. **National Institutes of Health, Ad Hoc Expert Group.** Workshop on the Medical Utility of Marijuana Expert Report 1997. Accessed June 7, 2007 at www.nih.gov/news/medmarijuana/MedicalMarijuana.htm
2. **Hollister L.** Marijuana (Cannabis) as Medicine. Journal of Cannabis Therapuetics 2001; 1(1): 5-27.
3. **Grant I, Cahn BR.** Cannabis and Endocannabinoid Modulators: Therapeutic Promises and Challenges. Clinical Neuroscience Research 2005; 5: 185-99
4. **Robson P.** Therapeutic Aspects of Cannabis and Cannabinoids. British Journal of Psychiatry 2001; 178: 107-15.
5. **Joy JE, Watson SJ, Benson JA.** Marijuana and Medicine: Assessing the Science Base. National Academy of Sciences, Institute of Medicine. Washington, DC; 1999.
6. **Hollister L.** Marijuana (Cannabis) as Medicine. Journal of Cannabis Therapuetics 2001; 1(1): 5-27.
7. **Woolridge E, Barton S, Samuel J, Osorio J, Dougherty A, Holdcroft A.** Cannabis Use in HIV for Pain and Other Medical Symptoms. Journal of Pain and Symptom Management 2005; 29 (4): 358-67
8. **Abrams D, Hilton J, Leiser R, Shade S, Elbeik T, et al.** Short-Term Effects of Cannabinoids in Patients with HIV-Infection. Annals of Internal Medicine 2003; 139: 258-66.
9. **Beal J, Olson R, Lefkowitz L, Laubenstein, et al.** Long-Term Efficacy and Safety of Dronabinol for Acquired Immunodeficiency Syndrome-Associate Anorexia. Journal of Pain and Symptom Management 1997; 14(1): 7-14
10. **Musty R, Rossi R.** Effects of Smoked Cannabis and Oral $\Delta^{9-}$ Tetrahydrocannabinol on Nausea and Emesis After Cancer Chemotherapy: A Review of State Clinical Trials. Journal of Cannabis Therapeutics 2001; 1(1): 29-42.
11. **Joy JE, Watson SJ, Benson JA.** Marijuana and Medicine: Assessing the Science Base. National Academy of Sciences, Institute of Medicine. Washington, DC; 1999.
12. **Grant I, Cahn BR.** Cannabis and Endocannabinoid Modulators: Therapeutic Promises and Challenges. Clinical Neuroscience Research 2005; 5: 185-99
13. **American Medical Association.** Featured Report: Medical Marijuana. Chicago, IL; June 2001 citing Merrit JC, Crawford WJ, Alexander PC, Anduze AL, Gelbart SS. Effect of Marijuana on Intraocular and Blood Pressure in Glaucoma. Opthamology 1980; 87:222-28.

14. **Hampson AJ, Grimald M, Axelrod J, Wink D.** Cannabidiol and $\Delta^{9-}$ Tetrahydrocannabinol Are Neuroprotective Antioxidants. Proceedings of the National Academy of Sciences USA 1998; 95: 8268-73.
15. **American Medical Association.** Featured Report: Medical Marijuana. Chicago, IL; June 2001.
16. **Joy JE, Watson SJ, Benson JA.** Marijuana and Medicine: Assessing the Science Base. National Academy of Sciences, Institute of Medicine. Washington, DC; 1999.
17. **American Academy of Ophthalmology.** Complementary Therapy Assessment: Marijuana in the Treatment of Glaucoma. Accessed on June 12, 2007 at www.aao.org/education/guidelines/cta/loader.cfm?url=/commonspot/security/getfile.cfm&PageID=1216.
18. **Consroe P, Musty R, Rein J, Tillery W, Pertwee R.** The Perceived Effects of Smoked Cannabis on Patients with Multiple Sclerosis. European Neurology: 38: 44-48.
19. **American Medical Association.** Featured Report: Medical Marijuana. Chicago, IL; June 2001 citing Malec J, Harvey RF, Cayner JJ. Cannabis Effect on Spasticity In Spinal Cord Injury. Archives of Physical Medicine and Rehabilitation 1982: 63: 116-118.
20. **Abrams DI, Jay CA, Shade SB, Vizoso H, Reda H, Press S, et al.** Cannanbis in Painful HIV-Associated Sensory Neuropathy: A Randomized Placebo-Controlled Trial. Neurology 2007; 68: 515-21.
21. **Robson P.** Therapeutic Aspects of Cannabis and Cannabinoids. British Journal of Psychiatry 2001; 178: 107-15.
22. **Hollister L.** Marijuana (Cannabis) as Medicine. Journal of Cannabis Therapuetics 2001; 1(1): 5-27 citing Noyes R, Brunk DR, Avery DH, Canter A. The Analgesic Properties of delta-9-tetrahydrocannabinol and codeine. Clinical Pharmacology and Therapeutics 1975; 18:84-89.
23. **Blake DR, Robson P, Ho M, Jubb RW, McCabe CS.** Preliminary Assessment of the Efficacy, Tolerability and Safety of a Cannabis-Based Medicine (Sativex) in the Treatment of Pain Caused by Rheumatoid Arthritis. Rheumatology 2006; 45: 50-52.
24. **Wallace MS, et al.** Dose-dependent effects of smoked cannabis on capsaicin-induced pain and hyperalgesia in healthy volunteers. Anesthesiology 2007; 107: epub.
25. **Grant I, Cahn BR.** Cannabis and Endocannabinoid Modulators: Therapeutic Promises and Challenges. Clinical Neuroscience Research 2005; 5: 185-99
26. **Joy JE, Watson SJ, Benson JA.** Marijuana and Medicine: Assessing the Science Base. National Academy of Sciences, Institute of Medicine. Washington, DC; 1999.
27. **Joy JE, Watson SJ, Benson JA.** Marijuana and Medicine: Assessing the Science Base. National Academy of Sciences, Institute of Medicine. Washington, DC; 1999.
28. **Joy JE, Watson SJ, Benson JA.** Marijuana and Medicine: Assessing the Science Base. National Academy of Sciences, Institute of Medicine. Washington, DC; 1999.
29. **Joy JE, Watson SJ, Benson JA.** Marijuana and Medicine: Assessing the Science Base. National Academy of Sciences, Institute of Medicine. Washington, DC; 1999.
30. **American Medical Association.** Featured Report: Medical Marijuana. Chicago, IL; June 2001.
31. **Beal J, Olson R, Lefkowitz L, Laubenstein, et al.** Long-Term Efficacy and Safety of Dronabinol for Acquired Immunodeficiency Syndrome-Associate Anorexia. Journal of Pain and Symptom Management 1997; 14(1): 7-14

32. **Abrams D, Hilton J, Leiser R, Shade S, Elbeik, T et al.** Short-Term Effects of Cannabinoids in Patients with HIV-Infection. Annals of Internal Medicine 2003; 139: 258-66.
33. **Musty R, Rossi R.** Effects of Smoked Cannabis and Oral Δ [9]- Tetrahydrocannabinol on Nausea and Emesis After Cancer Chemotherapy: A Review of State Clinical Trials. Journal of Cannabis Therapeutics 2001; 1(1): 29-42.
34. **National Institutes of Health, Ad Hoc Expert Group.** Workshop on the Medical Utility of MarijuanaExpert Report 1997. Accessed June 7, 2007 at www.nih.gov/news/medmarijuana/MedicalMarijuana.htm
35. **Joy JE, Watson SJ, Benson JA.** Marijuana and Medicine: Assessing the Science Base. National Academy of Sciences, Institute of Medicine. Washington, DC; 1999.
36. **Joy JE, Watson SJ, Benson JA.** Marijuana and Medicine: Assessing the Science Base. National Academy of Sciences, Institute of Medicine. Washington, DC; 1999.
37. **Abrams DI, Vizoso HP, Shade SB, Jay C, Kelly ME, Benowitz NL.** Vaporization as a Smokeless Cannabis Delivery System: A Pilot Study. Clinical Pharmacology & Therapeutics 2007; advanced online publication.
38. **Sorrel, AL.** Arrested Development: The Case for Studying Medical Marijuana. *AMNews* July 10, 2006. Accessed April 2, 2007 at www.ama-assn.org/amednews/2006/07/10/gvsa0710.htm
39. U.S. Food and Drug Administration Press Release: Inter-Agency Advisory Regarding Claims That Smoked Marijuana Is Medicine. April 20, 2006. Accessed June 12, 2007 at www.fda.gov/bbs/topics/NEWS/2006/NEW01362.html
40. **Joy JE, Watson SJ, Benson JA.** Marijuana and Medicine: Assessing the Science Base. National Academy of Sciences, Institute of Medicine. Washington, DC; 1999.
41. **Joy JE, Watson SJ, Benson JA.** Marijuana and Medicine: Assessing the Science Base. National Academy of Sciences, Institute of Medicine. Washington, DC; 1999.
42. **Joy JE, Watson SJ, Benson JA.** Marijuana and Medicine: Assessing the Science Base. National Academy of Sciences, Institute of Medicine. Washington, DC; 1999.

Send to Printer << Back to Article

examiner.com

# Local

## Pot clinic to become a legitimate business

(Cindy Chew/The Examiner)
Michael Welch operates a medical marijuana clinic in downtown San Francisco and will be the first to acquire a permit to legally do so.

Joshua Sabatini, The Examiner
2008-06-13 10:00:00.0
Current rank: # **23** of 9,576

**SAN FRANCISCO -**
Michael Welch will soon have the distinct honor of acquiring the very first permit to legally operate a medical marijuana dispensary in San Francisco.

His store, Sanctuary, at 600 O'Farrell St., is across the street from an electronics repair shop and near a Subaru auto shop and a hair salon.

The medical marijuana clinic has been in operation for three and half years — it opened in the wake of Proposition 215, a state ballot initiative passed in 1996 legalizing the use and sale of marijuana to those suffering illness, infirmity and chronic pain. Until 2005, there were no city rules governing pot clubs and their proliferation prompted public outcry.

State medical marijuana laws do not prevent federal law enforcement of the nation's laws, however, and The City's issuance of its first permit comes as club owners and their landlords are under the threat of being shutdown by the federal Drug Enforcement Agency.

Despite risk of federal prosecution, Welch and others say they are not staying in the underground.

"When you can see the look in somebody's face of a 78-year-old man who has glaucoma and is blind ... and then watch him medicate and to see him relax and laugh and tell jokes and be alive again — that's why I do it," said Welch, 42.

DEA Special Agent Javier Pena said medical marijuana dispensaries in the Bay Area "are all illegal."

"Anyone who owns one of the clubs is at risk of being arrested and charged," Pena said.

Not only does Welch have to brave the federal threat, he also had to deal with an "arduous" city permit process. Welch paid the $10,000 application fee and sunk about $23,000 into his leased 270-square-foot ground-floor space to bring it up to muster under the regulations, such as lowering the counter height and widening the entryway door.

Welch is waiting for his permit bill to arrive in the mail, which will cost about $3,000, and once he pays, he will receive the permit.

City legislators adopted rules governing the marijuana dispensaries in November 2005 in response to complaints that there were too many pot sellers, and that the businesses were often clustered together, in some cases near schools, attracting drug dealers and crime.

The law required clubs to obtain city permits by June 2006, but the deadline was extended twice, after city departments were slow to act on the applications.

There are 25 pending pot club permits. On Thursday, the Public Health Department approved a permit for the Re-leaf Center to move into a new location at 1284 Mission St., according to Larry Kessler, medical marijuana club inspector for the health department.

*jsabatini@sfexaminer.com*

## By the numbers

*One medical marijuana dispensary will soon become the first ever to receive a city permit to operate.*

**25** Number of clubs in business with pending permit applications

**1** Number of permits issued for marijuana delivery service

**June 2006** Original deadline for pot clubs to obtain permits

**January 2009** Existing deadline for pot clubs to obtain permits

*Source: Public Health Department*

*Examiner*
INCLUDED